**BOUTIN JONES INC.**
Robert D. Swanson SBN 162816
rswanson@boutinjones.com
555 Capitol Mall, Suite 1500
Sacramento, CA 95814-4603
T: (916) 321-4444/F: (916) 442-7597

**BASS BERRY & SIMS PLC**
Brian D. Roark (*Admitted Pro Hac Vice*)
broark@bassberry.com
Taylor M. Sample (*Admitted Pro Hac Vice*)
taylor.sample@bassberry.com
150 Third Avenue South, Suite 2800
Nashville, TN 37201
T: (615) 742-7753/F: (615) 742-2704

*Attorneys for Defendants Envision Healthcare
Corporation, et al.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JACK WATERS.<br><br>        Plaintiffs,<br><br>v.<br><br>ENVISION HEALTHCARE CORPORATION., ET AL.,<br><br>        Defendants. | **Case No.  2:19-cv-0873-TLN**<br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT PER FRCP 12(b)(6)**<br><br>Date:  April 21, 2022<br>Time:  2:00 p.m.<br>Courtroom:  2<br><br>Honorable Troy L. Nunley |

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT..........................................................................................1

BACKGROUND ...........................................................................................................2

I.      The Parties ......................................................................................................2

II.     Relator's Allegations ......................................................................................3

ARGUMENT ................................................................................................................4

I.      Relator's Lawsuit is Barred by the Public Disclosure Bar. .............................4

        A.      Numerous Public Disclosures Occurred Prior to Relator's Lawsuit. ...............5

        B.      Relator's Allegations are Substantially Similar to Prior Public Disclosures. ....8

        C.      Relator Is Not an Original Source...................................................................11

II.     Relator Fails to State a Claim under Rules 12(b)(6) and 9(b). ..................................12

        A.      Relator's Alleged Schemes Are Not Violations of the AKS. .........................13

        B.      Relator Fails to Plead an AKS Violation at St. George. ................................14

        C.      Relator Fails to Plead a Nationwide Scheme. ................................................15

III.    Relator's Second, Third, and Fourth Claims for Relief Should also be Dismissed.....17

CONCLUSION.............................................................................................................18

# TABLE OF AUTHORITIES

PAGE(S)

Cases

*A-1 Ambulance Serv., Inc. v. California*,
  202 F.3d 1238 (9th Cir. 2000) ...................................................................................5

*Ebeid ex rel. United States v. Lungwitz*,
  616 F.3d 993 (9th Cir. 2010) ...................................................................................13

*Frazier ex rel. U.S. v. Iasis Healthcare Corp.*,
  392 F. App'x 535 (9th Cir. 2010) ...........................................................................13

*Graham Cnty. Soil & Water Cons. Dist. v. U.S. ex rel. Wilson*,
  559 U.S. 280 (2010).....................................................................................................5

*Silbersher v. Valeant Pharms. Int'l, Inc.*,
  445 F. Supp. 3d 393 (N.D. Cal. 2020) ......................................................................6

*U.S. ex rel. Lee v. Corinthian Colls.*,
  655 F.3d 984 (9th Cir. 2011) ...................................................................................16

*U.S. ex rel. Calilung v. Ormat Indus., Ltd.*,
  2015 WL 1321029 (D. Nev. Mar. 24, 2015) ............................................................5

*U.S. ex rel. Campie v. Gilead Scis.*,
  862 F.3d 890 (9th Cir. 2017) ...................................................................................12

*U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*,
  2015 WL 4892259 (S.D. Cal. Aug. 17, 2015) ....................................................8, 12

*U.S. ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*,
  2021 WL 3240280 (E.D.N.Y. July 30, 2021)............................................................8

*U.S. ex rel. Hong v. Newport Sensors, Inc.*,
  2016 WL 8929246 (C.D. Cal. May 19, 2016) ...........................................................5

*U.S. ex rel. L. Project for Psychiatric Rts. v. Matsutani*,
  2010 WL 11526903 (D. Alaska Sep. 24, 2010) ......................................................11

*U.S. ex rel. Martinez v. KPC Healthcare Inc.*,
  2017 WL 10439030 (C.D. Cal. June 8, 2017) ........................................................16

*U.S. ex rel. Mateski v. Raytheon Co.*,
  816 F.3d 565 (9th Cir. 2016) .....................................................................................8

*See e.g., U.S. ex rel. Miller v. Cmty. Recovery Res., Inc.*, No. 2:13-cv-1004, Dkt. No. 88, at 16
(E.D. Cal. May 23, 2017) ........................................................................................................17

*U.S. ex rel. Pasqua v. Kan-Di-Ki, LLC*,
2012 WL 12895229 (C.D. Cal. June 18, 2012) .......................................................................17

*U.S. ex rel. Silingo v. Mobile Med. Examination Servs., Inc.*,
2015 WL 12752552 (C.D. Cal. Sept. 29, 2015) ......................................................................16

*U.S. ex rel. Solis v. Millennium Pharm., Inc.*,
445 F. Supp. 3d 786 (E.D. Cal. 2020).................................................................................4, 5

*U.S. ex rel. Solis v. Millennium Pharm., Inc.*,
885 F.3d 623 (9th Cir. 2018) .........................................................................................5, 8, 10

*U.S. ex rel. Swan v. Covenant Care, Inc.*,
279 F. Supp. 2d 1212 (E.D. Cal. 2002) ...................................................................................12

*U.S. ex rel. Vanasco v. AmSurg Corp., et al*, No. 8:16-cv-00288 (M.D. Fla. 2016)............... *passim*

*U.S. ex rel. Winkelman v. CVS Caremark Corp.*,
827 F.3d 201 (1st Cir. 2016)....................................................................................................12

*United States v. Cath. Healthcare W.*,
445 F.3d 1147 at n.1 (9th Cir. 2006)..........................................................................................6

*United States v. Ctr. for Diagnostic Imaging, Inc.*,
787 F. Supp. 2d 1213 (W.D. Wash. 2011)................................................................................15

*United States v. Kiewit Pac. Co.*,
41 F. Supp. 3d 796 (N.D. Cal. 2014) ..........................................................................................6

*Universal Health Serv., Inc. v. U.S. ex rel. Escobar*,
136 S. Ct. 1989 (2016)..............................................................................................................13

**Statutes**

31 U.S.C. § 3729(a)(1)(A) ...................................................................................................17, 18

31 U.S.C. § 3729(a)(1)(B)...........................................................................................................17

31 U.S.C. § 3729(a)(1)(C)...........................................................................................................17

31 U.S.C. § 3729(a)(1)(G)...........................................................................................................17

31 U.S.C. § 3730(e)(4)(A) .............................................................................................................5

31 U.S.C. § 3730 (e)(4)(B)..........................................................................................................11

Defendants' Memorandum in Support of Motion to Dismiss Complaint

1157747.3

42 U.S.C. § 1320a-7b(b) ....................................................................................13

**Rules**

Federal Rule of Civil Procedure 8(a) ..............................................................12

Federal Rule of Civil Procedure 9(b) ...................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) ..................................................12,18

**Other Authorities**

HHS-OIG Advisory Opinion No. 21-15, 2021 WL 5497672 (Nov. 5, 2021) .................................13

Defendants' Memorandum in Support of Motion to Dismiss Complaint

1157747.3

**PRELIMINARY STATEMENT**

Relator Jack Waters worked as a certified registered nurse anesthetist ("CRNA") at St. George Endoscopy Center in St. George, Utah, where he was paid a flat daily rate for providing anesthesia services to patients. Waters alleges that paying him a flat rate instead of allowing him to bill directly for his services amounted to a forced kickback from him to the surgery center for allowing him to work at the center. He further alleges that profits from his anesthesia services were distributed to owners of the center, including its physician-owners, which amounted to kickbacks to those physicians. Waters alleges that the anesthesia model in place at St. George violates the Anti-Kickback Statute ("AKS") and is used by Defendant AmSurg Corp. in more than 60 surgery centers around the country.

Waters filed the instant *qui tam* lawsuit under the False Claims Act ("FCA") on May 15, 2019. After investigating his allegations, the United States declined to intervene. Waters now seeks to prosecute the lawsuit on his own, but the FCA prohibits *qui tam* lawsuits based on allegations that are "substantially the same" as publicly disclosed information, unless the relator is an "original source" who materially adds to the publicly disclosed information. Known as the "public disclosure bar," this FCA provision prohibits parasitic actions that freeload off previous disclosures of fraud.

For years, AmSurg's public securities filings disclosed that its surgery centers contracted with anesthesia professionals for anesthesia services, that the surgery centers generated revenue from those services, that profits from anesthesia were distributed to the surgery centers' owners, including physician owners, and that these arrangements could pose a risk of violating the AKS. Waters' own Complaint quotes extensively from these securities filings. Additionally, in 2016, an anesthesiologist at an AmSurg surgery center in Orlando filed a *qui tam* lawsuit raising nearly identical allegations that AmSurg's anesthesia business model violated the AKS by paying him less than what it collected for his services and distributing the difference as profit to the surgery center's owners, including its physician owners. The anesthesiologist also alleged that AmSurg had implemented this same model at its surgery centers across the country. The United States investigated his allegations for two years before declining to intervene in 2018, at which point his case was unsealed and became public. Finally, several published articles and other news media

have questioned the legality of certain types of anesthesia arrangements, including those in use at AmSurg centers. Waters' allegations are substantially similar to these public disclosures, and he alleges no facts that materially add to what has already been disclosed. He has filed the quintessential parasitic lawsuit intended to be barred by the FCA's public disclosure bar.

Even if it were not precluded by the public disclosure bar, the lawsuit should nonetheless be dismissed because it fails to plead the alleged fraud with particularity under Federal Rule of Civil Procedure 9(b). Despite working only at St. George Endoscopy Center, Waters seeks to bring claims against every AmSurg surgery center with a similar anesthesia model, but he alleges no facts as to any other center beyond information gleaned from public documents.

Because Waters' allegations are barred by the public disclosure bar and fail to plead requisite facts showing that any Defendant defrauded federal government healthcare programs, his Complaint should be dismissed.

## **BACKGROUND**

### I.    The Parties

Envision Healthcare Corporation acquired AmSurg Corp., along with various subsidiaries—including, AmSurg Holdings, Inc., AmSurg Finance, Inc., and AmSurg Anesthesia Management, LLC—via merger in December 2016. (Compl. ¶ 10.) For purposes of this memorandum, these corporate entities are hereafter collectively referred to as "AmSurg."

AmSurg owns a majority interest in approximately 260 freestanding ambulatory surgery centers ("ASCs")—including endoscopy centers, eye surgery centers and surgical specialty centers—located in 35 states and the District of Columbia. (*Id.*) Physicians who perform procedures at those ASCs typically own the remaining minority interests. (*Id.* ¶¶ 163–64.) Approximately 60 of the ASCs have wholly-owned subsidiaries responsible for providing anesthesia services to patients receiving procedures at the ASC. (*See id.* ¶¶ 16–132.) Relator Jack Waters has sought to sue all of those entities as Defendants in this action. (*Id.*)

Waters is a CRNA who provided anesthesia services at an AmSurg-owned ASC in St. George, Utah: St. George Endoscopy Center, LLC ("St. George ASC"). (*Id.* ¶ 9.) From April 9, 2012 through the time he filed this lawsuit, Waters provided those services as an independent

1  contractor for St. George ASC's wholly-owned anesthesia subsidiary: AmSurg St. George

2  Anesthesia, LLC ("St. George Anesthesia") (collectively, "St. George"). (*Id.*)

3  **II.    Relator's Allegations**

4         Waters alleges that Defendants set up a series of anesthesia management companies to

5  contract with independent licensed anesthesia providers who provide care at surgery centers in

6  exchange for signing over their rights to bill and collect anesthesia reimbursement. (*Id.* ¶ 2.) Waters

7  contends that requiring the anesthesia providers to accept per diem rates for their services that are

8  less than the anesthesia revenue constitutes a kickback from the anesthesia providers to Defendants.

9  (*Id.*)   Additionally, Waters alleges that Defendants share a portion of the anesthesia revenue with

10  the ASC physician owners in exchange for those physicians' referrals. (*Id.* ¶ 3.)

11         Waters was paid a daily per diem rate of $1,025 to provide anesthesia services and $500 per

12  month to perform administrative duties for St. George Anesthesia. (*Id.* ¶¶ 152, 154.)  Waters

13  estimates that he and one other CRNA at St. George performed an average of 30 endoscopy cases

14  per day, for which he estimates St. George Anesthesia generated annual revenues of $1.4 million

15  per year. (*Id.* ¶ 157.) Subtracting what St. George Anesthesia paid him and the other CRNA, Waters

16  estimates that the annual profit on the anesthesia services was $980,000 or 71% of its anesthesia

17  revenue. (*Id.* ¶ 158.)  Waters alleges that St. George indirectly provided the physician minority

18  owners with a share of the anesthesia profits based on those physicians' ownership interest in the

19  center. (*Id.* ¶¶ 149, 159.)

20         In 2012 or 2013, Waters asked AmSurg's Regional Director for Ambulatory Anesthesia

21  Services if his independent contractor relationship and assignment of claims to St. George

22  Anesthesia was legal. (*Id.* ¶ 160.) The Regional Director assured him that it was. (*Id.*) Years later,

23  in 2019, Waters expressed concern about his arrangement to a non-owner physician at the center

24  and with a clinical consultant. (*Id.* ¶161.)  The clinical consultant raised the issue with AmSurg's

25  Regional Vice President of Operations, who responded that Waters' compensation was "fair market

26  value" for his services. (*Id.*)

27         Waters alleges that St. George's anesthesia business structure was part of AmSurg's

28  "nationwide" business model, where anesthesia providers were paid a per diem rate and anesthesia

profits were distributed to the ASC owners.  (*Id.* ¶¶ 162, 168.)  His basis for this claim is that the "business model" was publicly described in AmSurg's securities filings, including that:

- AmSurg entities had "'entered into certain arrangements for professional services, including arrangements for anesthesia services.'" (*Id.* ¶¶ 171, 183 (quoting 2012 and 2015 10-K).)
- Revenues from ASCs were derived from "'charges for anesthesia services provided by medical professionals employed or contracted by our centers.'" (*Id.* ¶ 167 (quoting 2015 10-K).)
- Cash distributions at AmSurg ASCs were made to AmSurg or physician owners equal to the "'percentage ownership interest in the entity.'" (*Id.* ¶ 164 (quoting 2015 10-K).)

Waters alleges that Defendants *knowingly* violated the FCA because AmSurg's securities filings disclosed that its entities did "not meet all of the criteria of either of the investment interest safe harbors or the surgery center safe harbor" and therefore did "not qualify for safe harbor protection from government review or prosecution under the anti-kickback statute."  (*Id.* ¶ 183.) Waters notes that AmSurg's securities filings even reference Advisory Opinions issued by the Department of Health and Human Services Office of Inspector General ("HHS OIG") noting that physician owners' receipt of profits through ownership in anesthesia companies that contract with independent anesthetists could under some circumstances risk violating the AKS.  (*Id.* ¶ 177.)

Waters filed this lawsuit under seal on May 15, 2019. (Dkt. No. 1.)  The Department of Justice investigated the allegations.  Following more than two years of investigation, the United States declined to intervene on October 13, 2021.  (Dkt. No. 17.)  After the lawsuit was unsealed, Waters served the complaint, which Defendants now move to dismiss.

## **ARGUMENT**

### I.    **Relator's Lawsuit is Barred by the Public Disclosure Bar.**

Under the FCA, the court "shall dismiss" a purported *qui tam* action "if substantially the same allegations or transactions" were "publicly disclosed" unless the relator is an "original source of the information."  31 U.S.C. § 3730(e)(4)(A).  This "public disclosure bar" strives to "'strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits" in which "opportunistic plaintiffs who have no significant information to contribute of their own'" seek to collect a share of the government's recovery.  *U.S. ex rel. Solis v. Millennium Pharm., Inc*.,

445 F. Supp. 3d 786, 795 (E.D. Cal. 2020) (quoting *Graham Cnty. Soil & Water Cons. Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 295 (2010)).

The public disclosure bar is triggered if "(1) the disclosure at issue occurred through one of the channels specified in the statute; (2) the disclosure was 'public'; and (3) the relator's action is 'based upon' the allegations or transactions publicly disclosed." *U.S. ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623, 626 (9th Cir. 2018) (internal quote omitted). Waters' current allegations were publicly disclosed prior to his filing suit, and he does not qualify as an original source. Because it violates the public disclosure bar, his lawsuit must be dismissed with prejudice.

**A.      Numerous Public Disclosures Occurred Prior to Relator's Lawsuit.**

A disclosure is considered "public" under the public disclosure bar if it appears in "a Federal . . . civil . . . hearing in which the Government or its agent is a party," in a "Federal report," or in "the news media." 31 U.S.C. § 3730(e)(4)(A). Here, the Complaint alleges conduct that was previously disclosed by (1) AmSurg's federal securities filings, (2) a nearly identical *qui tam* lawsuit, and (3) various news media publications questioning the anesthesia business model challenged by Waters' lawsuit.

AmSurg's securities filings are considered federal "reports" under the public disclosure bar because they are "required by the SEC and the information contained therein [is] made readily available to the public on easily navigable websites by the SEC." *U.S. ex rel. Calilung v. Ormat Indus., Ltd.*, 2015 WL 1321029 at *16 (D. Nev. Mar. 24, 2015). A previously-filed *qui tam* lawsuit is also considered a public disclosure under the public disclosure bar. *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1244 (9th Cir. 2000). Likewise, articles and reports that are published online fall into the category of "news media" under the public disclosure bar. *U.S. ex rel. Hong v. Newport Sensors, Inc.*, 2016 WL 8929246, at *5 (C.D. Cal. May 19, 2016), *aff'd sub nom.*, 713 F. App'x 724 (9th Cir. 2018) ("Information publicly available on the Internet generally qualifies as

/ / /

/ / /

/ / /

/ / /

'news media.'").[1]

Facts barring subsequent allegations of fraud may be publicly disclosed either through direct allegations of fraud or disclosure of transactions that give rise to an inference of fraud. *United States v. Kiewit Pac. Co.*, 41 F. Supp. 3d 796, 803 (N.D. Cal. 2014). "'[T]he substance of the disclosure need not contain an explicit 'allegation' of fraud . . . so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain.'" *Id.* (quoting *A–1 Ambulance Serv.*, 202 F.3d at 1243). Public information also need not be derived from a single source, but can be aggregated for purposes of the public disclosure bar. *United States v. Cath. Healthcare W.*, 445 F.3d 1147, 1151 at n.1 (9th Cir. 2006).

The public documents in this case—AmSurg's securities filings, the *Vanasco* litigation, and the news articles—disclosed the "material elements" of the fraud now alleged by Waters. The premise of Waters' case is that AmSurg's anesthesia business model is unlawful because it pays anesthesia providers a daily rate instead of allowing them to bill directly for their services and then distributes the profits from anesthesia services to the ASC owners, including physician owners, in violation of the AKS. (Complaint ¶¶ 2–3.) Although Defendants strongly dispute Waters' characterization, the material elements of this business model were publicly disclosed for years in AmSurg's SEC filings, which Waters quotes throughout his Complaint. These filings disclosed:

- AmSurg's ASC revenues included revenues derived from charges for anesthesia services provided by medical professionals employed or contracted by the ASCs;
- The ASCs made distributions to physician owners equal to their percentage ownership interests in the entity;
- These arrangements did not fall within any statutory or regulatory safe harbor under the AKS; and
- The prospect that these arrangements could give rise to a violation of the law.

(*See* Exhibit 1 at 4, 5, 8, 13, 14, 15, 18, and 19, (AmSurg 10-K filings)); (*see also* Compl. ¶¶ 183–84 (quoting similar language from AmSurg 2012 10-K filing).)

---

[1]    For purposes of applying the FCA's public disclosure bar, the court may consider judicially noticeable materials on a motion to dismiss. *See Silbersher v. Valeant Pharms. Int'l, Inc.*, 445 F. Supp. 3d 393, 400 (N.D. Cal. 2020). Defendants have thus contemporaneously filed a Request for Judicial Notice of the publicly-accessible documents referred to in this Memorandum of Law.

1157747.3

The material elements of Waters' case were also disclosed in 2016 by Dr. Stephen Vanasco, who filed a *qui tam* lawsuit against AmSurg raising nearly identical allegations. *U.S. ex rel. Vanasco v. AmSurg Corp., et al,* No. 8:16-cv-00288 (M.D. Fla. 2016) ("*Vanasco* Litigation"). Dr. Vanasco, who provided anesthesia services at an AmSurg ASC in Orlando, Florida, alleged that AmSurg paid anesthesia providers a significantly lower rate than the revenue generated by their services and then divided those profits with the physician owners of the ASC. (*See* Exhibit 2 ¶¶ 92–95, (*Vanasco* Complaint).) Dr. Vanasco alleged that this was "an illegal kickback," and that AmSurg "had instituted the same or similar scheme with physicians at surgery centers around the country." (*Id.* ¶ 98.) After the United States investigated Dr. Vanasco's allegations, it declined to intervene. (Exhibit 3, (*Vanasco* Notice of Declination).) The case was unsealed and dismissed in 2018.

Finally, numerous publications have questioned the legality of ASC physician owners receiving profits from anesthesia services provided at their centers. To provide just a few examples, in 2014, the American Society of Anesthesiologists ("ASA") published multiple public letters on its website about ASCs employing business models that allowed them "to capture the revenue stream from their referrals for anesthesia services," which the ASA characterized as "fraudulent and abusive." (Exhibit 4, (ASA Ltr. to OIG).) In 2016, the American Bar Association's Health Law Section published an article titled *Something Ventured: The Continued Scrutiny of ASC-Anesthesia Joint Ventures*, discussing the continued implementation and scrutiny of various anesthesia models, including an "Employment/Independent Contractor Model" under which an ASC engages anesthetists as independent contractors, reassigns the right bill and collect for their anesthesia services, and allows the income from the anesthesia services to be distributed to all physician owners. (Exhibit 5, (ABA Article).) And, in 2018, just six months before filing this lawsuit, Relator's counsel published an article online detailing what they believe to be "common models" and "problematic arrangements" between ASC physician-owners and anesthesia providers. (Exhibit 6, (Nelson Hardiman Article).)

The securities filings, the *Vanasco* litigation, and the news articles individually and collectively disclose the "material elements" of the claims brought by Waters. They were more than sufficient to have "put the government on notice to investigate the alleged fraud before [the relator]

1    filed his complaint." *U.S. ex rel.* Solis*, 885 F.3d at 627.

2         **B.      Relator's Allegations are Substantially Similar to Prior Public Disclosures.**

3         "[F]or a relator's allegations to be 'based upon' a prior public disclosure, the publicly

4    disclosed facts need not be identical with, but only *substantially similar* to, the relator's allegations."

5    *U.S. ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 573 (9th Cir. 2016) (citation omitted).   The

6    allegations in Waters' Complaint are substantially similar to the prior public disclosures.

7         First, Waters' allegations are substantially similar to AmSurg's SEC disclosures that the

8    Complaint cites and quotes extensively.   (*See e.g.,* Compl. ¶¶ 163–176.)   Not only are the SEC

9    filings the sole basis for alleging AmSurg's "nationwide business model," the Complaint also relies

10   on them to plead that AmSurg "knew" that the government had expressed concern about sharing

11   anesthesia revenues with referring physicians.   (*See e.g., id* ¶¶ 176–84.)

12        In a similar case, *U.S. ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.,*

13   2021 WL 3240280 (E.D.N.Y. July 30, 2021), the court held that SEC filings barred a would-be

14   relator's action.   The relator had alleged that Fresenius violated the AKS by paying more than fair

15   market value to purchase physician-owned dialysis centers as inducement for the physicians'

16   continued referrals to the centers.   *Id.* at *4.   The court held that Fresenius' SEC filings barred the

17   lawsuit, given that they disclosed that: (1) the centers were owned and operated by joint ventures in

18   which physicians owned a minority interest and referred their patients; (2) the joint ventures

19   complied with many of the AKS safe harbor criteria, but did not satisfy all of the elements of any

20   one safe harbor; and (3) if it were determined that one or more joint venture violated the AKS,

21   Fresenius would be forced to restructure or terminate them.   *Id.* at *2; *see also U.S. ex rel. Carter v.*

22   *Bridgepoint Educ., Inc.*, 2015 WL 4892259, at *6 (S.D. Cal. Aug. 17, 2015) (dismissing a *qui tam*

23   suit under the public disclosure bar where the defendant's SEC filings publicly disclosed "what later

24   became the very heart of [the] lawsuit").

25        The same is true here.   AmSurg's SEC filings publicly disclosed that its centers derive

26   revenue from anesthesia services provided by contracted or employed professionals, which revenue

27   is then shared with the centers' owners, including their physician owners.   (*See* Ex. 1 at 4, 6, 8, 10,

28   13, 15, 18, and 19, (AmSurg 10-K filings).)   Like *Fresenius*, the AmSurg SEC filings further

                                                            8

disclosed that OIG had issued Advisory Opinions concluding that under certain circumstances, some arrangements between physician-owned ASCs and anesthesia groups could potentially result in AKS violations, but that AmSurg's arrangements could be differentiated from those arrangements and complied with the AKS.  (*Id.* at 6, 10, 11, 15, and 19.)

Second, Relator's allegations are "substantially similar" to those raised in *Vanasco*:

| Allegation | *Vansaco* | *Waters* |
|---|---|---|
| AmSurg owns 51% of the ASC, and the physicians own 49%. | ¶ 79: "Orlando Endoscopy was doing business under the name of the two ASCs and was owned jointly as follows: 51% of both are owned by AmSurg Corp. and 49% of both are owned by the [GI doctors] who perform surgeries at the centers." | ¶ 149: "Relator was [] told by Scott Gines, the director of Defendant St. George Endoscopy Center, LLC that the ASC is owned by AmSurg (51%) and referring and non-referring physicians (49%)." |
| AmSurg and the physicians jointly own an anesthesia entity that provides anesthesia to the ASC. | ¶ 92–94: In July 2013, AmSurg Corp. entered into a joint venture with the GI Docs to establish its own in-house kickback scheme. | ¶ 151: Defendant St. George Endoscopy Center, LLC (which is jointly owned by AmSurg and the GI doctors) is the sole member and owner AmSurg St. George Anesthesia, LLC, which provides anesthesia services to the ASC.¶ ¶ |
| This anesthesia entity pays the anesthesia providers less than the total amounts collected for their | ¶ 95: "Under the In-House Scheme, AmSurg Corp. hired the anesthesia services personnel directly onto their payroll (at a significantly lower rate than the rate in effect under [a prior] | ¶ 155: "Defendant AmSurg St. George Anesthesia, LLC's contract requires relator to assign all his claims for anesthesia services to the company for billing and collection and to accept his per diem rates as |

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

9

| anesthesia services." | arrangement) to provide exclusive services for the ASCs." | total compensation for his services…" |
| The ASC retains the profits from the anesthesia services, and then gives a portion to the physician owners. | ¶ 96: "The difference between the low costs of the in-house anesthesia services and the revenue generated is significant and the owners of the ASCs retain the profits. AmSurg Corp. collects the profits from the anesthesia services providers and gives a portion to the GI Docs." | ¶ 3: "At several of the AMSURG ASCS, ENVISION engages in a further 'kickback' scheme by sharing a portion of this anesthesia revenue with the ASC Physician Owners in exchange for their referrals to the AMSURG ASCs."¶ ¶ |
| Sharing the anesthesia revenues with the physician owners violates the AKS. | ¶ 97: "This sharing of revenue constitutes an illegal kickback paid in return for the ASCs' exclusive use of AmSurg Corp. personnel for anesthesia services." | ¶ 3: "In this way, many of the AMSURG ASCs have also been knowingly submitting or causing to be submitted false and fraudulent claims and statements to Medicare and TRICARE for surgical services and facility fees that were the result of illegal remuneration (i.e., kickbacks) to ENVISION and the ASC Physician Owners."¶ |
| AmSurg has implemented similar corporate structures across the country as part of its nationwide business model. | ¶ 98: "Upon information and belief, Defendant AMSURG has instituted the same or similar scheme with physicians at other surgery centers around the country." | ¶ 168: "Defendant St. George Endoscopy Center, LLC's ownership of Defendant AmSurg St. George Anesthesia is consistent with AMSURG's nationwide business of partnering with physicians at certain AMSURG ASCs by providing the Physician ASC Owners with an ownership interests in an affiliated AMSURG Anesthesia Company that is the exclusive provider of anesthesia services for their ASC patients." |

Although the *Vanasco* litigation centered on an ASC in Florida, while Waters' focuses on an ASC in Utah, they both name AmSurg as a defendant and claim that AmSurg has implemented this model nationwide. The difference in where the relator worked is immaterial. *See U.S. ex rel. Solis,* 885 F.3d at 626 (finding that publicly disclosed allegations from a prior complaint were substantially similar where they had overlapping actors, conduct, and risk).

Third, Waters' allegations are substantially similar to the same issues raised by numerous publications questioning the legality of physician-owned ASCs paying anesthesia providers less

than the total anesthesia reimbursement and then retaining the difference as profit.  (*See e.g.,* Ex. 4 at 2–3 ("In our view, the economic model referred to as the 'company model' and variations on that model, which enable referring physicians to profit from their referrals for anesthesia services, are 'fraudulent and abusive.'"").); *see also, U.S. ex rel. L. Project for Psychiatric Rts. v. Matsutani*, 2010 WL 11526903, at *11 (D. Alaska Sep. 24, 2010), *aff'd sub nom.*, 454 F. App'x 644 (9th Cir. 2011) ("The fact that the prior disclosures do not identify all of the Defendants or all of the transactions is irrelevant—they provide more than enough information for the Government to investigate the conduct at issue.")

Any of these public disclosures alone would be sufficient to bar Waters' lawsuit.  Taken together, there can be no question that the disclosures were sufficient to put the government on notice of the alleged conduct or that Waters' suit is based on prior disclosures.  The only remaining question, therefore, is whether Waters qualifies as an "original source" under the statute.  He does not.

### C.    Relator Is Not an Original Source.

To qualify as an original source, Waters must allege facts showing that he possesses "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and [] has voluntarily provided the information to the Government before filing an action under this section."  31 U.S.C. § 3730 (e)(4)(B).

Waters does not come close.  As explained above, AmSurg had already disclosed in its SEC filings that its physician-owned ASCs generated revenue from services provided by contracted anesthetists and distributed those revenues among the ASC owners, including physician owners.  In addition, the *Vanasco* litigation raised public allegations that AmSurg's model violated the AKS at "surgery centers around the country."  (Ex. 2 ¶ 98, (*Vanasco* Complaint).)  Various publications also questioned the legality of this business model.  Waters' allegations about AmSurg's "nationwide business" model add nothing to what had already been publicly disclosed.  (Compl. ¶ 168.)  Nor are his allegations based on any independent knowledge.  In fact, Waters' allegations regarding AmSurg's nationwide business are largely based on AmSurg's website (*see, e.g., id.* at ¶ 148), court pleadings (*see, e.g., id.* ¶ 166), and SEC filings (*see, e.g., id.* ¶ 167).  Nothing that

1  Waters alleges about AmSurg's business could not also be obtained through a public search engine.

2  That leaves only his allegations about the single surgery center where he worked, but those

3  allegations also fail to add anything that is "sufficiently significant or essential so as to fall into the

4  narrow category of information that materially adds to what has already been revealed through

5  public disclosures." *U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir.

6  2016).   At best, his allegations confirm that AmSurg's model was implemented at the ASC in St.

7  George, Utah, but that is not new information.  Additionally, there is nothing materially additive

8  about Waters' compensation or his guess about the anesthesia profits at St. George. *E.g.*, *U.S. ex*

9  *rel. Swan v. Covenant Care, Inc.*, 279 F. Supp. 2d 1212, 1217 (E.D. Cal. 2002) ("a relator's ability

10 to reveal specific instances of fraud where the general practice has already been publicly disclosed

11 is insufficient to prevent operation of the [public disclosure] bar.").  Notably, he alleges no

12 materially additive facts about how the arrangements were negotiated or came about, or how the

13 anesthesia entity was operated, or why any Defendant would have believed the arrangements were

14 fraudulent.

15 Given that Waters is challenging a business model that has already been placed in the public

16 domain through securities filings, federal litigation, and news media, he cannot materially add to

17 the public disclosures by providing minimal details of his personal compensation at one surgery

18 center.  Nor can he overcome the fact that the model he seeks to attack has already been publicly

19 challenged.  Waters' Complaint should be dismissed with prejudice, as further amendment would

20 be futile and would only expend additional unnecessary resources to reach this same conclusion.

21 *See U.S. ex rel. Carter*, 2015 WL 4892259, at *7 (holding that amendment would be futile where

22 action was barred by FCA's public disclosure bar and granting motion to dismiss with prejudice).

23 **II.    Relator Fails to State a Claim under Rules 12(b)(6) and 9(b).**

24 To state a claim for relief under Rule 12(b)(6), a complaint alleging FCA violations must

25 "not only be plausible" as required by Rule 8(a), but also "must be pled with particularity under

26 Rule 9(b)." *U.S. ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 898 (9th Cir. 2017).  An FCA

27 complaint must "state with particularity the circumstances constituting fraud or mistake, including

28 the who, what, when, where, and how of the misconduct charged.  In addition, the plaintiff must set

12

forth what is false or misleading about a statement, and why it is false." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotations and citations omitted).

To plead a violation of the FCA, a relator must show: (1) presentment to the government, (2) of a false or fraudulent claim, (3) with knowledge of the claim's falsity, (4) that is material to the government's decision to pay the claim. *Universal Health Serv., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). Among other deficiencies, Waters' Complaint clearly fails to adequately plead the falsity of any claims.

### A. Relator's Alleged Schemes Are Not Violations of the AKS.

A claim can be "false" under the FCA if a claimant falsely certifies compliance with a statute or regulation, and compliance with that statute is material to the government's decision to pay the claim. *Escobar*, 136 S. Ct. at 2004. Waters alleges that Defendants falsely certified compliance with the federal AKS in submitting claims to government healthcare programs. Accordingly, he must plead particular facts and details under Rule 9(b) to show how each defendant violated the AKS in order to state a claim under the FCA as to that defendant. *Frazier ex rel. U.S. v. Iasis Healthcare Corp.*, 392 F. App'x 535, 537 (9th Cir. 2010).

The AKS is a criminal statute forbidding any person or entity from knowingly and willfully paying remuneration to induce the referral of services reimbursable by a federal healthcare program. 42 U.S.C. § 1320a-7b(b). Even accepting his factual allegations, the purported schemes Waters alleges do not violate the AKS.

Waters alleges that St. George Anesthesia required him to assign his billing rights and accept a per diem payment for providing anesthesia services. (*See* Compl. ¶¶ 146–161.) The assignment of billing rights is a widely-accepted practice, and, in November 2021, OIG issued an Advisory Opinion concluding that an arrangement where a CRNA assigned his billing rights to a physician practice that owned an ASC in exchange for a salary of less than what was billed for his anesthesia services posed a low risk of fraud and abuse under the AKS. (HHS-OIG Advisory Opinion No. 21-15, 2021 WL 5497672 (Nov. 5, 2021).) Because Waters has not alleged any facts showing that his arrangement was in any way exceptional or problematic, his theory that assigning his billing rights in exchange for a per diem rate fails to state a claim.

Waters also alleges that Defendants violated the AKS because ASC physician-owners received a portion of anesthesia revenue commensurate with their ownership in the center, which Waters claims to be *per se* illegal remuneration under the AKS. (*See* Compl. ¶¶ 146–161). But, there is <u>no</u> statute, regulation, or authoritative guidance making it *per se* illegal for ASC physician-owners to collect and retain anesthesia revenue. To the contrary, AO 21-15 expressly considered a proposed arrangement in which an ASC physician-owner would collect and retain net profits from anesthesia services performed by a CRNA and found that the arrangement presented a low risk of fraud under the AKS. (HHS-OIG AO No. 21-15.) Accordingly, this theory also fails to state a claim.

In sum, while Waters' Complaint is long on quotes to public documents and government reports, it is remarkably short on <u>facts</u> about St. George's—or any other ASCs'—arrangements that could lead to a plausible inference that they violated the AKS.

**B.      Relator Fails to Plead an AKS Violation at St. George.**

Waters' conclusory allegations that the anesthesia arrangement at St. George violated the AKS do not satisfy Rule 9(b). Besides stating how much he was paid per year and speculating on information and belief the annual anesthesia profits at St. George, he alleges no facts about <u>how</u> the arrangements in question came about, <u>who</u> negotiated them, <u>how</u> any amounts paid to physicians were tied to their referral volumes, <u>what</u> risks the ASC or anesthesia business assumed, or <u>what</u> management, billing, and other administrative duties the anesthesia business performed. Rather, he alleges only that he was paid less than what was billed and collected for his services and that the ASC owners retained the difference, in violation of the AKS. This is not sufficient.

Perhaps most revealing, Waters' primary AKS theory is that the ASC physician-owners were paid a portion of anesthesia revenues <u>as an inducement</u> to continue referring patients to the ASC for anesthesia, but the only fact he alleges is that the former center director once told him that AmSurg and the physician-owners "split the profit on and [sic] anesthesia revenue." (*Id.* ¶ 149.) As explained above, the simple fact that the ASC owners retained profits from anesthesia services at their center cannot state a violation of the AKS.

/ / /

### C.      Relator Fails to Plead a Nationwide Scheme.

Even if Waters had satisfied his Rule 9(b) pleading obligations as to St. George—which he clearly has not—Waters has certainly failed to plead adequate facts showing that any other named Defendant *knowingly presented* false claims to the government.  The lawsuit should at the very least be dismissed with respect to any entities other than St. George.

Waters has not worked at any AmSurg ASC other than St. George. He lacks personal knowledge as to any other Defendants.  The only facts he alleges as to other Defendants are drawn solely from AmSurg's website, its securities filings, and other public documents.

Waters alleges that AmSurg's Regional Directors told him: (1) that <u>his</u> compensation arrangement complied with applicable laws, (Compl. ¶ 160); (2) that <u>he</u> was one of the highest paid CRNAs at any of AmSurg's ASCs where AmSurg provides anesthesia, (*id.* ¶ 153); and (3) that a clinical consultant at <u>his</u> center had been assured by AmSurg that <u>his</u> per diem rate was fair market value for his services, (*id.* ¶ 161).  These are not only immaterial to the AKS analysis, but they also speak only to <u>Waters'</u> contract with <u>St. George Anesthesia</u>.

In fact, Waters' only allegation about his knowledge of anesthesia providers at other AmSurg ASCs is that he "routinely received AmSurg emails announcing vacancies for independent contractor CRNAs and anesthesiologists to provide anesthesia services at AMSURG ASCs throughout the United States." (*Id.* ¶ 153.)  That is all.  He does not say <u>where</u> the vacancies were, <u>what</u> the terms of the contracts included, <u>who</u> the contracting entity was, <u>who</u> owned the contracting entity, or <u>how</u> those entities' anesthesia revenues were collected, accounted, or distributed.  *See United States v. Ctr. for Diagnostic Imaging, Inc.,* 787 F. Supp. 2d 1213, 1222 (W.D. Wash. 2011), *amended in part*, 2011 WL 13353774 (W.D. Wash. Apr. 25, 2011) (holding that Plaintiffs failed to allege their claim of a nationwide scheme of inducing referrals where, as self-proclaimed insiders, they were unable to provide specifics to support their claim such as the location, persons involved, and how their allegations translated to a broader scheme).

In place of actual insider knowledge, Waters instead crams his Complaint full of lengthy quotes from AmSurg's publicly-available SEC filings describing its general business model.  His Complaint is emblematic of an opportunistic relator who has no information of his own to offer.  It

appears he has reviewed publicly-available records and named as many corporate Defendants as he could find.  But, since he does not know—and has not alleged—how these entities actually relate to his alleged fraud schemes, he simply lumps them together and generally accuses all of fraud.  For example, he combines Envision Healthcare Corporation, AmSurg Corp., AmSurg Holdings, Inc., AmSurg, LLC, AmSurg Finance, Inc., AmSurg Anesthesia Management, LLC and "various other subsidiary companies" into a single entity: "AMSURG" (*see* Compl. ¶ 11), and then proceeds to allege that based on his review of public records, "AMSURG" provides non-specific "administrative and operational oversight of its business model" from its Nashville headquarters. (*Id.* ¶ 165 (quoting AmSurg 10-K filings).)[2]  Waters employs a similar tactic for the 120+ AmSurg ASCs and anesthesia subsidiaries named in his Complaint.  After providing the publicly-available addresses and NPI information for these entities, (*see id.* ¶¶ 15–132), the Complaint transforms them into the monolithic "AMSURG ASCs" and "AMSURG Anesthesia Companies."[3]

Rule 9(b) "undoubtedly requires more than attributing wholesale all of the allegations against Defendants without distinguishing one from the other."  *U.S. ex rel. Silingo v. Mobile Med. Examination Servs., Inc.,* 2015 WL 12752552, at *9 (C.D. Cal. Sept. 29, 2015) (quoting *U.S. ex. rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011) (internal quotations omitted) (Rule 9(b) "does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud").  "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum identify the role of each defendant in the alleged *fraudulent* scheme."  *Id.* at *9 (citation omitted).

---

[2]     These allegations are insufficient to state a claim against these corporate defendants under Rule 9(b) and should be dismissed.  *See U.S. ex rel. Martinez v. KPC Healthcare Inc.*, 2017 WL 10439030, at *6 (C.D. Cal. June 8, 2017) ("Merely being a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation. Likewise, the bare assertion that the [parent] Defendants 'operated, directed, and conspired' with the [subsidiary] does not satisfy Rule 9's particularity standard.") (cleaned up).

[3]     Indeed, it is unclear which of the dozens of named ASCs are even implicated by Relator's claims.  For example, he alleges that "<u>several</u> of the AmSurg ASCs" share portions of their anesthesia revenue with physician owners, and "[i]n this way, <u>many</u> of the AmSurg ASCs" knowingly violated the law.  (*See* Compl. ¶ 3.)  These allegations fail to satisfy the requirements of notice pleading, much less the heightened pleading standards of Rule 9(b).

1157747.3

The minimal facts Waters alleges about his personal compensation fail to even state a claim against St. George, much less any of the hundreds other named Defendants whom he improperly lumps together and does not differentiate. *See id.* (finding that Plaintiff lumped together a group of defendants under the title "health plan defendants" in violation of Rule 9(b)'s pleading requirements). As such, his Complaint should be dismissed in its entirety.

### III.   Relator's Second, Third, and Fourth Claims for Relief Should also be Dismissed.

In addition to claiming that Defendants knowingly submitted false claims for reimbursement to the government in violation of 31 U.S.C. § 3729(a)(1)(A), Waters adds claims that Defendants also knowingly made false statements to obtain reimbursement for false claims in violation of § 3729(a)(1)(B); knowingly concealed an obligation to pay money to the United States in violation of § 3729(a)(1)(G); and knowingly conspired to violate the FCA in violation of § 3729(a)(1)(C). (*See* Compl. ¶¶ 191–202.) Waters' failure to state a claim under § 3729(a)(1)(A) is also fatal to these tack-on claims.

Each of these claims also requires additional factual allegations absent from Waters' Complaint. For example, to state a claim for conspiracy, the Complaint must allege facts showing that Defendants reached an agreement with at least one other person or entity to violate the FCA and that one conspirator performed some act to effect the conspiracy. *See e.g., U.S. ex rel. Miller v. Cmty. Recovery Res., Inc.*, No. 2:13-cv-1004, Dkt. No. 88, at 16 (E.D. Cal. May 23, 2017) (Nunley, J.). Under the intra-corporate conspiracy doctrine, a corporation cannot conspire with employees, agents, or subsidiaries. *Id.* Because Waters fails to differentiate among the 120+ "Defendants" named in this claim for relief, he has not adequately pleaded facts showing which Defendants reached agreements to violate the FCA, with whom they agreed, or what steps were taken to effect the agreement. Nor has he clearly delineated whether the alleged conspiracy actually involves parties outside intra-corporate conspiracy doctrine. The same is true of his §§ (a)(1)(B) and (a)(1)(G) claims. To state a "reverse false claim" under § (a)(1)(G), Waters must identify a specific legal obligation to pay money to the United States at the time Defendants' allegedly submitted false claims, which does not include any *potential* obligation Defendants would incur if found liable in this lawsuit. *U.S. ex rel. Pasqua v. Kan-Di-Ki, LLC*, 2012 WL 12895229, at *10

(C.D. Cal. June 18, 2012) (dismissing reverse false claims counts that relied on a finding of liability under § 3729(a)(1)(A)).  Waters has identified no such obligation.  Rather, he relies on his general allegations that Defendants submitted claims for reimbursement that were legally false because they were the result of AKS violations.  These allegations are insufficient to state a claim under §§ (a)(1)(A), (B), (C), and (G), and all four claims for relief should be dismissed.

<u>**CONCLUSION**</u>

Relator's Complaint should be dismissed with prejudice as to all Defendants because it is barred by the FCA's public disclosure bar and fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).

DATED:  March 14, 2022                          BOUTIN JONES INC.


By: */s/ Robert D. Swanson*

**BOUTIN JONES INC.**
Robert D. Swanson SBN 162816
rswanson@boutinjones.com
555 Capitol Mall, Suite 1500
Sacramento, CA 95814-4603
T: (916) 321-4444/F: (916) 442-7597


**BASS BERRY & SIMS PLC**
Brian D. Roark (*Admitted Pro Hac Vice*)
broark@bassberry.com
Taylor M. Sample (*Admitted Pro Hac Vice*)
taylor.sample@bassberry.com
150 Third Avenue South, Suite 2800
Nashville, TN 37201
T: (615) 742-7753/F: (615) 742-2704

*Attorneys for Defendants Envision Healthcare Corporation, et al.*

Defendants' Memorandum in Support of Motion to Dismiss Complaint

1157747.3