**BOUTIN JONES INC.**
Robert D. Swanson SBN 162816
rswanson@boutinjones.com
555 Capitol Mall, Suite 1500
Sacramento, CA 95814-4603
T: (916) 321-4444/F: (916) 442-7597

**BASS BERRY & SIMS PLC**
Brian D. Roark (*Admitted Pro Hac Vice*)
broark@bassberry.com
Taylor M. Sample (*Admitted Pro Hac Vice*)
taylor.sample@bassberry.com
150 Third Avenue South, Suite 2800
Nashville, TN 37201
T: (615) 742-7753/F: (615) 742-2704

*Attorneys for Defendants Envision Healthcare Corporation, et al.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JACK WATERS.<br><br>Plaintiffs,<br><br>v.<br><br>ENVISION HEALTHCARE CORPORATION, ET AL.,<br><br>Defendants. | Case No.  **2:19-cv-0873-TLN**<br><br>**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**<br><br>Date:  April 21, 2022<br>Time:  2:00 p.m.<br>Courtroom:  2<br><br>Honorable Troy L. Nunley |

Pursuant to Federal Rule of Evidence 201, Defendants request that the Court take judicial notice of the following in consideration of their contemporaneously-filed Motion to Dismiss Relator's Complaint:

1. True and correct excerpts of AmSurg Corp. and Envision Healthcare Corporation's 10-K filings with the United States Securities and Exchange Commission, attached hereto as **Exhibit 1**.

2. The Complaint and Notice of Declination in *U.S. ex rel. Vanasco v. AmSurg Corp., et al.,* No. 8:16-cv-00288 (M.D. Fla. 2016) (Docket Nos. 1, 22), attached hereto as **Exhibit 2** and **Exhibit 3**, respectively.

3. Publicly available letter published by the American Society of Anesthesiologists dated February 25, 2014 and accessible at https://www.asahq.org/advocacy-and-asapac/fda-and-washington-alerts/washington-alerts/2014/02/asa-urges-issuance-of-federal-fraud-alert-on-the-company-model, attached hereto as **Exhibit 4**.

4. Publicly available news article from the American Bar Association Health Law Section titled *Something Ventured: Continued Scrutiny of ASC-Anesthesia Joint Ventures* dated October 2016 and accessible at http://garnerhealth.com/wp-content/uploads/2014/02/Something-Ventured_-The-Continued-Scrutiny-of-ASC-Anesthesia-Joint-Ventures-_-Health-Law-Section-_-HL000890-_-ABA-Health-eSource.pdf, attached hereto as **Exhibit 5**

5. Publicly available article from Nelson Hardiman titled *Compliance Risks in ASC Anesthesia Services* dated December 3, 2018 and accessible at https://www.nelsonhardiman.com/compliance-risks-in-asc-anesthesia-services/, attached hereto as **Exhibit 6.**

Judicial notice of these publicly-available materials is appropriate in considering the applicability of the False Claims Act's public disclosure bar: 31 U.S.C. § 3730(e)(4)(A). *Silbersher v. Valeant Pharms. Int'l, Inc.*, 445 F. Supp. 3d 393, 400 (N.D. Cal. 2020) (quoting *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010)) ("Courts may take

judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." ); *see also Reyn's Pasta Bella, LLC v. Visa USA Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (courts "may take judicial notice of court filings and other matters of public record.").

DATED:  March 14, 2022                    BOUTIN JONES INC.


                                          By: */s/ Robert D. Swanson*
                                          ROBERT D. SWANSON

                                          **BOUTIN JONES INC.**
                                          Robert D. Swanson SBN 162816
                                          rswanson@boutinjones.com
                                          555 Capitol Mall, Suite 1500
                                          Sacramento, CA 95814-4603
                                          T: (916) 321-4444/F: (916) 442-7597

                                          **BASS BERRY & SIMS PLC**
                                          Brian D. Roark (*Admitted Pro Hac Vice*)
                                          broark@bassberry.com
                                          Taylor M. Sample (*Admitted Pro Hac Vice*)
                                          taylor.sample@bassberry.com
                                          150 Third Avenue South, Suite 2800
                                          Nashville, TN 37201
                                          T: (615) 742-7753/F: (615) 742-2704

                                          *Attorneys for Defendants Envision Healthcare Corporation, et al.*

# Exhibit 1

10-K 1 amsg-10k-2012-12-31.htm FORM 10-K

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the Fiscal Year Ended December 31, 2012**
**Commission File Number 000-22217**

## AMSURG CORP.

*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Tennessee** | **62-1493316** |
| *(State or Other Jurisdiction of Incorporation)* | *(I.R.S. Employer Identification No.)* |
| **20 Burton Hills Boulevard**<br>**Nashville, Tennessee** | **37215** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

Securities registered pursuant to Section 12(b) of the Act:      <u>**Common Stock, no par value**</u>
*(Title of class)*
<u>**Nasdaq Global Select Market**</u>
*(Name of each exchange on which registered)*

Registrant's telephone number, including area code:  (615) 665-1283

Securities registered pursuant to Section 12(g) of the Act:         **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes [X]       No [ ]

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes [ ]       No [X]

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes [X]       No [ ]

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes [X]       No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  [ ]

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer [X]   Accelerated filer [ ]   Non-accelerated filer [ ]   Smaller reporting Company [ ]
*(Do not check if a smaller reporting company)*

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes [ ]       No [X]

As of February 26, 2013, 32,123,196 shares of the Registrant's common stock were outstanding.  The aggregate market value of the shares of common stock of the Registrant held by nonaffiliates on June 30, 2012 (based upon the closing sale price of these shares as reported on the Nasdaq Global Select Market as of June 30, 2012) was approximately $920,000,000. This calculation assumes that all shares of common stock beneficially held by executive officers and members of the Board of Directors of the Registrant are owned by "affiliates," a status which each of the officers and directors individually may disclaim.

**Documents Incorporated by Reference**
Portions of the Registrant's Definitive Proxy Statement for its Annual Meeting of Shareholders to be held on May 23, 2013, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Item 1.  Business – (continued)

**Strategy**

We believe we are a leader in the acquisition, development and operation of ASCs. The key components of our strategy are to:

- attract and retain physicians that are leaders in their specialty and market;
- increase same-center revenue growth and profitability at our existing surgery centers;
- expand our national network of ASCs by selectively acquiring both single-specialty ASCs and multi-specialty ASCs, and developing new ASCs in partnership with physicians; and
- pursue the acquisition of companies that own and operate multiple ASCs.

*Attract and retain physicians that are leaders in their specialty and market.*  Physicians are critical to the delivery of healthcare and are a valuable component of our operating model. We currently operate 240  ASCs with over 2,000 physician partners. We typically structure partnerships with physicians in a 51% / 49% ownership relationship, which we believe is mutually beneficial to us and our physician partners. Under our partnership structure, physicians gain a partner in AmSurg who provides management services, including clinical and regulatory support, financial reporting, performance measurement, group purchasing, contracting, and marketing services. According to Syndics Research Corporation, our net promoter score, as defined by their survey to measure overall physician satisfaction, was 87% and exceeded industry benchmarks for physician satisfaction. We believe our focus on physician satisfaction, combined with providing high quality healthcare in a patient friendly and convenient environment, helps us attract and retain physician partners.

*Increase same-center revenue growth.*  We grow revenues in our existing facilities primarily through increasing procedure volume by (1) increasing the number of physicians performing procedures at our centers, (2) marketing our centers to referring physicians, payors and patients, and (3) achieving efficiencies in center operations. For the year ended December 31, 2012, we achieved same-center revenue growth of 3%.

*Growth in the number of physicians performing procedure.*  The most effective way to increase procedure volume and revenues at our ASCs is to increase the number of physicians who use our centers through:

- the physicians affiliated with the ASCs recruiting new physicians to their practices;
- identifying additional physicians to join the partnerships that own the ASCs; and
- recruiting non-partner physicians in the same or other specialties to use excess capacity at the ASCs.

*Marketing our centers to referring physicians, payors and patients.*  We market our ASCs to referring physicians and payors by emphasizing the quality, high patient satisfaction and lower cost at our ASCs. We have a dedicated business development team that is responsible for negotiating contracts with third party payors. They are responsible for obtaining new contracts for our ASCs with payors that do not currently contract with us and negotiating increases to reimbursement rates pursuant to existing contracts. We also increase awareness of the benefits of our ASCs with employers and patients through public awareness programs, health fairs and screening programs, including programs designed to educate employers and patients as to the health and cost benefits of our services.

*Achieving efficiencies in center operations:*  We have dedicated teams with business and clinical expertise that are responsible for implementing best practices within our ASCs. The implementation of these best practices allows the ASCs to improve operating efficiencies through:

- physician scheduling enhancements;
- improved patient flow; and
- improved operating room turnover.

We also enhance the profitability of our ASCs through benefits we receive through economies of scale such as group purchasing, staffing and clinical efficiencies and cost containment initiatives. We also track facility performance relative to certain benchmarks in order to maximize center-level revenue and profitability. The information we gather and collect from our ASCs and operations team members allows us to develop best practices and identify those ASCs that could most benefit from improved operating efficiency techniques and cost containment measures.

*Expand our national network of ASCs.*  While we have been an active acquirer of ASCs historically, the market remains fragmented, providing many opportunities for additional acquisitions. We target ownership in single-specialty ASCs that perform gastrointestinal endoscopy, ophthalmology and orthopedic procedures, as well as multi-specialty ASCs that are equipped and staffed to perform surgical procedures in more than one specialty. Currently, approximately 77% of our revenues are from single-specialty centers that perform gastroenterology or ophthalmology procedures. These specialties have a higher concentration of older patients than other specialties, such as orthopaedics or ENT. We believe the aging demographics of the U.S. population will be a source of procedure growth for gastroenterology and ophthalmology ASCs

We will also opportunistically pursue the acquisition of companies that own and operate multiple ASCs.

We typically look to acquire ASCs that meet the following criteria:

- *Diversified physician group:* ASCs that have eight to ten (or more) physicians. In order to manage succession planning, we look to acquire ASCs whose physicians vary in age in order to limit the risk of several physicians exiting the practice in a short period of time.
- *Market leader:* ASCs that are market leaders for the procedures performed in that facility.

3

Item 1.  Business – (continued)

- *Contracts with payors:* ASCs that contract with all or most of the major commercial payors in their market.
- *History of growth:* ASCs with a track record of consistent case and revenue growth.

Our development staff identifies existing centers that are potential acquisition candidates and physicians who are potential partners for new center development. We begin our acquisition process with a due diligence review of the target center and its market. We use experienced teams of operations and financial personnel to conduct a review of all aspects of the center's operations, including the following:

- quality and reputation of the physicians affiliated with the center;
- market position of the center and the physicians affiliated with the center;
- payor and case mix;
- competition and growth opportunities in the market;
- staffing and supply review;
- equipment assessment; and
- opportunities for operational efficiencies.

In presenting the advantages to physicians of developing a new ASC in partnership with us, our development staff emphasizes the proximity of a surgery center to a physician's office, the simplified administrative procedures, the ability to schedule consecutive cases without preemption by inpatient or emergency procedures, the rapid turnaround time between cases, the high technical competency of the center's clinical staff and the state-of-the-art surgical equipment. We also focus on our expertise in developing and operating centers, including contracting with vendors and third-party payors. In a development project, we provide services, such as financial feasibility pro forma analysis, site selection, financing for construction, equipment and build out, and architectural oversight. Capital contributed by the physicians and AmSurg plus debt financing provides the funds necessary to construct and equip a new surgery center and initial working capital.

As part of each acquisition or development transaction, we form a limited partnership or limited liability company and enter into a limited partnership agreement or operating agreement with our physician partners. We generally own 51% of the limited partnerships or limited liability companies. Under these agreements, we receive a percentage of the net income and cash distributions of the entity equal to our percentage ownership interest in the entity and have the right to the same percentage of the proceeds of a sale or liquidation of the entity. In the limited partnership structure, as the sole general partner, one of our affiliates is generally liable for the debts of the limited partnership. However, the physician partners are generally required to guarantee their pro rata share of any indebtedness or lease agreements to which the limited partnership is a party in proportion to their ownership interest in the limited partnership.

We manage each limited partnership and limited liability company and oversee the business office, contracting, marketing, financial reporting, accreditation, clinical, regulatory and administrative operations of the surgery center. The physician partners provide the center with a medical director and performance improvement chairman and may provide certain other specified services such as billing and collections, transcription and accounts payable processing. In addition, the limited partnership or limited liability company may lease the services of certain non-physician personnel from entities affiliated with the physician partners, who will provide services at the center. Certain significant aspects of the limited partnership's or limited liability company's governance are overseen by an operating board, which is comprised of equal representation by AmSurg and our physician partners. We work closely with our physician partners to increase the likelihood of a successful partnership.

A majority of the limited partnership and operating agreements provide that, if certain regulatory changes take place, we will be obligated to purchase some or all of the noncontrolling interests of our physician partners. The regulatory changes that could trigger such obligations include changes that: (i) make the referral of Medicare and other patients to our surgery centers by physicians affiliated with us illegal; (ii) create the substantial likelihood that cash distributions from the limited partnerships or limited liability companies to the affiliated physicians will be illegal; or (iii) cause the ownership by the physicians of interests in the limited partnerships or limited liability companies to be illegal. There can be no assurance that our existing capital resources would be sufficient for us to meet the obligations, if they arise, to purchase these noncontrolling interests held by physicians. The determination of whether a triggering event has occurred generally would be made by the concurrence of our legal counsel and counsel for the physician partners or, in the absence of such concurrence, by independent counsel having expertise in healthcare law chosen by both parties. Such determination therefore would be within our control. The triggering of these obligations could have a material adverse effect on our financial condition and results of operations. See "– Government Regulation."

**Surgery Center Operations**

The size of our typical single-specialty ASC is approximately 3,000 to 6,000 square feet.  The size of our typical multi-specialty ASC is approximately 5,000 to 17,000 square feet.  Each center typically has two to three operating or procedure rooms with areas for reception, preparation, recovery and administration. Each surgery center is specifically tailored to meet the needs of its physician partners.  Our surgery centers perform an average of approximately 6,800 procedures per year, though the wide range among centers from a low of approximately 1,200 procedures per year to a high of 33,000 procedures per year.  The cost of developing a typical surgery center is approximately $3 million.  Constructing, equipping and licensing a surgery center generally takes 12 to 15 months.  As of December 31, 2012, 149 of our centers performed gastrointestinal endoscopy procedures, 48 centers were multi-specialty centers, 36 centers performed ophthalmology surgery procedures and seven centers performed orthopaedic procedures.  The procedures performed at our centers generally do not require an extended recovery period.  Our centers are staffed with approximately 10 to 15 clinical professionals and administrative personnel, including nurses and surgical technicians, some of whom may be leased on a full or part-time basis from entities affiliated with our physician partners.

4

**Competition**

We encounter competition in three separate areas: competition with other providers for physicians to utilize our centers, patients and managed care contracts; competition with other companies for acquisitions; and competition for joint venture development of new centers.

*Competition for Physicians to Utilize Our Centers, Patients and Managed Care Contracts.* We compete with hospitals and other surgery centers in recruiting physicians to utilize our surgery centers, for patients and for the opportunity to contract with payors. In some of the markets in which we operate, there are shortag physicians in certain specialties, including gastroenterology. In several of the markets in which we operate, hospitals are recruiting physicians or groups of physic become employed by the hospitals, including primary care physicians and physicians in certain specialties, including gastroenterology. In many cases the hospital restricted those physicians' ability to refer patients to physicians and facilities not affiliated with the hospital. In addition, physicians, hospitals, payors and other providers may form integrated delivery systems that restrict the physicians who may treat certain patients or the facilities at which patients may be treated. Comp with hospitals and other surgery centers may limit our ability to contract with payors or negotiate favorable payment rates.

*Competition for Acquisitions.* There are several public and private companies that compete with us for the acquisition of existing ASCs and companies that own a manage ASCs. We may also compete with local hospitals in certain transactions. Some of these competitors may have greater resources than we have. The princ competitive factors that affect our and our competitors' ability to complete acquisitions are price, experience and reputation, and access to capital.

*Competition for Joint Venture Development of Centers.* We believe that we do not have a direct corporate competitor in the development of single-specialty ASCs across the specialties of gastroenterology and ophthalmology. There are, however, several publicly and privately held companies that develop multi-specialty surg centers, and these companies may compete with us in the development of multi-specialty centers. Further, many physicians develop surgery centers without a cor partner, utilizing consultants who typically perform these services for a fee and who take a small equity interest or no equity interest in the ongoing operations of t center.

**Government Regulation**

The healthcare industry is subject to extensive regulation by a number of governmental entities at the federal, state and local level. Government regulation aff our business activities by controlling our growth, requiring licensure and certification for our facilities, regulating the use of our properties and controlling reimbursement to us for the services we provide.

*Certification.* We depend on third-party programs, including governmental and private health insurance programs, to reimburse us for services rendered to pa in our ASCs. In order to receive Medicare reimbursement, each surgery center must meet the applicable conditions of coverage set forth by HHS, relating to type of facility, its equipment, personnel and standard of medical care, as well as compliance with state and local laws and regulations, all of which are subjec change from time to time. ASCs undergo periodic on-site Medicare certification surveys. Each of our existing centers is certified as a Medicare provider. Although we intend for our centers to participate in Medicare and other government reimbursement programs, there can be no assurance that these centers wil continue to qualify for participation.

*Medicare-Medicaid Fraud and Abuse Provisions.* The federal anti-kickback statute prohibits healthcare providers and others from soliciting, receiving, offeri paying, directly or indirectly, any remuneration (including any kickback, bribe or rebate) with the intent of generating referrals or orders for services or items covered by a federal healthcare program. The anti-kickback statute is very broad in scope, and many of its provisions have not been uniformly or definitively interpreted by case law or regulations. Courts have found a violation of the anti-kickback statute if just one purpose of the remuneration is to generate referral even if there are other lawful purposes. Furthermore, the Health Reform Law provides that knowledge of the law or intent to violate the law is not required to establish a violation of the anti-kickback statute. Violations may result in criminal penalties or fines of up to $25,000 or imprisonment for up to five years, or Violations of the anti-kickback statute may also result in substantial civil penalties, including penalties of up to $50,000 for each violation, plus three times the amount claimed, and exclusion from participation in the Medicare and Medicaid programs. Exclusion from these programs would result in significant reducti revenue and would have a material adverse effect on our business. The Health Reform Law provides that submission of a claim for services or items generate violation of the anti-kickback statute constitutes a false or fraudulent claim and may be subject to additional penalties under the federal False Claims Act.

HHS has published final safe harbor regulations that outline categories of activities that are deemed protected from prosecution under the anti-kickback statute Two of the safe harbor regulations relate to investment interests in general: the first concerning investment interests in large publicly traded companies ($50,000,000 in net tangible assets) and the second for investments in smaller entities. The safe harbor regulations also include safe harbors for investments i certain types of ASCs. The limited partnerships and limited liability companies that own our surgery centers do not meet all of the criteria of either of the investment interests safe harbors or the surgery center safe harbor. Thus, they do not qualify for safe harbor protection from government review or prosecutio under the anti-kickback statute. However, a business arrangement that does not substantially comply with a safe harbor is not necessarily illegal under the anti kickback statute.

The HHS Office of Inspector General, or OIG, is authorized to issue advisory opinions regarding the interpretation and applicability of the federal anti-kic statute, including whether an activity constitutes grounds for the imposition of civil or criminal sanctions. We have not sought such an opinion regarding any arrangements. Although advisory opinions are not binding on any entity other than the parties who submitted the requests, advisory opinions provide guidance as to how the OIG would analyze joint ventures involving surgeons such as our physician partners. We believe our arrangements are structured consistent with OIG guidance.

12

Item 1.  Business – (continued)

While several federal court decisions have aggressively applied the restrictions of the anti-kickback statute, they provide little guidance as to the application anti-kickback statute to our limited partnerships and limited liability companies. We believe that we are in compliance with the current requirements of appli federal and state law because, among other factors:

- the limited partnerships and limited liability companies exist to effect legitimate business purposes, including the ownership, operation and continued improvement of high quality, cost-effective and efficient services to the patients served;
- the limited partnerships and limited liability companies function as an extension of the group practices of physicians who are affiliated with the surger centers and the surgical procedures are performed personally by these physicians without referring the patients outside of their practice;
- our physician partners have a substantial investment at risk in the limited partnerships and limited liability companies;
- terms of the investment do not take into account volume of the physician partners' past or anticipated future services provided to patients of the center
- the physician partners are not required or encouraged as a condition of the investment to treat Medicare or Medicaid patients at the centers or to influe others to refer such patients to the centers for treatment;
- the limited partnerships, the limited liability companies, our subsidiaries and our affiliates will not loan any funds to or guarantee any debt on behalf o physician partners with respect to their investment; and
- distributions by the limited partnerships and limited liability companies are allocated uniformly in proportion to ownership interests.

The safe harbor regulations also set forth a safe harbor for personal services and management contracts.  Certain of our limited partnerships and limited liabili companies have entered into ancillary services agreements with our physician partners' group practices, pursuant to which the practice may provide the center billing and collections, transcription, payables processing, payroll and other ancillary services.  The consideration payable by a limited partnership or limited liability company for certain of these services may be based on the volume of services provided by the practice, which is measured by the limited partnership' limited liability company's revenues.  Although these relationships do not meet all of the criteria of the personal services and management contracts safe harb believe that the ancillary services agreements are in compliance with the current requirements of applicable federal and state law because, among other factor fees payable to the physician practices are equal to the fair market value of the services provided thereunder.

In addition, certain of our limited partnership and limited liability companies have entered into certain arrangements for professional services, including arrangements for anesthesia services.  In May 2012, the OIG issued an advisory opinion in which it concluded that two proposed arrangements between an anesthesia group and physician-owned ASCs could result in prohibited remuneration under the federal anti-kickback statute.  We believe our arrangements fo anesthesia services are unlike those described in the OIG advisory opinion and are in compliance with the requirements of the federal anti-kickback statute.

Many of the states in which we operate also have adopted laws that prohibit payments to physicians in exchange for referrals similar to the federal anti-kickba statute, some of which apply regardless of the source of payment for care. These statutes typically provide criminal and civil penalties as well as loss of licens

Notwithstanding our belief that the relationship of physician partners to our surgery centers should not constitute illegal remuneration under the federal anti-kickback statute or similar laws, we cannot assure you that a federal or state agency charged with enforcement of the anti-kickback statute and similar laws m not assert a contrary position or that new federal or state laws might not be enacted that would cause the physician partners' ownership interests in our centers become illegal, or result in the imposition of penalties on us or certain of our facilities. Even the assertion of a violation could have a material adverse effect u us.

In addition to the anti-kickback statute, the Health Insurance Portability and Accountability Act of 1996, or HIPAA, provides for criminal penalties for healthc fraud offenses that apply to all health benefit programs, including the payment of inducements to Medicare and Medicaid beneficiaries in order to influence th beneficiaries to order or receive services from a particular provider or practitioner.  Federal enforcement officials have numerous enforcement mechanisms to combat fraud and abuse, including the Medicare Integrity Program and an incentive program under which individuals can receive up to $1,000 for providing information on Medicare fraud and abuse that leads to the recovery of at least $100 of Medicare funds. In addition, federal enforcement officials have the abil exclude from Medicare and Medicaid any investors, officers and managing employees associated with business entities that have committed healthcare fraud.

Evolving interpretations of current, or the adoption of new, federal or state laws or regulations could affect many of our arrangements. Law enforcement autho including the OIG, the courts and Congress, are increasing their scrutiny of arrangements between healthcare providers and potential referral sources to ensur the arrangements are not designed as a mechanism to exchange remuneration for patient care referrals or opportunities. Investigators also have demonstrated a willingness to look behind the formalities of a business transaction to determine the underlying purposes of payments between healthcare providers and poten referral sources.

*Prohibition on Certain Self-Referrals and Physician Ownership of Healthcare Facilities*.  The federal physician self-referral law, commonly referred to as the Law, prohibits a physician from making a referral for a designated health service to an entity if the physician or a member of the physician's immediate family financial relationship with the entity.  Sanctions for violating the Stark Law include denial of payment, refunding amounts received for services provided purs to prohibited referrals, civil money penalties of up to $15,000 per prohibited service provided and exclusion from the federal healthcare programs.  The Stark applies to referrals involving the following services under the definition of "designated health services": clinical laboratory services; physical therapy service occupational therapy services; radiology and imaging services;

13

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the Fiscal Year Ended December 31, 2013**
**Commission File Number 000-22217**

## AMSURG CORP.

*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Tennessee** | **62-1493316** |
| *(State or Other Jurisdiction of Incorporation)* | *(I.R.S. Employer Identification No.)* |
| **20 Burton Hills Boulevard** | |
| **Nashville, Tennessee** | **37215** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

Securities registered pursuant to Section 12(b) of the Act:       **Common Stock, No par value**
*(Title of class)*
**Nasdaq Global Select Market**
*(Name of each exchange on which registered)*

Registrant's telephone number, including area code:  (615) 665-1283

Securities registered pursuant to Section 12(g) of the Act:       **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes [X]          No [ ]

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes [ ]          No [X]

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past days.
Yes [X]          No [ ]

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit post such files).
Yes [X]          No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer [X]   Accelerated filer [ ]   Non-accelerated filer [ ]   Smaller reporting Company [ ]
*(Do not check if a smaller reporting company)*

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes [ ]          No [X]

As of February 26, 2014, 32,487,151 shares of the Registrant's common stock were outstanding.  The aggregate market value of the shares of common stock of the Registrant held by nonaffiliates on June 30, 2013 (based upon the closing sale price of these shares as reported on the Nasdaq Global Select Market as of June 30, was approximately $1,088,000,000.  This calculation assumes that all shares of common stock beneficially held by executive officers and members of the Board of Directors of the Registrant are owned by "affiliates," a status which each of the officers and directors individually may disclaim.

**Documents Incorporated by Reference**

Portions of the Registrant's Definitive Proxy Statement for its Annual Meeting of Shareholders to be held on May 20, 2014, are incorporated by reference into Part of this Annual Report on Form 10-K.

Our development staff identifies existing centers that are potential acquisition candidates and physicians who are potential partners for new center development. We begin our acquisition process with a due diligence review of the target center and its market. We use experienced teams of operatio and financial personnel to conduct a review of all aspects of the center's operations, including the following:

- quality and reputation of the physicians affiliated with the center;
- market position of the center and the physicians affiliated with the center;
- payor and case mix;
- competition and growth opportunities in the market;
- staffing and supply review;
- equipment assessment; and
- opportunities for operational efficiencies.

In presenting the advantages to physicians of developing a new ASC in partnership with us, our development staff emphasizes the proximity of a surgery center to a physician's office, the simplified administrative procedures, the ability to schedule consecutive cases without preemption by inpatient or emergency procedures, the rapid turnaround time between cases, the high technical competency of the center's clinical staff and the state of-the-art surgical equipment. We also focus on our expertise in developing and operating centers, including contracting with vendors and third-party payors. In a development project, we provide services, such as financial feasibility pro forma analysis, site selection, financing for construction, equipment and build out, and architectural oversight. Capital contributed by the physicians and AmSurg plus debt financing provides the funds necessary to construct and equip a new surgery center and initial working capital.

As part of each acquisition or development transaction, we form a limited partnership or limited liability company and enter into a limited partnership agreement or operating agreement with our physician partners. We generally own 51% of the limited partnerships or limited liability companies. Under these agreements, we receive a percentage of the net income and cash distributions of the entity equal to our percentage ownership interest in the entity and have the right to the same percentage of the proceeds of a sale or liquidation of the entity. In the limited partnership structure, as the sole general partner, one of our affiliates is generally liable for the debts of the limited partnership. However, the physician partners are generally required to guarantee their pro rata share of any indebtedness or lease agreements to which the limited partnership is a party in proportion to their ownership interest in the limited partnership.

We manage each limited partnership and limited liability company and oversee the business office, contracting, marketing, financial reporting, accreditation, clinical, regulatory and administrative operations of the surgery center. The physician partners provide the center with a medical directo and performance improvement chairman and may provide certain other specified services such as billing and collections, transcription and accounts payable processing. In addition, the limited partnership or limited liability company may lease the services of certain non-physician personnel from entities affiliated with the physician partners, who will provide services at the center. Certain significant aspects of the limited partnership's or limited liability company's governance are overseen by an operating board, which is comprised of equal representation by AmSurg and our physician partner We work closely with our physician partners to increase the likelihood of a successful partnership.

A majority of the limited partnership and operating agreements provide that, if certain regulatory changes take place, we will be obligated to purchase some or all of the noncontrolling interests of our physician partners. The regulatory changes that could trigger such obligations include changes that: make the referral of Medicare and other patients to our surgery centers by physicians affiliated with us illegal; (ii) create the substantial likelihood tha cash distributions from the limited partnerships or limited liability companies to the affiliated physicians will be illegal; or (iii) cause the ownership b the physicians of interests in the limited partnerships or limited liability companies to be illegal. There can be No assurance that our existing capital resources would be sufficient for us to meet the obligations, if they arise, to purchase these noncontrolling interests held by physicians. The determination of whether a triggering event has occurred generally would be made by the concurrence of our legal counsel and counsel for the physic partners or, in the absence of such concurrence, by independent counsel having expertise in healthcare law chosen by both parties. Such determinatio therefore would not be within our control. The triggering of these obligations could have a material adverse effect on our financial condition and resu of operations. See "– Government Regulation."

**Surgery Center Operations**

The size of our typical single-specialty ASC is approximately 3,000 to 6,000 square feet.  The size of our typical multi-specialty ASC is approximate 8,000 to 12,000 square feet.  Each center typically has two to three operating or procedure rooms with areas for reception, preparation, recovery and administration. Each surgery center is specifically tailored to meet the needs of its physician partners.  Our surgery centers perform an average of approximately 6,800 procedures per year, though there is a wide range among centers from a low of approximately 1,000 procedures per year to a hig 32,000 procedures per year.  The cost of developing a typical surgery center is approximately $3.5 million.  Constructing, equipping and licensing a surgery center generally takes 12 to 15 months.  As of December 31, 2013, 151 of our centers performed gastrointestinal endoscopy procedures, 48 c were multi-specialty centers, 36 centers performed ophthalmology surgery procedures and seven centers performed orthopaedic procedures.  The procedures performed at our centers generally do not require an extended recovery period.  Our centers are staffed with approximately 10 to 15 clinic professionals and administrative personnel, including nurses and surgical technicians, some of whom may be leased on a full or part-time basis from entities affiliated with our physician partners.

The types of procedures performed at each center depend on the specialty of the practicing physicians. The procedures most commonly performed at surgery centers are:

- gastroenterology - colonoscopy and other endoscopy procedures;
- ophthalmology - cataracts and retinal laser surgery; and
- orthopaedic - knee and shoulder arthroscopy and carpal tunnel repair.

Item 1.   Business – (continued)

| Location | Acquired (A) Developed (D) Unconsolidated (U) | Specialty | Acquisition/ Opening Date | Operating or Procedure Room |
|---|---|---|---|---|
| **Texas** | | | | |
| Abilene | A | Ophthalmology | March 1997 | 2 |
| Abilene | D | Gastroenterology | December 1994 | 3 |
| Austin | A | Multispecialty | September 2011 | 4 |
| Austin | A,U | Gastroenterology | September 2011 | 3 |
| Austin | A,U | Gastroenterology | September 2011 | 3 |
| Beaumont | D | Gastroenterology | October 1994 | 3 |
| Bedford | A | Gastroenterology | December 2009 | 3 |
| Bryan | A | Gastroenterology | December 2008 | 3 |
| Conroe | A | Gastroenterology | August 2007 | 4 |
| Dallas | A | Gastroenterology | December 2009 | 4 |
| Dallas | A | Gastroenterology | December 2009 | 3 |
| El Paso | D | Gastroenterology | December 1998 | 4 |
| Mesquite | A | Gastroenterology | August 2007 | 2 |
| North Richland Hills | A | Gastroenterology | December 2009 | 4 |
| Plano | A | Gastroenterology | December 2009 | 4 |
| San Antonio | A | Gastroenterology | July 2003 | 4 |
| San Antonio | A | Multispecialty | September 2011 | 5 |
| San Antonio | D | Gastroenterology | May 2007 | 3 |
| San Antonio | D | Gastroenterology | June 2012 | 3 |
| Waco | A | Gastroenterology | July 2010 | 3 |
| Woodlands | A | Gastroenterology | September 2006 | 2 |
| **Utah** | | | | |
| Salt Lake City | D | Gastroenterology | April 1998 | 2 |
| St. George | A | Gastroenterology | July 2003 | 2 |
| **Washington D.C.** | A | Gastroenterology | November 1993 | 2 |
| **Washington** | | | | |
| Puyallup | A | Gastroenterology | March 2005 | 2 |
| Puyallup | D | Gastroenterology | May 2009 | 3 |
| Tacoma | A | Gastroenterology | March 2005 | 5 |
| Tacoma | A | Gastroenterology | March 2005 | 2 |
| Tacoma | A | Gastroenterology | March 2005 | 2 |
| **Wyoming** | | | | |
| Casper | A | Gastroenterology | October 2004 | 2 |
| | | | | 759 |

Our limited partnerships and limited liability companies lease the real property on which our surgery centers operate, either from entities affiliated with our physician partners or from unaffiliated parties.

**Revenues**

Our revenues are derived from facility fees charged for surgical procedures performed in our surgery centers and, at certain of our surgery centers (primarily centers that perform gastrointestinal endoscopy procedures), charges for anesthesia services provided by medical professionals employed or contracted by our centers.  These fees vary depending on the procedure, but usually include all charges for operating room usage, special equipment usage, supplies, recovery room usage, nursing staff and medications.  Facility fees do not include professional fees charged by the physicians that perform the surgical procedures.  Revenues are recorded at the time of the patient encounter and billings for such procedures are made on or about that same date. At the majority of our centers, it is our policy to collect patient co-payments and deductibles at the time the surgery is performed. Our revenues are recorded net of estimated contractual adjustments from third-party medical service payors. Our billing and accounting systems provide us historical trends of the surgery centers' cash collections and contractual write-offs, accounts receivable agings and established fee adjustments from third-party payors. These estimates are recorded and monitored monthly for each of our surgery centers as revenues are recognized. Our ability to accurately estimate contractual adjustments is dependent upon and supported by the fact that our surgery centers perform and bill for limited types of procedures, the range of reimbursement for those procedures within each surgery center specialty is very narrow and payments are typically received within 15 to 45 days of billing. Except in certain limited instances, these estimates are not, however, established from billing system generated contractual adjustments based on fee schedules for the patient's insurance plan for each patient encounter.

*Certification.*  We depend on third-party programs, including governmental and private health insurance programs, to reimburse us for services rende
patients in our ASCs.  In order to receive Medicare reimbursement, each surgery center must meet the applicable conditions of coverage set forth by t
relating to the type of facility, its equipment, personnel and standard of medical care, as well as compliance with state and local laws and regulations,
which are subject to change from time to time. ASCs undergo periodic on-site Medicare certification surveys.  Each of our existing centers is certifie
Medicare provider.  Although we intend for our centers to participate in Medicare and other government reimbursement programs, there can be
No assurance that these centers will continue to qualify for participation.

*Medicare-Medicaid Fraud and Abuse Provisions.*  The federal Anti-Kickback Statute prohibits healthcare providers and others from soliciting, receivi
offering or paying, directly or indirectly, any remuneration (including any kickback, bribe or rebate) with the intent of generating referrals or orders f
services or items covered by a federal healthcare program. The Anti-Kickback Statute is very broad in scope, and many of its provisions have not bee
uniformly or definitively interpreted by case law or regulations. Courts have found a violation of the Anti-Kickback Statute if just one purpose of the
remuneration is to generate referrals, even if there are other lawful purposes.  Furthermore, the Health Reform Law provides that knowledge of the la
intent to violate the law is not required to establish a violation of the Anti-Kickback Statute.  Violations may result in criminal penalties or fines of up
$25,000 or imprisonment for up to five years, or both. Violations of the Anti-Kickback Statute may also result in substantial civil penalties, including
penalties of up to $50,000 for each violation, plus three times the amount claimed, and exclusion from participation in the Medicare and Medicaid
programs. Exclusion from these programs would result in significant reduction in revenues and would have a material adverse effect on our business.
Health Reform Law provides that submission of a claim for services or items generated in violation of the Anti-Kickback Statute constitutes a false o
fraudulent claim and may be subject to additional penalties under the federal False Claims Act, or "FCA."

HHS has published final safe harbor regulations that outline categories of activities that are deemed protected from prosecution under the Anti-Kickb
Statute. Two of the safe harbor regulations relate to investment interests in general: the first concerning investment interests in large publicly traded
companies ($50,000,000 in net tangible assets) and the second for investments in smaller entities. The safe harbor regulations also include safe harbo
investments in certain types of ASCs.  The limited partnerships and limited liability companies that own our surgery centers do not meet all of the cri
of either of the investment interests safe harbors or the surgery center safe harbor. Thus, they do not qualify for safe harbor protection from governme
review or prosecution under the Anti-Kickback Statute. However, a business arrangement that does not substantially comply with a safe harbor is not
necessarily illegal under the Anti-Kickback Statute.

The HHS Office of Inspector General, or "OIG," is authorized to issue advisory opinions regarding the interpretation and applicability of the federal
Kickback Statute, including whether an activity constitutes grounds for the imposition of civil or criminal sanctions.  We have not sought such an op
regarding any of our arrangements. Although advisory opinions are not binding on any entity other than the parties who submitted the requests, adv
opinions provide some guidance as to how the OIG would analyze joint ventures involving surgeons such as our physician partners.  We believ
arrangements are structured to be consistent with OIG guidance.

While several federal court decisions have aggressively applied the restrictions of the Anti-Kickback Statute, they provide little guidance as t
application of the Anti-Kickback Statute to our limited partnerships and limited liability companies. We believe that we are in compliance with the cu
requirements of applicable federal and state law because, among other factors:

- the limited partnerships and limited liability companies exist to effect legitimate business purposes, including the ownership, operation and
  continued improvement of high quality, cost-effective and efficient services to the patients served;
- the limited partnerships and limited liability companies function as an extension of the group practices of physicians who are affiliated with t
  surgery centers and the surgical procedures are performed personally by these physicians without referring the patients outside of their practic
- our physician partners have a substantial investment at risk in the limited partnerships and limited liability companies;
- terms of the investment do not take into account the volume of the physician partners' past or anticipated future services provided to patients
  the centers;
- the physician partners are not required or encouraged as a condition of the investment to treat Medicare or Medicaid patients at the centers or
  influence others to refer such patients to the centers for treatment;
- the limited partnerships, the limited liability companies, our subsidiaries and our affiliates will not loan any funds to or guarantee any debt or
  behalf of the physician partners with respect to their investment; and
- distributions by the limited partnerships and limited liability companies are allocated uniformly in proportion to ownership interests.

The safe harbor regulations also set forth a safe harbor for personal services and management contracts.  Certain of our limited partnerships and limit
liability companies have entered into ancillary services agreements with our physician partners' group practices, pursuant to which the practice may
provide the center with billing and collections, transcription, payables processing, payroll and other ancillary services.  The consideration payable by
limited partnership or limited liability company for certain of these services may be based on the volume of services provided by the practice, which
measured by the limited partnership's or limited liability company's revenues.  Although these relationships do not meet all of the criteria of the pers
services and management contracts safe harbor, we believe that the ancillary services agreements are in compliance with the current requirements of
applicable federal and state law because, among other factors, the fees payable to the physician practices are equal to the fair market value of the serv
provided thereunder.

In addition, certain of our limited partnerships and limited liability companies have entered into certain arrangements for professional services, inclu
arrangements for anesthesia services.  The OIG has issued advisory opinions in which it concluded that proposed arrangements between anesthesia gr
and facilities, including physician-owned ASCs, could result in prohibited remuneration under the federal Anti-Kickback Statute.

We believe our arrangements for anesthesia services are unlike those described in the OIG advisory opinions and are in compliance with the requirem of the federal Anti-Kickback Statute.

Many of the states in which we operate also have adopted laws that prohibit payments to physicians in exchange for referrals similar to the federal An Kickback Statute, some of which apply regardless of the source of payment for care. These statutes typically provide criminal and civil penalties as w loss of licensure.

Notwithstanding our belief that the relationship of physician partners to our surgery centers should not constitute illegal remuneration under the feder Anti-Kickback Statute or similar laws, we cannot assure you that a federal or state agency charged with enforcement of the Anti-Kickback Statute an similar laws might not assert a contrary position or that new federal or state laws might not be enacted that would cause the physician partners' owner interests in our centers to become illegal, or result in the imposition of penalties on us or certain of our facilities. Even the assertion of a violation cou have a material adverse effect upon us.

In addition to the Anti-Kickback Statute, the Health Insurance Portability and Accountability Act of 1996, or "HIPAA", provides for criminal penalti healthcare fraud offenses that apply to all health benefit programs, including the payment of inducements to Medicare and Medicaid beneficiaries in c to influence those beneficiaries to order or receive services from a particular provider or practitioner.  Federal enforcement officials have numerous enforcement mechanisms to combat fraud and abuse, including the Medicare Integrity Program and an incentive program under which individuals ca receive up to $1,000 for providing information on Medicare fraud and abuse that leads to the recovery of at least $100 of Medicare funds. In addition federal enforcement officials have the ability to exclude from Medicare and Medicaid any investors, officers and managing employees associated wit business entities that have committed healthcare fraud.

Evolving interpretations of current, or the adoption of new, federal or state laws or regulations could affect many of our arrangements. Law enforcem authorities, including the OIG, the courts and Congress, are increasing their scrutiny of arrangements between healthcare providers and potential refe sources to ensure that the arrangements are not designed as a mechanism to exchange remuneration for patient care referrals or opportunities. Investig also have demonstrated a willingness to look behind the formalities of a business transaction to determine the underlying purposes of payments betwe healthcare providers and potential referral sources.

*Prohibition on Certain Self-Referrals and Physician Ownership of Healthcare Facilities*.  The federal physician self-referral law, commonly referred the "Stark Law", prohibits a physician from making a referral for a designated health service to an entity if the physician or a member of the physicia immediate family has a financial relationship with the entity, unless an exception applies.  Sanctions for violating the Stark Law include denial of payment, refunding amounts received for services provided pursuant to prohibited referrals, civil money penalties of up to $15,000 per prohibited ser provided and exclusion from the federal healthcare programs.  The Stark Law applies to referrals involving the following services under the definitio "designated health services":  clinical laboratory services; physical therapy services; occupational therapy services; radiology and imaging services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics orthotics and prosthetic devices and supplies; home health services; outpatient prescription drugs; and inpatient and outpatient hospital services.

Through a series of rulemakings, CMS has issued final regulations interpreting the Stark Law.  While the regulations help clarify the requirements of exceptions to the Stark Law, it is difficult to determine the full effect of the regulations.  Under these regulations, services that would otherwise const a designated health service, but that are paid by Medicare as a part of the surgery center payment rate, are not a designated health service for purpose the Stark Law.  In addition, there is a Stark Law exception covering implants, prosthetics, implanted prosthetic devices and implanted durable medica equipment provided in a surgery center setting under certain circumstances. The so-called ASC exemption to the Stark Law also applies to any radiol and imaging procedures that are integral to a covered ASC surgical procedure and that are performed immediately before, during, or immediately following the surgical procedure (that is, on the same day).  Similarly, CMS has excluded from the Stark Law definition of "outpatient prescription d any drugs that are "covered as ancillary services" under the revised ASC payment system.  These drugs include those furnished during the immediate postoperative recovery period to a patient to reduce suffering from nausea or pain.  CMS cautioned, however, that only those radiology, imaging and outpatient prescription drug items and services that are integral to an ASC procedure and performed on the same day as the covered surgical procedu will qualify for the ASC exemption.  The Stark Law prohibition continues to prohibit a physician-owned ASC from furnishing outpatient prescription drugs for use in a patient's home. Because of these exemptions, we believe the Stark Law does not prohibit physician ownership or investment intere our surgery centers to which they refer patients. Several states in which we operate have self-referral statutes similar to the Stark Law. We believe th physician ownership of surgery centers is not prohibited by these state self-referral statutes.  However, the Stark Law and similar state statutes are sub to different interpretations.  Violations of any of these self-referral laws may result in substantial civil or criminal penalties, including large civil mon penalties and exclusion from participation in the Medicare and Medicaid programs.  Exclusion of our surgery centers from these programs could resu significant loss of revenues and could have a material adverse effect on us.  We can give you No assurances that further judicial or agency interpretat of existing laws or further legislative restrictions on physician ownership or investment in healthcare entities will not be issued that could have a mate adverse effect on us.

*The Federal False Claims Act and Similar Federal and State Laws.* We are subject to state and federal laws that govern the submission of claims for reimbursement. These laws generally prohibit an individual or entity from knowingly and willfully presenting a claim (or causing a claim to be prese for payment from Medicare, Medicaid or other third-party payors that is false or fraudulent. Penalties under these statutes include substantial civil and criminal fines, exclusion from the Medicare program, and imprisonment. The standard for "knowing and willful" often includes conduct that amounts reckless disregard for whether accurate information is presented by claims processors. One of the most prominent of these laws is the federal FCA, w may be enforced by the federal government directly, or by a qui tam plaintiff (or whistleblower) on the government's behalf. There are many potentia bases for liability under the FCA, including knowingly and improperly avoiding repayment of an overpayment received from the government and the knowing failure to report and return an overpayment within 60 days of identifying the overpayment. The Health Reform Law expanded the scope of t federal FCA to cover payments in connection to the health insurance exchanges created under the Health Reform Law, if those payments include any federal funds. When a private plaintiff brings a qui tam action under the FCA, the defendant often

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the Fiscal Year Ended December 31,  2014**
**Commission File Number 001-36531**

## AMSURG CORP.
*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Tennessee** | **62-1493316** |
| *(State or Other Jurisdiction of Incorporation)* | *(I.R.S. Employer Identification No.)* |
| **1A Burton Hills Boulevard** | |
| **Nashville, Tennessee** | **37215** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

Securities registered pursuant to Section 12(b) of the Act:

**Common Stock, No par value**

**5.250% Mandatory Convertible Preferred Stock, Series A-1, No par value**
*(Title of class)*
**Nasdaq Global Select Market**
*(Name of each exchange on which registered)*

Registrant's telephone number, including area code:  (615) 665-1283

Securities registered pursuant to Section 12(g) of the Act:  None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes [X]                No [ ]

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes [ ]                No [X]

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes [X]                No [ ]

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes [X]                No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  [ ]

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer [X]   Accelerated filer [ ]   Non-accelerated filer [ ]   Smaller reporting Company [ ]
(Do not check if a smaller reporting company)

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes [ ]                No [X]

As of February 26, 2015, 48,367,128 shares of the Registrant's common stock were outstanding.  The aggregate market value of the shares of common stock of the Registrant held by nonaffiliates on June 30, 2014 (based upon the closing sale price of these shares as reported on the Nasdaq Global Select Market as of June 30, 2014) was approximately $1,438,900,000.  This calculation assumes that all shares of common stock beneficially held by executive officers and members of the Board of Directors of the Registrant are owned by "affiliates," a status which each of the officers and directors individually may disclaim.

**Documents Incorporated by Reference**
Portions of the Registrant's Definitive Proxy Statement for its Annual Meeting of Shareholders to be held on  May 20, 2015, are incorporated by reference into Part III of this Annual Report on Form 10-K.

As part of each transaction, our development subsidiaries form a new corporation and enter into a management or operating agreement with our physician partners. We generally own 51% of the LPs or LLCs. Under these agreements, we receive a percentage of the net income and cash distributions of the entity equal to our percentage ownership interest in the entity and have the

Item 1.  Business - (continued)

It is unclear what the ultimate resulting impact of the Health Reform Law will be on the number of uninsured individuals or what the payment terms will be for individuals covered by the Medicaid expansion or who purchase coverage through health insurance exchanges. Further, the Health Reform Law remains subject to legislative efforts to repeal or modify the law, further delay and a number of court challenges to its constitutionality and interpretation. For example, the U.S. Supreme Court will hear *King v. Burwell* during the 2015 session, which challenges the extension of premium subsidies to health insurance policies purchased through federally-operated health insurance exchanges. Further, the employer mandate, which requires firms with 50 or more full-time employees to offer health insurance or pay fines, was delayed until January 1, 2015 and will not be fully implemented until January 1, 2016. Because of the many variables involved, including the law's complexity, lack of comprehensive implementing definitive regulations or interpretive guidance, gradual or partially delayed implementation, court challenges, the possibility of amendments, repeal, or further implementation delays, uncertainty regarding how individuals and employers will respond to the choices afforded them by the law, we are unable to predict the net effect of the Health Reform Law. In addition, efforts to reform the healthcare industry continue to attract attention at both the federal and state levels.

*Certification.* We depend on third-party programs, including governmental and private health insurance programs, to reimburse us for services rendered to patients in our ASCs and by our outsourced physicians in various care settings. In order to receive Medicare reimbursement, each surgery center must meet the applicable conditions for coverage set forth by HHS relating to the type of facility, its equipment, personnel and standard of medical care, as well as its compliance with state and local laws and regulations, all of which are subject to change from time to time. ASCs undergo periodic on-site Medicare certification surveys. Each of our existing surgery centers is certified as a Medicare provider. Our outsourced physicians participate in Medicare, but are not subject to certification surveys or on-site inspections. While we intend for our outsourced physicians and centers to participate in Medicare and other government reimbursement programs, there can be No assurance that our physicians or centers will continue to qualify for participation.

*Medicare-Medicaid Fraud and Abuse Provisions.* The federal Anti-Kickback Statute prohibits healthcare providers and others from knowingly and willfully soliciting, receiving, offering or paying, directly or indirectly, any remuneration (including any kickback, bribe or rebate) in return for, or to induce, referrals or orders for services or items covered by a federal healthcare program. The Anti-Kickback Statute is very broad in scope, and many of its provisions have not been uniformly or definitively interpreted by case law or regulations. Courts have found a violation of the Anti-Kickback Statute if just one purpose of the remuneration is to generate referrals, even if there are other lawful purposes. Furthermore, the Health Reform Law provides that knowledge of the law or intent to violate the law is not required to establish a violation of the Anti-Kickback Statute. Violations may result in criminal penalties or fines of up to $25,000 or imprisonment for up to five years, or both. Violations of the Anti-Kickback Statute may also result in substantial civil penalties, including penalties of up to $50,000 for each violation, plus three times the amount claimed, and exclusion from participation in the Medicare and Medicaid programs. Exclusion from these programs would result in significant reduction in revenues and would have a material adverse effect on our business. The Health Reform Law provides that submission of a claim for services or items generated in violation of the Anti-Kickback Statute constitutes a false or fraudulent claim and may be subject to additional penalties under the federal False Claims Act (FCA).

Congress and HHS have published safe harbors that outline categories of activities that are deemed protected from prosecution under the Anti-Kickback Statute. Failure to meet the requirements of a safe harbor does not necessarily render the conduct or business arrangement illegal under the Anti-Kickback Statute. However, such conduct and business arrangements may lead to increased scrutiny by governmental enforcement authorities. In addition, the HHS Office of Inspector General (OIG) is authorized to issue advisory opinions regarding the interpretation and applicability of the federal Anti-Kickback Statute, including whether an activity constitutes grounds for the imposition of civil or criminal sanctions. Although advisory opinions are not binding on any entity other than the parties who submitted the requests, advisory opinions provide some guidance as to how the OIG would analyze a particular arrangement.

HHS has published regulations for safe harbors that relate to investment interests in general and to investments in certain types of ASCs. The limited partnerships and limited liability companies that own our surgery centers do not meet all of the criteria of a safe harbor. However, a business arrangement that does not substantially comply with a safe harbor is not necessarily illegal under the Anti-Kickback Statute.

We believe that our surgery centers and the related limited partnerships and limited liability companies are in compliance with the current requirements of applicable federal and state law because, among other factors:

- the limited partnerships and limited liability companies exist to effect legitimate business purposes, including the ownership, operation and continued improvement of high quality, cost-effective and efficient services to the patients served;

Item 1.  Business - (continued)

- the limited partnerships and limited liability companies function as an extension of the group practices of physicians who are affiliated with the surgery centers and the surgical procedures are performed personally by these physicians without referring the patients outside of their practice;
- our physician partners have a substantial investment at risk in the limited partnerships and limited liability companies;
- terms of the investment do not take into account the volume of the physician partners' past or anticipated future services provided to patients of the centers;
- the physician partners are not required or encouraged as a condition of the investment to treat Medicare or Medicaid patients at the centers or to influence others to refer such patients to the centers for treatment;
- the limited partnerships, the limited liability companies, our subsidiaries and our affiliates will not loan any funds to or guarantee any debt on behalf of the physician partners with respect to their investment; and
- distributions by the limited partnerships and limited liability companies are allocated uniformly in proportion to ownership interests.

The safe harbor regulations also set forth a safe harbor for personal services and management contracts. Certain of our limited partnerships and limited liability companies have entered into ancillary services agreements with our physician partners' group practices, pursuant to which the practice may provide the center with billing and collections, transcription, payables processing, payroll and other ancillary services. The consideration payable by a limited partnership or limited liability company for certain of these services may be based on the volume of services provided by the practice, which is measured by the limited partnership's or limited liability company's revenues. Although these relationships do not meet all of the criteria of the personal services and management contracts safe harbor, we believe that the ancillary services agreements are in compliance with the current requirements of applicable federal and state law because, among other factors, we believe the fees payable to the physician practices are equal to the fair market value of the services provided.

In addition, certain of our limited partnerships and limited liability companies have entered into certain arrangements for professional services, including arrangements for anesthesia services. The OIG has issued advisory opinions in which it concluded that proposed arrangements between anesthesia groups and facilities, including, physician-owned ASCs could result in prohibited remuneration under the federal Anti-Kickback Statute. We believe our arrangements for anesthesia services are unlike those described in the OIG advisory opinions and are in compliance with the requirements of the federal Anti-Kickback Statute.

In connection with our outsourced physician services, we have a variety of financial relationships with physicians, hospitals, ASCs, and other healthcare services, including joint venture arrangements. These financial relationships do not meet all of the criteria of the personal services and management contracts safe harbor, but we believe that the arrangements are in compliance with the current requirements of applicable federal and state law because, among other factors, we believe the fees payable under the arrangements are consistent with fair market value of the services provided.

We believe we have structured our relationships with physicians and other providers to comply with the Anti-Kickback Statute, but we cannot assure you that a federal or state agency charged with enforcement of the Anti-Kickback Statute and similar laws might not assert a contrary position or that new federal or state laws might not be enacted that would cause these arrangements to become illegal, or result in the imposition of penalties on us or certain of our facilities. Even the assertion of a violation could have a material adverse effect upon us.

Many of the states in which we operate have adopted laws that prohibit payments to physicians in exchange for referrals similar to the federal Anti-Kickback Statute, some of which apply regardless of the source of payment for care. These statutes typically provide criminal and civil penalties as well as loss of licensure.

In addition to the Anti-Kickback Statute, the Health Insurance Portability and Accountability Act of 1996 (HIPAA) provides for criminal penalties for healthcare fraud offenses that apply to all health benefit programs, including the payment of inducements to Medicare and Medicaid beneficiaries in order to influence those beneficiaries to order or receive services from a particular provider or practitioner. Federal enforcement officials have numerous enforcement mechanisms to combat fraud and abuse, including the Medicare Integrity Program and an incentive program under which individuals can receive up to $1,000 for providing information on Medicare fraud and abuse that leads to the recovery of at least $100 of Medicare funds. In addition, federal enforcement officials have the ability to exclude from Medicare and Medicaid any investors, officers and managing employees associated with business entities that have committed healthcare fraud.

Evolving interpretations of current, or the adoption of new, federal or state laws or regulations could affect many of our arrangements. Law enforcement authorities, including the OIG, the courts and Congress, are increasing their scrutiny of arrangements between healthcare providers and potential referral sources to ensure that the arrangements are not designed as a mechanism to exchange remuneration for patient care referrals or opportunities. Investigators also have demonstrated a willingness to look behind the

Table of Contents

within our control are present, classification of noncontrolling interests outside of permanent equity is required. The amounts of consolidated net income attributable to us and to the noncontrolling interests are identified and presented on the face of the consolidated statements of earnings; changes in ownership interests are accounted for as equity transactions; and when a subsidiary is deconsolidated, any retained noncontrolling equity investment in the former subsidiary and the gain or loss on the deconsolidation of the subsidiary is measured at fair value. Lastly, the cash flow impact of certain transactions with noncontrolling interests is classified within financing activities.

Upon the occurrence of various fundamental regulatory changes, we would be obligated under the terms of our partnership and operating agreements to purchase the noncontrolling interests related to a majority of our partnerships. We believe that the likelihood of a change in current law that would trigger such purchases was remote as of December 31, 2014, and the occurrence of such regulatory changes is outside of our control. As a result, these noncontrolling interests that are subject to this redemption feature are not included as part of our equity and are classified as noncontrolling interests – redeemable on our consolidated balance sheets.

Center profits and losses are allocated to our partners in proportion to their ownership percentages and reflected in the aggregate as net earnings attributable to noncontrolling interests. The partners of our center partnerships typically are organized as general partnerships, limited partnerships or limited liability companies that are not subject to federal income tax. Each partner shares in the pre-tax earnings of the center in which it is a partner. Accordingly, the earnings attributable to noncontrolling interests in each of our consolidated partnerships are generally determined on a pre-tax basis. Total net earnings attributable to noncontrolling interests are presented after net earnings. However, we consider the impact of the net earnings attributable to noncontrolling interests on earnings before income taxes in order to determine the amount of pre-tax earnings on which we must determine our tax expense. In addition, distributions from the partnerships are made to both our wholly-owned subsidiaries and the partners on a pre-tax basis.

*Physician Services*

On July 16, 2014, we completed our acquisition of Sheridan. Our consolidated financial statements include the accounts of Sheridan and its wholly-owned subsidiaries along with the accounts of affiliated professional corporations (PCs) with which Sheridan currently has management arrangements. Our agreements with these PCs provide that the term of the arrangements is permanent, subject only to termination by us, except in the case of gross negligence, fraud or bankruptcy by us. These arrangements are captive in nature as a majority of the outstanding voting equity instruments of the PCs are owned by nominee shareholders appointed at our sole discretion. We have a contractual right to transfer the ownership of the PCs at any time to any person we designate as the nominee shareholder. We have the right to receive income, both as ongoing fees and as proceeds from the sale of our interest in the PCs, in an amount that fluctuates based on the performance of the PCs and the change in the fair value of our interest in the PCs. We have exclusive responsibility for the provision of all non-medical services required for the day-to-day operation and management of the PCs and establishes the guidelines for the employment and compensation of the physicians and other employees of the PCs. In addition, the agreements provide that we have the right, but not the obligation, to purchase, or to designate a person(s) to purchase, the stock of the PCs for a nominal amount. Separately, in our sole discretion, we have the right to assign our interest in the management and purchase agreements. Based upon the provisions of these agreements, we have determined that the PCs are variable interest entities and that we are the primary beneficiary as defined in the accounting guidance for consolidation.

In both our Ambulatory Services Division and Physician Services Division, the investments in unconsolidated affiliates in which we exert significant influence but do not control or otherwise consolidate are accounted for using the equity method. These investments are included as investments in unconsolidated affiliates in our consolidated balance sheets. Our share of the profits and losses from these investments are reported in equity in earnings of unconsolidated affiliates in our consolidated statement of earnings. We monitor each investment for other-than-temporary impairment by considering factors such as current economic and market conditions and the operating performance of the company and record a reduction in carrying value when necessary.

**Revenue Recognition**

*Ambulatory Services*

Our ambulatory services revenues, net of adjustments, are derived from facility fees charged for surgical procedures performed in our centers and, at certain of our centers (primarily centers that perform gastrointestinal endoscopy procedures), charges for anesthesia services provided by medical professionals employed or contracted by our centers.  These fees vary depending on the procedure, but usually include all charges for operating room usage, special equipment usage, supplies, recovery room usage, nursing staff and medications.  Facility fees do not include professional fees charged by the physicians that perform the surgical procedures.  Revenues are recorded at the time of the patient encounter and billings for such procedures are made on or about that same date. At the majority of our centers, it is our policy to collect patient co-payments and deductibles at the time the surgery is performed. Our revenues are recorded net of estimated contractual adjustments from third-party medical service payors. Our billing and accounting systems provide

10-K 1 amsg-2015123110k.htm 10-K

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the Fiscal Year Ended December 31, 2015**
**Commission File Number 001-36531**

## AMSURG CORP.
*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Tennessee** | **62-1493316** |
| *(State or Other Jurisdiction of Incorporation)* | *(I.R.S. Employer Identification No.)* |
| **1A Burton Hills Boulevard** | |
| **Nashville, Tennessee** | **37215** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

Securities registered pursuant to Section 12(b) of the Act:

**Common Stock, no par value**

**5.250% Mandatory Convertible Preferred Stock, Series A-1, no par value**
*(Title of class)*
**Nasdaq Global Select Market**
*(Name of each exchange on which registered)*

Registrant's telephone number, including area code: (615) 665-1283

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes [X]          No [ ]

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes [ ]          No [X]

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes [X]          No [ ]

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes [X]          No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer [X]   Accelerated filer [ ]   Non-accelerated filer [ ]   Smaller reporting Company [ ]
(Do not check if a smaller reporting company)

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes [ ]          No [X]

As of February 24, 2016, 54,720,648 shares of the Registrant's common stock were outstanding. The aggregate market value of the shares of common stock of the Registrant held by nonaffiliates on June 30, 2015 (based upon the closing sale price of these shares as reported on the Nasdaq Global Select Market as of June 30, 2015) was approximately $3,318,935,487. This calculation assumes that all shares of common stock beneficially held by executive officers and members of the Board of Directors of the Registrant are owned by "affiliates," a status which each of the officers and directors individually may disclaim.

**Documents Incorporated by Reference**
Portions of the Registrant's Definitive Proxy Statement for its Annual Meeting of Shareholders to be held on May 26, 2016, are incorporated by reference into Part III of this Annual Report on Form 10-K.

the center's clinical staff and the state-of-the-art surgical equipment. We also focus on our expertise in developing and operating centers, including contracting with vendors and third-party payors. In a development project, we provide services, such as financial feasibility pro forma analysis, site selection, financing for construction, equipment and build out, and architectural oversight. Capital contributed by the physicians and our company plus debt financing provides the funds necessary to construct and equip a new surgery center and initial working capital.

As part of each surgery center acquisition or development transaction, we generally form an LLC or LP, which are referred to herein as "partnerships" where certain states require and enter into an operating agreement or a LP agreement with our physician partners. We generally own 51% of the partnerships. Under these agreements, we receive a percentage of the net income and cash distributions of the entity equal to our percentage ownership interest in the entity and have the right to the same percentage of the proceeds upon a sale or liquidation of the entity. In the LP structure, as the sole general partner, one of our affiliates is generally liable for the debts of the LP. However, the physician partners are generally required to guarantee their pro rata share of any indebtedness or lease agreements to which the limited partnership is a party in proportion to their ownership interest in the LP.

Except in limited instances, we manage each partnership and oversee the business office, contracting, marketing, financial reporting, accreditation, clinical, regulatory and administrative operations of the surgery center. The physician partners provide the center with a medical director and performance improvement chairman and may provide certain other specified services such as billing and collections, transcription and accounts payable processing. In addition, the partnership may lease the services of certain non-physician personnel from entities affiliated with the physician partners, who will provide services at the center. Certain significant aspects of the partnership's governance are overseen by an operating board, which is typically comprised of equal representation by AmSurg and our physician partners. We work closely with our physician partners to increase the likelihood of a successful partnership.

A majority of the operating agreements and LP agreements for our surgery centers provide that, if certain regulatory changes take place, we will be obligated to purchase some or all of the noncontrolling interests of our physician partners. The regulatory changes that could trigger such obligations include changes that: (i) make the referral of Medicare and other patients to our surgery centers by physicians affiliated with us illegal; (ii) create the substantial likelihood that cash distributions from the partnership to the affiliated physicians will be illegal; or (iii) cause the ownership by the physicians of interests in the partnership's to be illegal. There can be no assurance that our existing capital resources would be sufficient for us to meet the obligations, if they arise, to purchase these noncontrolling interests held by physicians. The determination of whether a triggering event has occurred generally would be made by the concurrence of our legal counsel and counsel for the physician partners or, in the absence of such concurrence, by independent counsel having expertise in healthcare law chosen by both parties. Such determination therefore would not be within our control. The triggering of these obligations could have a material adverse effect on our financial condition and results of operations. See "– Government Regulation."

### *Ambulatory Services Revenues*

Revenues from our ASCs are derived from facility fees charged for surgical procedures performed and, at certain of our surgery centers (primarily centers that perform gastrointestinal endoscopy procedures), charges for anesthesia services provided by medical professionals employed or contracted by our centers. These fees vary depending on the procedure, but usually include all charges for operating room usage, special equipment usage, supplies, recovery room usage, nursing staff and medications. Facility fees do not include professional fees charged by the physicians that perform the surgical procedures. Revenues are recorded at the time of the patient encounter and billings for such procedures are made on or about that same date. At the majority of our centers, it is our policy to collect patient co-payments and deductibles at the time the surgery is performed. Our revenues are recorded net of estimated contractual adjustments from third-party medical service payors.

ASCs depend upon third-party reimbursement programs, including governmental and private insurance programs, to pay for substantially all of the services rendered to patients. We derived approximately 26%, of our ambulatory services segment revenue in the year ended December 31, 2015, and 25% of our revenues in the years ended December 31, 2014 and 2013 from governmental healthcare programs, primarily Medicare and managed Medicare programs, and the remainder from a wide mix of commercial payors and patient co-pays and deductibles. The Medicare program currently pays ASCs in accordance with predetermined fee schedules. Our surgery centers are not required to file cost reports and, accordingly, we have no unsettled amounts from governmental third-party payors.

ASCs are paid under the Medicare program based upon a percentage of the payments to HOPDs pursuant to the hospital outpatient prospective patient system and reimbursement rates for ASCs are updated annually based on changes in the consumer price index (CPI). The Health Reform Law provides for the annual CPI increases applicable to ASCs to be reduced by a productivity adjustment, which is based on historical nationwide productivity gains. In 2013, ASC reimbursement rates increased by 0.6%, which positively impacted our 2013 ambulatory services revenues by approximately $2.5 million and our net earnings per diluted share by $0.02. In

We believe that our surgery centers and the related limited partnerships and limited liability companies are in compliance with the current requirements of applicable federal and state law because, among other factors:

- the limited partnerships and limited liability companies exist to effect legitimate business purposes, including the ownership, operation and continued improvement of high quality, cost-effective and efficient services to the patients served;
- the limited partnerships and limited liability companies function as an extension of the practices of physicians who are affiliated with the surgery centers and the surgical procedures are performed personally by these physicians without referring the patients outside of their practice;
- our physician partners have a substantial investment at risk in the limited partnerships and limited liability companies;
- terms of the investment do not take into account the volume of the physician partners' past or anticipated future services provided to patients of the centers;
- the physician partners are not required or encouraged as a condition of the investment to treat Medicare or Medicaid patients at the centers or to influence others to refer such patients to the centers for treatment;
- the limited partnerships, the limited liability companies, our subsidiaries and our affiliates do not loan any funds to or guarantee any debt on behalf of the physician partners with respect to their investment; and
- distributions by the limited partnerships and limited liability companies are allocated uniformly in proportion to ownership interests.

The safe harbor regulations also set forth a safe harbor for personal services and management contracts. Certain of our limited partnerships and limited liability companies have entered into ancillary services agreements with our physician partners' group practices, pursuant to which the practice may provide the center with billing and collections, transcription, payables processing, payroll and other ancillary services. The consideration payable by a limited partnership or limited liability company for certain of these services may be based on the volume of services provided by the practice, which is measured by the limited partnership's or limited liability company's revenues. Although these relationships do not meet all of the criteria of the personal services and management contracts safe harbor, we believe that the ancillary services agreements are in compliance with the current requirements of applicable federal and state law because, among other factors, we believe the fees payable to the physician practices are equal to the fair market value of the services provided.

In addition, certain of our limited partnerships and limited liability companies have entered into certain arrangements for professional services, including arrangements for anesthesia services. The OIG has issued advisory opinions in which it concluded that proposed arrangements between anesthesia groups and facilities, including, physician-owned ASCs could result in prohibited remuneration under the federal Anti-Kickback Statute. We believe our arrangements for anesthesia services are unlike those described in the OIG advisory opinions and are in compliance with the requirements of the federal Anti-Kickback Statute.

In connection with our outsourced physician services, we have a variety of financial relationships with physicians, hospitals, ASCs, and other healthcare services, including joint venture arrangements. These financial relationships do not meet all of the criteria of the personal services and management contracts safe harbor, but we believe that the arrangements are in compliance with the current requirements of applicable federal and state law because, among other factors, we believe the fees payable under the arrangements are consistent with fair market value of the services provided.

We believe we have structured our relationships with physicians and other providers to comply with the Anti-Kickback Statute, but we cannot assure you that a federal or state agency charged with enforcement of the Anti-Kickback Statute and similar laws might not assert a contrary position or that new federal or state laws might not be enacted that would cause these arrangements to become illegal, or result in the imposition of penalties on us or certain of our facilities. Even the assertion of a violation could have a material adverse effect upon us.

Many of the states in which we operate have adopted laws that prohibit payments to physicians in exchange for referrals similar to the federal Anti-Kickback Statute, some of which apply regardless of the source of payment for care. These statutes typically provide criminal and civil penalties as well as loss of licensure.

In addition to the Anti-Kickback Statute, the Health Insurance Portability and Accountability Act of 1996 (HIPAA) provides for criminal penalties for healthcare fraud offenses that apply to all health benefit programs, including the payment of inducements to Medicare and Medicaid beneficiaries in order to influence those beneficiaries to order or receive services from a particular provider or practitioner. Federal enforcement officials have numerous enforcement mechanisms to combat fraud and abuse, including the Medicare Integrity Program and an incentive program under which individuals can receive up to $1,000 for providing information on Medicare fraud and abuse that leads to the recovery of at least $100 of Medicare funds. In addition, federal enforcement officials have the ability to exclude from Medicare and Medicaid any investors, officers and managing employees associated with business entities that have committed healthcare fraud.

3/8/22, 1:44 PM                                                                    10-K

Case 2:19-cv-00873-TLN-AC   Document 31-3   Filed 03/14/22   Page 23 of 93
Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations - (continued)                Table of Contents

presented after net earnings. However, we consider the impact of the net earnings attributable to noncontrolling interests on earnings before income taxes in order to determine the amount of pre-tax earnings on which we must determine our tax expense. In addition, distributions from the partnerships are made to both our wholly-owned subsidiaries and the partners on a pre-tax basis.

*Physician Services*

Our consolidated financial statements include the accounts of Sheridan and its wholly-owned subsidiaries along with the accounts of affiliated professional corporations (PCs) with which Sheridan currently has management arrangements. Sheridan's agreements with these PCs provide that the term of the arrangements is permanent, subject only to termination by us, except in the case of gross negligence, fraud or bankruptcy by us. The professional corporation structure is primarily used in states which prohibit the corporate practice of medicine. The arrangements are captive in nature as a majority of the outstanding voting equity instruments of the PCs are owned by nominee shareholders appointed at our sole discretion. The nominee shareholder is generally a medical doctor who is generally one of our senior corporate employees. We have a contractual right to transfer the ownership of the PCs at any time to any person we designate as the nominee shareholder. We have the right to all assets and to receive income, both as ongoing fees and as proceeds from the sale of any interest in the PCs, in an amount that fluctuates based on the performance of the PCs and the change in the fair value of the interest in the PCs. We have exclusive responsibility for the provision of all non-medical services required for the day-to-day operation and management of the PCs and establishes the guidelines for the employment and compensation of the physicians and other employees of the PCs which is consistent with the operation of our wholly-owned affiliates. Based on the provisions of these agreements, we have determined that the PCs are variable interest entities and that we are the primary beneficiary as defined in the Financial Accounting Standards Board's Accounting Standards Codification 810 "Consolidations."

In both our ambulatory services segment and physician services segment, the investments in unconsolidated affiliates in which we exert significant influence but do not control or otherwise consolidate are accounted for using the equity method. These investments are included as investments in unconsolidated affiliates in our consolidated balance sheets. Our share of the profits and losses from these investments are reported in equity in earnings of unconsolidated affiliates in our consolidated statement of earnings. We monitor each investment for other-than-temporary impairment by considering factors such as current economic and market conditions and the operating performance of the company and record a reduction in carrying value when necessary.

### Revenue Recognition

*Ambulatory Services*

Our ambulatory services revenues, net of adjustments, are derived from facility fees charged for surgical procedures performed in our centers and, at certain of our centers (primarily centers that perform gastrointestinal endoscopy procedures), charges for anesthesia services provided by medical professionals employed or contracted by our centers.  These fees vary depending on the procedure, but usually include all charges for operating room usage, special equipment usage, supplies, recovery room usage, nursing staff and medications.  Facility fees do not include professional fees charged by the physicians that perform the surgical procedures.  Revenues are recorded at the time of the patient encounter and billings for such procedures are made on or about that same date. At the majority of our centers, it is our policy to collect patient co-payments and deductibles at the time the surgery is performed. Our revenues are recorded net of estimated contractual adjustments from third-party medical service payors. Our billing and accounting systems provide us historical trends of the centers' cash collections and contractual write-offs, accounts receivable agings and established fee adjustments from third-party payors. These estimates are recorded and monitored monthly for each of our centers as revenues are recognized. Our ability to accurately estimate contractual adjustments is dependent upon and supported by the fact that our centers perform and bill for limited types of procedures, the range of reimbursement for those procedures within each surgery center specialty is very narrow and payments are typically received within 15 to 45 days of billing. These estimates are not, however, established from billing system generated contractual adjustments based on fee schedules for the patient's insurance plan for each patient encounter.

Revenues from ambulatory services are recognized on the date of service, net of estimated contractual adjustments from third-party medical service payors including Medicare and Medicaid. During the years ended December 31, 2015, 2014 and 2013, we derived approximately 26%, 25% and 25%, respectively, of our ambulatory services revenues from governmental healthcare programs, primarily Medicare and managed Medicare programs.  Concentration of credit risk with respect to other payors is limited due to the large number of such payors.

*Physician Services*

Physician services revenue primarily consists of fee for service revenue and contract revenue and is derived principally from the provision of physician services to patients of the healthcare facilities we serve. Contract revenue represents income earned from our hospital customers to supplement payments from third-party payors.

Exhibit 2



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

2016 FEB -5   AM 11:46

MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA;
STATE OF FLORIDA;
ex rel. STEPHEN VANASCO,

Plaintiffs

Case No.: 8:16-CV-288-T-33 TGW

v.

AHP OF ORLANDO, LLC, a Florida limited liability
company; AMSURG CORP., a Tennessee and Florida
corporation; AMSURG HOLDINGS, INC., a
Tennessee, Delaware and Florida corporation;
ANESTHESIA HEALTHCARE PARTNERS, INC., a
Nevada, Georgia and Florida corporation; CENTRAL
FLORIDA SURGICAL CENTERS, INC., a Florida
profit corporation; ORLANDO FL ENDOSCOPY ASC,
LLC., a Tennessee and Florida limited liability
company, CITRUS AMBULATORY SURGERY
CENTER, INC., a Florida corporation, AVANISH M.
AGGARWAL, MD., an individual; ROBERT T.
BAKER, MD., an individual; STEVEN L BRINT, MD.,
an individual; RICHARD A. DUMOIS, MD., an
individual; KENNETH R. FEUER, an individual;
ALEX M. MENENDEZ, MD., an individual and JOHN
AND JANE DOE DEFENDANTS 1-100,

Defendants

**FILED IN CAMERA AND
UNDER SEAL PURSUANT
TO THE FALSE CLAIMS
ACT, 31 U.S.C. § 3729 *et seq.***

## *QUI TAM* ACTION

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT
## AND DEMAND FOR JURY TRIAL

### FILED UNDER SEAL

1



1.      Under the federal False Claims Act and the states false claims acts, as defined and more specifically listed below, this complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on defendants until the Court so orders. The government may elect to intervene and proceed with the action within sixty (60) days after it received the Complaint.

2.      As required by the False Claims Act, Relator voluntarily submitted prior to the filing of this complaint, a confidential written disclosure statement (subject to the attorney-client and common interest privileges to the United States Government containing material evidence and information in her possession pertaining to the allegations contained in this complaint.

## INTRODUCTION

3.      This case involves fraudulent arrangements whereby physician owners of ambulatory surgery centers ("ASC") enter into "joint ventures" in which the physicians are paid kickbacks from fees generated for anesthesia services for their referral of patients.

4.      The ASC owners use different models to perpetrate the foregoing, all of which are in violation of the law.

## ORIGINAL SOURCE STATEMENT

5.      Relator is the original source of the information underlying the allegations contained in this Complaint. 31 U.S.C. §3730(e)(4)(A), and (B).

2

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §3730(b), which allows a private person to bring suit for a violation of the False Claims Act pursuant to 28 U.S.C. §1345 and which provides the District Courts with original jurisdiction over all civil actions commenced by the United States of America pursuant to 28 U.S.C. §1331.

7.      The acts proscribed by 31 U.S.C. §3729 *et seq*. and complained of herein were performed by the Defendants who transact business and reside in this district. Therefore, this Court has personal jurisdiction over Defendants and venue is proper in this district pursuant to 31 U.S.C. §3732(a).

8.      Further, this Court has jurisdiction, under 31 U.S.C. §3732(b), over any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under §3732.

9.      Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because the Defendants are subject to personal jurisdiction in this District and transact business in this District.

10.     The Florida FCA claims are filed pendent to the federal claims filed herein and pursuant to Fla. Stat. Ann. §68.081 *et seq*.

## PARTIES

11.     Relator Stephen Vanasco D.O. (hereafter referred to as "Relator") is a board certified anesthesiologist in Florida who worked as an anesthesiologist for AHP of Orlando, LLC, which is owned by Anesthesia Health Partners, Inc.

12.     At all times relevant to this complaint Relator resided at 6146 Crystal View Dr., Orlando, FL 32819.

13.     Defendant AHP OF ORLANDO, LLC (hereafter referred to as "AHP LLC") is a Florida limited liability company with its principal address at 4411 Suwanee Dam Rd., Ste 250, Suwanee, GA 30024.

14.     Defendant AMSURG CORP. (hereafter referred to as "Amsurg Corp.") is a for-profit corporation organized under the laws of Tennessee with its principal address a 1A Burton Hills Blvd., Nashville, TN 37215.

15.     Defendant AMSURG HOLDINGS, INC. (hereafter referred to as "Amsurg Holdings") is a for-profit corporation organized under the laws of Tennessee and Delaware with its principal address at 1A Burton Hills Blvd., Nashville, TN 37215.

16.     Defendant ANESTHESIA HEALTHCARE PARTNERS, INC. (hereafter referred to as "AHP Inc.") is a Nevada corporation, registered in Georgia which has the principal address of 3079 Peachtree Industrial Blvd, Duluth, GA 30097.

17.     Defendant ORLANDO FL ENDOSCOPY ASC, LLC and/or THE ORLANDO FL ENDOSCOPY ASC, LLC (hereafter referred to as "Orlando Endoscopy") is a Tennessee limited liability company registered in Florida with a principal address of 1A Burton Hills Blvd., Nashville, TN 3715.

18.     Defendant Orlando Endoscopy is the owner of the fictitious names registered in Florida to do business as "Central Florida Surgical Center" and "Citrus Ambulatory Surgery Center" (hereafter referred to individually as "Central ASC" and "Citrus ASC" respectively

4

and collectively as the "ASCs"), with a mailing address of 20 Burton Hills Blvd., 5th Fl.,
Nashville, TN 37215.

19.     Defendant CITRUS AMBULATORY SURGERY CENTER, INC. is an active
corporation in the State of Florida with a principal address of 2861 S. Delaney Avenue, Suite
B, Orlando, FL 32806 in the middle district of Florida.

20.     Defendant CENTRAL FLORIDA SURGICAL CENTERS, INC., (hereafter
referred to as "CFSC") is a for profit corporation organized under Florida law with a principal
address of 11140 W. Colonial Drive., Ste 3, Ocoee, FL 34761.

21.     At all times relevant to this complaint the ASCs described herein, Central ASC
and Citrus ASC, were owned by Amsurg Corp. (51%) and CFSC. (49%).

22.     Defendant AVANISH M. AGGARWAL, MD., is a gastroenterologist and an
owner/member of Citrus Ambulatory Surgical Center and Central Florida Surgical Center.

23.     Defendant ROBERT T. BAKER, MD., is a gastroenterologist and an
owner/member of Citrus Ambulatory Surgical Center and Central Florida Surgical Center,

24.     Defendant STEVEN L. BRINT, MD., is a gastroenterologist and an
owner/member of Central Florida Surgical Center.

25.     Defendant RICHARD A. DUMOIS, MD., is a gastroenterologist and an
owner/member of Central Florida Surgical Center.

26.     Defendant KENNETH R. FEUER, MD., is a gastroenterologist and an
owner/member of Central Florida Surgical Center and Citrus Ambulatory Surgical Center.

27.     Defendant ALEX M. MENENDEZ, MD., is a gastroenterologist and an owner/member of Citrus Ambulatory Surgical Center,

28.     Defendants JOHN AND JANE DOE DEFENDANTS 1-100 include other ASCs and their physician owners who have been participating in the schemes set forth below.

## REGULATORY FRAMEWORK

Federal False Claims Act

29.     A cause of action arises when any person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. §3729(a)(1)(A).

30.     Liability also arises when a person knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. §3729(a)(1)(B).

31.     As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is necessary. *Id.*

32.     Pursuant to the §3729(a)(1)(G) of the FCA, a cause of action arises when a person knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

33.     FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim for payment or approval is liable for a civil penalty of not less than $5,500 and up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government.

34.     The *qui tam* provision of the FCA empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government.

35.     A FCA complaint is filed under seal and without service on the defendants and remains under seal while the government conducts an investigation of the allegations in the Complaint and determines whether to join the action.

Florida False Claims Act

36.     The Florida FCA provides that any person who knowingly makes, uses, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state is liable for the full amount of damages incurred by the State due to the false statement, and for each claim a civil penalty of not less than $5,500.00 or more than $11,000.00 plus triple the amount of damages suffered by the state as a result of the conduct.  Fla. Stat. Ann. § 68.082(2).

37.     Similar to the federal False Claims Act, the Florida Act provides a cause of action for an individual to bring a cause of action, on behalf of the State of Florida, and against defendants for false and/or fraudulent claims. Fla. Stat. Ann. § 68.083(2).

38.     The Florida Department of Legal Affairs, or the Department of Financial Services under certain circumstances, may elect to intervene and proceed with the action, on behalf of the state, within 60 days after it receives both the complaint and the material evidence and information.  Fla. Stat. Ann. § 68.083(3).

The Medicare Program

39.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §1395 *et seq.*, known as the federal Medicare program, which authorizes medical benefits for the elderly, blind and disabled. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare program.

40.     As a condition precedent to the receipt of payment or reimbursement from Medicare and Medicaid of costs incurred for treating and providing care to beneficiaries, defendants must be familiar with the laws and regulations regarding the provision of healthcare services.

41.     If services are billed to Medicare or Medicaid despite the failure to satisfy a condition material to reimbursement, then they are false claims because they are based on fraudulent activities and billings of defendants that should not be paid.

42.     By falsely billing Medicare, the defendants knowingly caused the Government to pay defendants more than it would have had defendants followed the law.

Federal and State Funding for Medicaid

43.     Medicaid was established by Title XIX of the Social Security Act of 1965, 42 U.S.C. §1396 *et seq*. Medicaid is a jointly funded federal-state program and enables states such as Florida to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical services.

44.     Although Medicaid is funded in significant part by the states, the federal government pays a portion of Medicaid costs. In Florida, the federal government pays for approximately 53 percent of all Medicaid healthcare services, while the State of Florida funds the remaining 47 percent. Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under both the federal FCA and the Florida FCA.

The Anti-Kickback Statute

45.     In 1972, Congress enacted the federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b *et seq*., which prohibited payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by the federal government.

46.     The AKS also provides that those who knowingly and willfully solicit or receive, offer or pay anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal health care program may make payment shall be guilty of a felony. 42 U.S.C. § 1320a- 7b(b)(1).

47.     The AKS covers any such arrangement where at least one purpose of the remuneration was to pay for the referral of services or to otherwise induce referrals.

48.     A violation of the AKS is a basis for False Claims Act liability.  31 U.S.C. §3729-3733 and 42 U.S.C. §1320a–7b(g).

49.     Compliance with AKS is a condition material to payment from Medicare and/or Medicaid.

50.     The purpose of the AKS is to protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than the cost, quality of care or necessity of services.

51.     The AKS seeks to prevent overutilization, limit costs, preserve freedom of choice and preserve competition in health care services. Therefore, complying with AKS is essential to protecting Medicare and Medicaid, and compliance is material to payment from and participation in government-funded health care programs.

52.     As a condition precedent to the receipt of payment or reimbursement from Medicare and Medicaid of costs incurred for treating and providing care to beneficiaries, defendants must be familiar with the laws and regulations regarding the provision of healthcare services.

53.     AKS contains a number of safe harbors that outline how an arrangement may be excluded from the application of the AKS. 42 C.F.R. 1001.952.

54.     In order to qualify for a safe harbor, however, a party has to meet all of the specific requirements of that safe harbor.

55.     The safe harbors include the ambulatory surgical center ("ASC") safe harbor (42 CFR 1001.952(r)), the employee safe harbor (42 CFR 1001.952(i)), and the professional services management contracts safe harbor (42 C.F.R. § 1001.952(d)).

56.     The ambulatory surgical center safe harbor applies to an investment return on surgery services performed at ASCs.  42 CFR 1001.952(r).

57.     Under the ASC safe harbor there are four, slightly different scenarios: (1) Surgeon-Owned ASCs, (2) Single-Specialty ASCs, (3) Multi-Specialty ASCs, and (4) Hospital/Physician ASCs.  42 CFR 1001.952(r)(1-4).

58.     Each of the preceding arrangements have similar core requirements: they must not be related to volume or value of referrals, no loans or loan guarantees by other investors are allowed, distributions must be directly proportional to the amount of the capital investment of that investor, ancillary services must be directly and integrally related to primary procedures performed at the ASC and none may be separately billed to Medicare, they must treat Medicare patients in a nondiscriminatory manner, and patients must be fully informed of the physician's ownership.  42 CFR 1001.952(r).

59.     The ambulatory surgical center safe harbor does not apply to investment returns on anesthesia service profits (*See* 42 C.F.R. § 416.2) because anesthesia services are not surgical services.  *See* 42 C.F.R. §§ 416.2 and 416.164(c).

60.     The employee safe harbor applies to any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment

in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.  42 CFR 1001.952(i).

61.     The professional services management services safe harbor (42 CFR 1001.952(d)) is similar to the employee safe harbor but applies to non-employee agents if its seven criteria are met:

a)   The agency agreement is set out in writing and signed by the parties;

b)   The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent;

c)   If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals;

d)   The term of the agreement is for not less than one year;

e)   The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs;

f) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law; and

g) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

62.     Importantly, the employee safe harbor and the professional services management services safe harbor only apply to the compensation paid to the employee or manager and do not apply to investment returns on anesthesia service profits received by the owners.

63.     The Group Practice Safe Harbor of the AKS excludes from the definition of remuneration any payment that is a return on an investment interest, such as a dividend or interest income, made to a solo or group practitioner investing in his or her own practice or group practice if the following four standards are met:

a) Equity interest in the group practice is held by licensed physicians who practice in the group practice as defined by the Stark Law;

b) Equity interest must be in group practice itself and not in a subdivision of it;

c) The group practice (or subdivision providing ancillary services) meets the Stark Law definition of a group practice/ancillary services of the group practice; and

d) The group practice (or subdivision providing ancillary services) must be a unified business with centralized decision-making, pooling of expenses, and a

compensation system that is not based on satellite offices operating substantially as if they were separate enterprises or profit centers.

64. Under the Stark Law, a group practice is a group of physicians in which each group physician, whether shareholder or employee:

a) Provides substantially the full range of services that such physician routinely provides utilizing the resources of the group;

b) Provides, bills and collects for substantially all services through the group;

c) Shares expenses and income from the practice which are distributed in accordance with predetermined methods;

d) Does not receive, directly or indirectly, compensation based on the volume or value of the physician's referrals, except through a permitted profit sharing or productivity bonus arrangement;

e) Personally conducts at least 75% of the group's physician-patient ☐encounters in the aggregate in the practice, and

f) Meets other regulatory standards.

65. Further, under the Stark Law, for anesthesia to be an "ancillary service" of the group practice from which the owners of the group practice can derive revenue, it must:

a) Be provided in the same building (same street address) where the medical services are routinely delivered.

b) The services must be furnished personally by the referring physician member of the group or personally by individuals who are generally or directly supervised by the referring physician or another physician in the group.

c) The services must be billed by the physician performing or supervising the services, or a group practice of which such a physician is a member under a billing number assigned to the group practice, or an entity that is wholly owned by such physician or group practice.

66.     The group practice safe harbor does not apply because, while the physician owners may have their own separate group practices, the ASC entity that receives other compensation does not meet the definition of a group practice under the Stark Law.

OIG Advisory Opinion No. 12-06 on AKS Safe Harbors

67.     The Office of Inspector General recently addressed a proposed arrangement for anesthesia services similar to the ones orchestrated by Defendants. See OIG Advisory Opinion No. 12-06, Proposal B.

68.     The OIG opinion addressed an arrangement where the owners of the ASC were also the owners of the entity providing the anesthesia services in the ASC. The anesthesia company was run by an anesthesiologist who charged the ASC a flat rate for its services pursuant to a contract with the ASC. The owners of the ASC retained the profits from the operations of the anesthesia entity after it paid out the anesthesiologist. This is commonly referred to as the "company model" in the anesthesia services sector.

69.     Under the company model, the ASC refers its patients to the anesthesiology company while the ASC owners are also owners of the anesthesiology company or derive profits therefrom.

70.     In exchange for those referrals, the ASC owners take a kick back from the anesthesiology company under the guise of "profit" for those services.

71.     In that opinion, the OIG stated that it has "long been concerned about the potential for investments in ASCs to serve as vehicles to reward referrals."

72.     Moreover, the OIG found that no safe harbors would apply to the profits the physician owners were receiving from the anesthesia services.

73.     Therefore, Defendants use of the company model created an illegal kickback scheme in violation of the AKS.

74.     Compliance with the AKS is a condition material to payment from Medicare and/or Medicaid.

75.     As a condition precedent to the receipt of payment or reimbursement from Medicare and Medicaid of costs incurred for treating and providing care to beneficiaries, defendants must be familiar with the laws and regulations regarding the provision of healthcare services.

76.     As stated above, if services are billed to Medicare or Medicaid despite the failure to satisfy a condition material to reimbursement, then they are false claims because they are based on fraudulent activities and billings of defendants that should not be paid.

77.     In billing Medicare and Medicaid for reimbursement when conditions for payment were not met the defendants knowingly caused the Government to pay defendants more than it would have had defendants followed the law.

78.     Approximately 20% of the procedures performed by the Defendants were reimbursed from government payers.

## GENERAL ALLEGATIONS

79.     At all relevant times, Orlando Endoscopy was doing business under the name of the two ASCs and was owned jointly as follows: 51% of both are owned by Amsurg Corp. and 49% of both are owned by the CFSC who perform surgeries at the centers.

80.     The Florida Secretary of State lists the directors and/or officers of Defendant CENTRAL FLORIDA SURGICAL CENTERS, INC. as: Alex Menendez, Kenneth R. Feuer, Steven Brint, Robert Baker, Richard Dumois, and Avanish Aggarwal ("GI Docs").

81.     Defendants perpetrated two fraudulent schemes (detailed further below)—the Joint Venture Scheme (hereafter "Joint Venture Scheme") and the In-House Joint Venture Scheme (hereafter the "In-House Scheme")—that involve the payment of kickbacks in exchange for the referral of patients.

Joint Venture Scheme

82.     In or around 2008, the CFSC and AHP LLC formed a joint venture under which Relator states that AHP LLC held 51% ownership and the CFSC held 49% ownership (split equally among the GI Docs).

83.     AHP LLC managed the joint venture and paid Relator and other anesthesia personnel a flat salary to provide anesthesia service to the ASCs.

84.     During this time, AHP LLC had its medical professionals assign their billing rights to AHP LLC and then it billed the government directly for the anesthesia services.

85.     Under the Joint Venture Scheme, AHP LLC personnel would provide exclusive anesthesia services to the ASCs and AHP LLC would share the revenue generated from the billing of such services with the ASCs in exchange for the exclusive referral of patients.

86.     This sharing of revenue constitutes an illegal kickback meant to incentivize the ASCs to use AHP LLC exclusively for anesthesia services.

87.     Relator states that each of the GI Docs, in one particular year, received $181,000 from the anesthesia services provided by AHP LLC as indicated on Schedule K-1 tax forms.

88.     Relator believes that this income was characterized as investment income for tax purposes.

89.     AKS's ASC safe harbor applies to investment returns on surgery services performed at ASCs but does not apply to investment returns on anesthesia service profits.  See OIG Advisory Opinion 12-06, 42 C.F.R. §§ 416.2 and 416.164(c).

90.     Relator learned that the aforementioned payments stopped after OIG Advisory Opinion 12-06 was released addressing the illegal nature and problems with anesthesia service providers making payments to ASC owners in exchange for the right to bill for services.

91.     AHP LLC stopped making payments to the GI Docs for one full year while the GI Docs sought multiple legal opinions regarding how to re-arrange the relationship in another way so they could still get paid for referring anesthesia services.

92.     Relator understands that whatever arrangement that was devised was vetoed by ASC co-owner Amsurg Corp. because AmSurg Corp. wanted to establish its own in-house kickback scheme.

In-House Scheme

93.     In or around July of 2013 AHP LLC stopped performing anesthesia services at the ASCs altogether.

94.     Also around July of 2013 AMSURG entered into a joint venture with the GI Docs similar to the arrangement between AHP LLC and the GI Docs.

95.     Under the In-House Scheme Amsurg Corp. hired the anesthesia services personnel directly onto their payroll (at a significantly lower rate than the rate in effect under the AHP LLC arrangement) to provide exclusive services for the ASCs.

96.      The difference between the low cost of the in-house anesthesia services and the revenue generated is significant and the owners of the ASCs retain the profits.  Amsurg Corp. collects the profits from the anesthesia service providers and gives a portion to the GI Docs.

97.     This sharing of revenue constitutes an illegal kickback paid in return for the ASCs exclusive use of Amsurg Corp. personnel for anesthesia services.

98.     Upon information and belief, Defendant AMSURG has instituted the same or similar scheme with physicians at other surgery centers around the country.

## DAMAGES TO THE UNITED STATES

99.     If services are billed to Medicare or Medicaid despite the failure to satisfy a condition material to reimbursement, then they are false claims because they are based on fraudulent activities and billings of defendants that should not be paid.

100.     By falsely billing Medicare and Medicaid, the defendants knowingly caused the Government to pay defendants more than it would have had defendants followed the law.

101.     A significant percentage of the procedures performed by the defendants were reimbursed from government payors, such as Medicare and Medicaid.

102.     Under the federal False Claims Act those who knowingly and willfully make or cause to be made any false statement or representation of a material fact in any application for any benefit or payment from the federal government is liable for a civil penalty of not less than $5,500 and not more than $11,000 per occurrence, plus three times the amount of damages which the federal government sustains because of those acts. 31 U.S.C. § 3729(a).

103.     Upon information and belief, Relator believes that over $1.5 million has been paid by the Government for anesthesia services alone at those two ASCs where kickbacks were being paid.

104.     The ASCs additionally received payments for surgery services provided at the same time.

105.     Relator believes that approximately 20% of patients at the ASCs received services that were reimbursed by Government programs.

## COUNT ONE
## FALSE CLAIMS ACT - PRESENTATION OF FALSE CLAIMS

106.     Relator incorporates and re-alleges paragraphs 1 through 106 as if fully set forth herein.

107.     In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers and agents knowingly and/or recklessly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

108.     The United States of America, in reasonable and justified reliance on the purported accuracy of these certified false and fraudulent claims by Defendants, paid and continues to pay for medical services and products allegedly provided to individuals insured by Medicare and Medicaid.

## COUNT TWO
## FALSE CLAIMS ACT - FALSE STATEMENTS

109.     Relator incorporates and re-alleges paragraphs 1 through 109 as if fully set forth herein.

110.     In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729(a)(1)(B).

111.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments that resulted in its being damaged in an amount to be determined.

## COUNT THREE
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

112.    Relator incorporates and re-alleges paragraphs 1 through 112 as if fully set forth herein.

113.    Under the Florida False Claims Act, in effect prior to July 1, 2013, Defendants, in performing the acts described above, acting in concert and/or through their own actions or through the acts of their officers and/or agents, have knowingly violated:

a)  Fla. Stat. § 68.082(2)(a) by knowingly presenting or causing to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval and/or; □

b)  Fla. Stat. § 68.082(2)(b) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

114.    Under the Florida False Claims Act, as amended and effective July 1, 2013, Defendants, in performing the acts described above, acting in concert and/or through their own actions or through the acts of their officers and/or agents, have knowingly violated:

a)  Fla. Stat. § 68.082(2)(a) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval and/or;

    b) Fla. Stat. § 68.082(2){b} by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim.

115.    The State of Florida, unaware of the foregoing circumstances and conduct of the Defendants, made full payments that resulted in it being damaged in an amount to be determined.

## PRAYER FOR RELIEF

WHEREFORE, RELATOR respectfully requests that this Court enter judgment against Defendants as follows:

a.    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

b.    That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented and/or payment the Defendants wrongfully avoided paying to the United States;

c.    That pre- and post-judgment interest is awarded, along with reasonable attorney's fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case;

d.    That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

e. That the State of Florida be awarded damages in the amount of three times the damages sustained by the State of Florida because of the false claims alleged in this Complaint, as the Florida False Claims Act provides;

f. That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented to the State of Florida Medicaid Program;

g. That necessary expenses, costs, and reasonable attorney's fees be awarded as provided by the Florida False Claims Act;

h. That Relaters be awarded the maximum amount allowed pursuant to the Florida False Claims Act; and,

i. That this Court award such other and further general, equitable, and legal relief as it deems just and proper.

## DEMAND FOR A JURY TRIAL

Relators demand a jury trial on all claims alleged herein.

Respectfully Submitted,

Date: February 5, 2016

_____

J. Marc Vezina, Esq.
   LA Bar No. 24683
   TX Bar No 24000141
   GA Bar No. 465449
   MI Bar No. P76232
Monica P. Navarro (MI Bar No P52985)
VEZINA LAW, PLC
Attorneys for Relator
280 N. Old Woodward Ave, Suite LL20
Birmingham, MI 48009
Office: (248) 558-2700
Fax: (248) 232-1581
jmv@vezinalaw.com
mnavarro@vezinalaw.com

_____

**Kevin J. Darken**
Florida Bar No. 0090956
kdarken@tampalawfirm.com
THE BARRY A. COHEN LEGAL TEAM
201 East Kennedy Boulevard, Suite 1950
Tampa, Florida 33602
Telephone: (813) 225-1655
Facsimile:  (813) 225-1921
*Attorney for Relator*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Relator's Unopposed Motion to Seal Pursuant to 31 U.S.C. §3730(b)* has been furnished by hand-delivery to **Lee Bentley,** United States Attorney, United States Attorney's Office, 400 N. Tampa Street, Suite 3200, Tampa, FL 33602 and by Federal Express to **Loretta E. Lynch,** United States Attorney General, Dept. of Justice, 950 Pennsylvania Ave., N.W., Washington, D.C. 20530-0001; **Pam Bondi,** Florida Attorney General, Office of Attorney General, State of Florida, The Capitol PL-01, Tallahassee, FL 32399-1050; and **Jeff Atwater,** Florida Chief Financial Officer, Office of the Chief Financial Officer, Florida Department of Financial Services, 200 East Gaines Street, Tallahassee, FL 32399-0301 on this 5th day of February, 2016.

Kevin J. Darken

Exhibit 3

FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

2018 JAN 30  PM 4: 21

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA
and STATE OF FLORIDA
*ex rel.* STEPHEN VANASCO,

      Plaintiffs,

v.

AHP OF ORLANDO, LLC, a Florida Limited
Liability Company; AMSURG CORP., a
Tennessee and Florida Corporation;
AMSURG HOLDINGS, INC., a Tennessee,
Delaware and Florida Corporation;
ANESTHESIA HEALTHCARE PARTNERS,
INC., a Nevada, Georgia and Florida
Corporation; CENTRAL FLORIDA SURGICAL
CENTERS, INC., a Florida Profit Corporation;
ORLANDO FL ENDOSCOPY ASC, LLC, a
Tennessee and Florida Limited Liability
Company; CITRUS AMBULATORY SURGERY
CENTER, INC., a Florida Corporation; AVANISH
M. AGGARWAL, MD, an individual; ROBERT T.
BAKER, MD, an individual; STEVEN L. BRINT,
MD, an individual; RICHARD A. DUMOIS, MD,
an individual; KENNETH R. FEUER, an individual;
ALEX M. MENENDEZ, MD, an individual; and
JOHN AND JANE DOE DEFENDANTS 1-100,

      Defendants.

_____/

Case No. 8:16-cv-288-T-33TGW

**FILED *EX PARTE*
AND UNDER SEAL**

## GOVERNMENT'S NOTICE OF ELECTION TO DECLINE INTERVENTION

    Pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(4)(B), the United States

hereby notifies the Court of its decision to decline intervention in this action.

    Although the United States declines to intervene in this matter, it respectfully refers

the Court to 31 U.S.C. § 3730(c)(3).   That provision allows the relator to maintain the

action in the name of the United States, subject to the proscription of section 3730(b)(1) that

the "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."    Accordingly, the United States respectfully requests that, should either the relator or the defendants propose that this action be dismissed, settled or otherwise discontinued, this Court solicit the written consent of the United States before ruling or granting its approval.

Furthermore, pursuant to 31 U.S.C. § 3730(c)(3), the United States respectfully requests that all pleadings, motions, responses, replies, notices, and any other papers filed in this action be served upon the United States through the undersigned counsel and, additionally, that all Orders, Notices, and other papers issued by the Court be so served on counsel for the United States.    The United States also reserves its right to order any deposition transcripts and to intervene in this action, for good cause, at a later date.    *See id.*

Finally, the United States respectfully requests that – except for the relator's Complaint, this Notice, and the Order unsealing this case – all papers ordered to remain under seal by this Court's prior Orders be and remain under seal.    This is requested because, in discussing the content and extent of the United States' investigation, such papers are provided by law to the Court alone for the sole purpose of evaluating whether the seal and the time for making an election to intervene should be extended.

A proposed Order is submitted herewith for the Court's consideration.

2

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

Dated:  January 30, 2018                By:       _Christon P. Ax_____

CHRISTOPHER P. TUITE
SEAN P. KEEFE
Assistant United States Attorneys
Florida Bar Nos. 125146 and 0413828
400 North Tampa Street, Suite 3200
Tampa, FL 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6200
E-mail: christopher.tuite@usdoj.gov

*Counsel for United States of America*

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on January 30, 2018, I caused a copy of the foregoing

*Government's Notice of Election to Decline Intervention*, and accompanying proposed Order, to

be sent to the following individuals by United States First Class Mail, postage pre-paid:

J. Marc Vezina
Monica P. Navarro
Vezina Law, PLC
280 N. Old Woodward Ave.
Suite LL20
Birmingham, MI 48009

Kevin J. Darken
The Barry A. Cohen Legal Team
201 East Kennedy Blvd.
Suite 1950
Tampa, FL 33602

*Counsel for Qui Tam Relator*


CHRISTOPHER P. TUITE
Assistant United States Attorney

# Exhibit 4

American Society of
Anesthesiologists®

1501 M Street, N.W. • Suite 300 • Washington, D.C. 20005 • (202) 289-2222 • Fax: (202) 371-0384 • www.asahq.org

February 25, 2014

Inspector General Daniel R. Levinson
Office of Inspector General
Congressional and Regulatory Affairs
United States Department of Health and Human Services
Room 5541 Cohen Building
330 Independence Avenue, SW
Washington, DC 20201

**Attention: OIG-122-N**

Dear Mr. Levinson:

On behalf of the over 52,000 members of The American Society of Anesthesiologists (ASA), we appreciate the opportunity to submit comments in response to the Office of Inspector General (OIG) solicitation of proposals and recommendations for modifying existing safe harbor provisions and developing new Special Fraud Alerts. In our view, the economic model referred to as the "company model," and variations on that model, which enable referring physicians to profit from their referrals for anesthesia services, are "fraudulent and abusive." These arrangements negatively affect patients, competition, and the integrity of Federal health care programs. They never improve the quality of care or reduce the cost of care.

You already have recognized in Advisory Opinion 12-06, which addresses both a company model and management services arrangement, that company model arrangements allow referring physicians to do indirectly what they cannot do directly: profit from their referrals. Despite OIG guidance in the 2003 Special Advisory Bulletin on Contractual Joint Ventures, the 1989 Special Fraud Alert on Joint Venture Arrangements, and Advisory Opinion 12-06, referring physicians continue to operate company model and similar arrangements, emboldened by the lack of enforcement activity and the lack of generally applicable guidance from the OIG. When referring physicians make decisions regarding selection of anesthesiologists based upon who is willing to turn over substantial professional revenues in exchange for the referrals, patient care is jeopardized and the integrity of the Federal health care system is corrupted.

You further recognized in Advisory Opinion 13-15, issued in response to a request regarding a company model-like arrangement in a hospital setting involving anesthesia services and a psychiatry group, that the referenced company model-like arrangement, which would have allowed the referring physician practice to retain anesthesia revenue, also implicated the Anti-Kickback Statute. The opinion concluded that the proposed arrangement appeared to be designed to permit the referring physician psychiatry group "to do indirectly what it cannot do directly; that is, to receive compensation, in the form of a portion of Requestor's anesthesia services revenues, in return for the Psychiatry Group's referrals of ECT patients to Requestor for anesthesia services."

Inspector General Daniel R. Levinson
February 25, 2014
Page 2 of 19

Last year we submitted a number of recommendations in response to the OIG's solicitation of proposals and recommendations for modifying existing safe harbor provisions and developing new Special Fraud Alerts and were disappointed that OIG did not adopt these suggestions.[1]  These "fraudulent and abusive" practices continue unabated.  In 2013 we again surveyed our ASA members regarding efforts by referring physicians to capture anesthesia revenue in exchange for referrals.  Our 2013 survey received 828 responses from all fifty states, Washington DC, and Puerto Rico, and revealed that 420 practices – over half of the respondents – had been approached about engaging in a "company model".[2]  Of those, 306 practices received a "company model" request at a facility where they already were providing services, 252 practices experienced this problem in more than one facility, and 53 experienced it in more than two facilities.  Most worrisome is that, of those practices that received a request to engage in a "company model" and rejected it, 42.5% lost their contract to practice at that location.  Despite claims from referring physicians that they establish these models in pursuit of access and quality, and not for the substantial revenue they garner for the referring physicians, our survey demonstrated:

A.   Most, if not all, of these arrangements are ones in which the referring physicians already had a relationship with an anesthesiology group.  There was no access issue.

B.   The referring physicians usually seek to have the existing anesthesiologists provide services under the new arrangement.  There was no quality issue.

C.   The referring physicians only implement these arrangements in scenarios in which the anesthesia services are self-supporting.  They do not seek to implement them in scenarios in which the anesthesia services are not self-supporting.

D.   Some referring physicians may be requesting that their employed or contracted anesthesia practitioners provide anesthesia for patients who otherwise may not have needed anesthesia services.  This finding points to overutilization, which is one of the fundamental regulatory concerns underlying the Anti-Kickback Statute.

*We remain very concerned that, unless you issue a Special Fraud Alert on these abusive arrangements and modify existing safe harbors to make clear that they do not protect these elaborate schemes, referring physicians and their consultants will continue to press these abusive and illegal models.* (See Section C for ASA's specific requests.)

**A.   "Company Model" Arrangements and Variations**

**1.      What is a "Company Model" Arrangement?**

Consultants tout the company model (and variations on that model) as a way for referring physicians, such as gastroenterologists, ophthalmologists, orthopedists, and others, to offset their declining professional fees by skimming professional fees for anesthesia services.  The company model is a
form of fee-splitting whereby referring physicians create a separate "anesthesia company" that contracts with or hires anesthesiologists and/or nonphysician anesthetists to provide anesthesia services for the referring physicians' patients who are undergoing procedures or surgery.  Typically, the referring

---

[1]  Office of Inspector General Semiannual Report to Congress April 2013-September 2013, Appendix F, pp 108-109.
[2]   *A Growing Problem: Results of the Second ASA Survey on the Company Model*, American Society of Anesthesiologists Newsletter, December 2013, Vol. 77, N. 12, pp. 46-48, , available at http://viewer.zmags.com/publication/32cf98ac#/32cf98ac/48.

Inspector General Daniel R. Levinson
February 25, 2014
Page 3 of 19

physicians also own the facility where surgical/procedural and anesthesia services are provided, such as an ambulatory surgery center (ASC). The sole purpose of the anesthesia company is to provide anesthesia services to the referring physicians or the facilities they own. The referring physicians submit a bill for the procedure or surgery and also bill for the anesthesia services through the anesthesia company, as well as the facility fee through the ASC. The referring physicians then pay the anesthesia personnel less than the amount collected as the anesthesia professional service and retain the balance (often the majority) of the anesthesia professional fees. This retained profit is in fact a kickback, compensation to the referring physicians for providing the referral for anesthesia services. The referring physicians share in three revenue streams: (1) the facility fee for the facility they own, (2) their own procedural fee, and (3) the anesthesia professional services fee.

As stated in ASA's previous letters to the OIG,[3] physician-owned facilities have been moving away from the traditional fee-for-service model and turning to the company model and related arrangements to capture the revenue stream from their referrals for anesthesia services.

## 2.    What are the Variations on Company Model Arrangements?

Advisors and consultants have offered referring physicians a variety of alternative arrangements to implement, with implementation often dependent upon how many groups of referring physicians and nonphysicians (such as ASC management companies) plan to share in the anesthesia revenue. We are aware of at least four variations on the company model.

a.    Under what is called the "In-House Provider Model," the ASC, which is owned by the referring physicians, either employs or contracts with anesthesia personnel and bills for the anesthesia services. The consultants note that one advantage of that model is that anesthesia income is distributed to all referring physician owners.

In Advisory Opinion 12-06, the OIG stated that the safe harbor for ASC investments would not protect distribution of anesthesia revenues to referring physician owners of the ASC. The OIG reiterated this view in its *Fall 2013 Semiannual Report to Congress*.[4] As noted in Section C.2.b, below, we seek modification of the ASC safe harbor to clarify that only the profits from ASC services – the ASC facility fees – would be protected. If the OIG does not believe that modification of the safe harbor is necessary, as it stated in its *Fall 2013 Semiannual Report to Congress*, we urge the OIG to issue a Special Fraud Alert and to make clear the scope of protection afforded by the safe harbor for ASC investments.

b.    Under the so-called "Group Practice/Contracted Provider Model," the existing practice of the referring physicians employs anesthesia personnel and submits claims to payors for the anesthesia services. The consultants note that this approach is more practical when only one or two specialties own an ASC, and cite gastroenterology and ophthalmology as two examples.

---

[3] ASA has submitted letters to the OIG on company model issues, including a letter from ASA President Roger A. Moore, M.D. dated March 19, 2009; a letter from ASA President Alexander A. Hannenberg, M.D. dated June 16, 2010; a letter from ASA President Mark A. Warner, M.D. dated February 24, 2011; a letter from ASA President Jerry A. Cohen, M.D. dated February 27, 2012; and a letter from ASA President John Zerwas, M.D. dated February 26, 2013.

[4] See note 1, above.

Inspector General Daniel R. Levinson
February 25, 2014
Page 4 of 19

As discussed below, we seek a modification to the safe harbor for investments in group practices to avoid protection for arrangements that are thinly veiled efforts to enable referring physicians to profit from their referrals of anesthesia services.[5]  If the OIG elects not to modify this safe harbor, we request that the OIG issue a Special Fraud Alert to address the Anti-Kickback Statute implications of the referring physicians retaining anesthesia revenue.

c.  Under the "Anesthesia Partner Model," the referring physicians establish a new company along with the anesthesiologists and/or nonphysician anesthetists.  The new company contracts with anesthesia personnel and bills for their services.  The consultants have commented that this arrangement can be customized to allow some or all of the referring physicians to profit from anesthesia fees.  Essentially, this arrangement involves less profit for the referring physicians, as they share ownership of the new anesthesia company with the anesthesiologists and/or nonphysician anesthetists.

d.  The "Anesthesia Practice Management Model" involves formation of two companies.  First, the referring physicians and nonphysicians, such as the ASC management company, together form an anesthesia management company.  The anesthesia management company provides administrative services to the ASC and receives a fee for these services, which is distributed to the equity owners of the company – the referring physicians and nonphysician managers.

The referring physicians also create a separate "anesthesia company" that is owned by the referring physicians who also own the ASC.  This anesthesia company contracts with or employs the anesthesiologists and bills for the anesthesia services.

This model is touted as enabling nonphysician owners of the ASC, as well as referring physicians, to profit from the revenues of the anesthesia management company.

Beyond these four models, consultants and businesses offer other variations of these models.  These four are offered as examples of the focus on delivering profits to the referring physicians and ASC management companies in exchange for the referral of anesthesia services to the anesthesiologists.

(As used in this letter, the term "company model" references all variations on the original company model arrangement outlined in Section A.1, above.)[6]

## 3.    The Role of Consultants:  How Company Models Are Marketed

The raison d'être of company model arrangements is to enable referring physicians to "capture" the anesthesia professional fee revenue stream and offset declining professional revenues for the referring physicians' own services.  Consultants market company model arrangements as additional revenue sources for ASCs and their physician owners or a way to "profit from anesthesia services."

---

[5]  In 2013, ASA sought a modification of the safe harbor for employee compensation for the same purpose, but the OIG stated in its *Fall 2013 Semiannual Report to Congress* (p. 108) that it did not have authority to modify elements of this statutory safe harbor.  In light of the OIG's response, ASA is not repeating its request.  The inability to modify the safe harbor underscores the need for further OIG guidance, preferably in the form of a Special Fraud Alert.

[6]  ASA is not suggesting that all models of physician employment, such as academic practices in which physicians are employed by a medical school or faculty practice plan and the deans and department chairs control salaries, are illegal.  The focus of this comment letter is on structures owned in whole or in part by referring physicians.

Inspector General Daniel R. Levinson
February 25, 2014
Page 5 of 19

Consultants fuel interest in these arrangements by presenting these models at ASC symposia and conferences and at professional medical specialty meetings, and by publishing articles in the trade press. The message of the presentations and articles is on the financial gain in exchange for the referrals of patients.  These articles include *Can ASCs Share in Anesthesia Revenue?*, *Five Ways Your ASC Can Profit From Anesthesia Services*, and *Can Surgery Centers Profit From Anesthesia?*

The consulting firms that offer "turnkey" services and work with referring physicians to implement company model arrangements focus on the *volume* of the referring physicians' procedures and the payor mix for those procedures in order to calculate the *value* of the referrals for anesthesia services and, ultimately, the amount of revenue that referring physicians can realize from implementing these models. They offer "revenue forecasts" and other projections of how much money referring physicians can generate from implementation of a new arrangement.

In summary, the focus of these arrangements is on how much money the referring physicians can generate from their referrals for anesthesia services under Federal and private commercial health care programs.  In the *pro formas* used to provide projections, consultants request information on the payor mix, including the percentage of Medicare, Medicaid, HMO Medicare, HMO Medicaid, Champus, Tricare, and other Federal health care programs.

**4.      Post-Advisory Opinion 12-06 Activity**

The issuance of Advisory Opinion 12-06 has led to reexamination of the legality of some company model arrangements, but its effect has been limited.

The consulting firms (including law firms) that promote company model arrangements continue to offer services to implement models that allow referring physicians to profit from their referrals for anesthesia services.  The sole business model of some of the consulting firms is to sell anesthesia management services to referring physicians.  Those firms have an economic stake in giving comfort to those who have relied upon their aggressive "guidance" and they continue to market their services to referring physicians.

Business and legal consultants acknowledge Advisory Opinion 12-06, but choose to interpret it narrowly.

- Some claim that the Advisory Opinion result is based upon the fact that the request was submitted by an anesthesia practice.

- Others have sought to marginalize the Advisory Opinion, saying, for example, that it is not the "death knell" of anesthesia company model arrangements.

- Counsel for referring physicians sometimes take the position that company model arrangements do not violate the Anti-Kickback Statute, so long as the referring physicians divide the anesthesia profits equally.

- Some recommend that company model arrangements be "structured, and most importantly, actually implemented in a good faith manner and involve circumstances that reflect good intent, such as improving quality, efficiency and coordination of care or other permissible purposes."[7]

---

[7] *OIG Advisory Opinion 12-06:  Insightful Guidance from the OIG For Structuring Company Model Arrangements*, ABA Health e-Source, June 2012, Volume 8, No. 10, available at

- Consultants point to the language in the Advisory Opinion about it not applying to anyone other than the requestor ("This advisory opinion has no application to, and cannot be relied upon by, any other individual or entity.") as the basis for differentiating other proposed company model arrangements.

- Finally, others have questioned the validity of the OIG's comments on the scope of the safe harbor for ASC investments.

An article published last year (February 19, 2013) pointed to areas not addressed by Advisory Opinion 12-06 and suggested that the OIG may not prevail on its position on the unavailability of the safe harbor for ASC investments as applied to direct employment of anesthesiologists by ASCs.[8]

Some referring physicians who previously had implemented company model arrangements have simply dismissed Advisory Opinion 12-06 and have rejected efforts by the anesthesiologists to review the legality of the arrangement in light of the guidance in the Advisory Opinion. While the anesthesiologists can terminate their relationship with the referring physicians in those instances, the harm to Federal programs goes unchecked.

In summary, while Advisory Opinion 12-06 has garnered attention, it has not stemmed the efforts of referring physicians and their consultants to "capture the anesthesia revenue stream."

**5.        Expansion from ASCs and Offices to Hospitals**

Company model arrangements are most often implemented in the ASC, single specialty center, or office environment for two reasons. First, referring physicians often own the ASCs or centers, and they certainly own their own offices, in which such an arrangement is implemented. Second, the payor mix for cases in the ASC or office environment tends to be more favorable than in the inpatient environment.

In the past several years, as hospitals acquire ASCs and single specialty centers, ASA has heard increasing numbers of reports of hospitals requesting or insisting that the exclusive anesthesia group agree to a carve-out from exclusivity for the ASC or center, so that the referring physicians, whose practices and centers are being acquired, can either implement or continue to operate a company model arrangement and can begin or continue to capture the anesthesia revenue stream.

(An exclusive anesthesia group often has a right of first refusal to provide anesthesia services in all locations a hospital operates, which would be triggered by such an acquisition, absent the request to waive the right.)

To be clear, the requests by hospitals for a carve-out to exclusivity relate just to the ASC or center being acquired, where the referring physicians can expect to profit from anesthesia services. They do not relate to the standard inpatient cases the referring physicians perform, where there is generally less opportunity to profit from anesthesia services.

---

http://www.americanbar.org/newsletter/publications/aba_health_esource_home/aba_health_law_esource_0612_kal mowitz.html.
[8] *22 Advisory Opinions Issued by the Office of Inspector General – 6 of Interest; Anesthesia ASC Arrangements – 7 Key Concepts; and ASC Anti-Kickback Safe Harbor issues -9 Key Concepts for 2013,* McGuire Woods, February 19, 2013, available at  https://www.mcguirewoods.com/Client-Resources/Alerts/2013/2/22-OIG-Advisory-Opinions.aspx.

Other variations on this model occur when hospitals employ referring physicians who have had their own anesthesia arrangements, or physician practices start using the hospital, and the hospital pressures the anesthesia group to agree to a carve-out from exclusivity for the referring physicians to continue their own arrangements for anesthesia services, under which the referring physicians bill and collect for the anesthesia services and retain the revenue after paying the anesthesia personnel. These requests have occurred in the context of service lines in which the anesthesia services are projected to be self-supporting.

Apart from the legality of the company model or related arrangements in place at these locations, these requests by hospitals for the anesthesia group to forgo a valuable right in exchange for continuing to serve as the exclusive contractor raise separate Anti-Kickback and Stark law concerns. Indeed, in Advisory Opinion 13-15, the OIG noted its concern about the Anti-Kickback Statute implications of a hospital requesting that an exclusive anesthesia group agree to such a carve-out from exclusivity. It is notable that these requests have occurred in different regions of the country and they post-date issuance of Advisory Opinions 12-06 and 13-15. In one reported instance, even after issuance of Advisory Opinion 13-15, a hospital continued to persist in its request for a carve-out to an exclusive contract to allow referring physicians to make their own anesthesia arrangements for a specific service line and to capture the anesthesia revenue.

## B.    Need for Further Guidance

ASA believes that further OIG guidance is needed on the legality of company model arrangements and variations on those models. ASA also urges you to modify existing safe harbors to limit their application to direct and indirect efforts by referring physicians to profit from their referrals of anesthesia services. (Specific requests appear in Section C, below.)

The continuing efforts of referring physicians to condition their referrals of anesthesia services on the willingness of anesthesiologists and nonphysician anesthetists to transfer a portion of their professional anesthesia fees to the referring physicians, or to an entity owned by the referring physicians, underscore the need for OIG guidance on the variety of legal structures that consultants market as an "additional revenue stream" or an "ancillary revenue stream" for referring physicians.

There is a pressing need for clear guidance "on the ground." ASA has heard from many of its members who are frustrated with what they view to be conflicting advice from attorneys as to the legality of company model arrangements. While the legality of an arrangement will depend upon the specific facts, the inconsistent advice from different attorneys leaves many anesthesiologists, and presumably referring physicians, confused as to what is, and is not, permissible.

ASA also has heard reports of reputable attorneys in well-respected law firms counseling referring physicians on a variety of company model-type arrangements. These attorneys make the following points, among others, in counseling their clients that there is little risk in entering into these arrangements:

- They argue that there has been widespread criticism of OIG Advisory Opinion 12-06, suggesting that such criticism detracts from the OIG guidance offered in that opinion.

- They argue, notwithstanding OIG guidance to the contrary, that meeting a safe harbor for the payments to the anesthesia personnel (*e.g.*, the safe harbor for personal services and management contracts or the safe harbor for employment) is sufficient to establish the legality of the arrangement, even if no safe harbor protects the retained profit that the

Inspector General Daniel R. Levinson
February 25, 2014
Page 8 of 19

referring physicians realize. They contend that the safe harbors are not meaningful if it becomes necessary to identify a safe harbor for the retained profit that the referring physicians may realize.

- They contend that it is legal for ASCs to contract directly with anesthesiologists to allow the ASC to bill for the anesthesiologists' services, even in factual contexts in which the referring physician ASC owners change from a traditional fee-for-service model in which the very same anesthesiologists billed and collected for their own services. Such attorneys argue that the ability of physicians and nonphysician practitioners to reassign their benefits to an ASC[9] makes the transaction legal, even if the referring physicians who own the ASC realize hundreds of thousands of dollars from their referrals as a result of the reassignment, and without regard to the intent of the ASC owners in entering into the transaction.

- They interpret the discussion in Advisory Opinion 12-06 regarding the scope of the safe harbor for investments in ASCs to address only profits from a subsidiary – a separate "anesthesia company" – and not to apply to profits derived from anesthesia services in an "In-House Provider Model," in which an ASC owned by referring physicians directly contracts with anesthesiologists and requires the anesthesiologists to reassign their anesthesia fees to the ASC.

- They point to the standard language in Advisory Opinion 12-06 that the opinion does not apply to, and cannot be relied upon, any individual or entity other than the requestor of the opinion to limit the applicability of the guidance in that opinion to other similar fact patterns.

It is against this backdrop of continued marketing efforts by those consultants who seek to profit from implementation of company model arrangements, continuing demands for anesthesiologists to turn over their anesthesia revenue to referring physicians, new requirements by hospitals for anesthesiologists to agree to turn over anesthesia profits to referring physicians, and conflicting legal advice regarding the legality of these arrangements under the Anti-Kickback Statute that ASA requests that you issue a Special Fraud Alert on these arrangements and modify existing safe harbors to limit protection for arrangements that are elaborately constructed, but in practice are little more than naked efforts to enable referring physicians to profit from their referrals for anesthesia services in settings where the anesthesia services are profitable.

**C.    Specific Requests**

**1.    Issuance of a Special Fraud Alert**

Based upon the reasons outlined above, ASA believes that there is a pressing need for OIG guidance on the variety of company model arrangements that have been and continue to be implemented.

In prior discussions, OIG staff have indicated that the OIG prefers to provide guidance through the Advisory Opinion process, when it has specific facts on which to comment. Significantly, the Advisory Opinion process is not available to many anesthesiologists who are faced with requests (demands?) to participate in a company model arrangement. In particular, as explained below, anesthesiologists often are unable to satisfy the regulatory requirement in 42 C.F.R. § 1008.15(a) that the party requesting an advisory opinion certify that the facts relate to an arrangement "which the requestor in good faith plans to undertake."

---

[9] *Medicare Program Integrity Manual*, Chapter 15, Section 15.5.20.C.

Inspector General Daniel R. Levinson
February 25, 2014
Page 9 of 19

In a seemingly deliberate and carefully choreographed effort, referring physicians frequently immediately cut off discussions with anesthesiologists who raise questions about the legality of a proposed arrangement, or who request information on the specific structure of a proposed arrangement, thereby depriving the anesthesiologists of the ability to file for an advisory opinion, as they are unable to represent that they will engage in the transaction, if approved.  For the large majority of anesthesiologists facing requests to participate in a company model arrangement, the advisory opinion process is therefore unavailable.

In other instances, also in a seemingly deliberate and carefully choreographed effort, referring physicians refuse to disclose any details or documents regarding a proposed arrangement unless the anesthesiologists execute a confidentiality and nondisclosure agreement, which precludes their ability to seek guidance from the OIG regarding the proposed arrangement.

ASA has heard of these patterns occurring in enough different locations and settings to be concerned that the advisory opinion process is not a realistic option for the large majority of anesthesiologists facing demands to participate in these arrangements.

Company model arrangements represent a specific trend that is abusive and illegal.

- They corrupt medical decision making, which can result in decreased quality of care for Federal health care program patients.

- They threaten the integrity of Federal health care programs.

- They result in overutilization of anesthesia services for certain procedures, resulting in increased cost to Federal health care programs.

- They are expanding to referring physicians in increasing numbers of medical specialties. They also are expanding beyond the ASC environment to single specialty centers, offices, and even hospitals.

- They are promoted by consultants who stand to benefit from management and other fees generated by the arrangement.

In a June 2001 Special Advisory Bulletin titled "Practices of Business Consultants," the OIG warned providers, suppliers, and others regarding the practices of business consultants who either engage in improper practices or encourage abuse of the Medicare and Medicaid programs.  The efforts of business consultants who develop and implement company model arrangements for referring physicians to promote these arrangements occur in a marketplace in which legal experts disagree about the application of the Anti-Kickback Statute to these arrangements (and enforcement activity has not been observed).

OIG guidance is needed to promote compliance with the Anti-Kickback Statute and to minimize the potential for differing interpretations of the legality of, or risk associated with, particular arrangements.

We encourage you to use a Special Fraud Alert as a vehicle in which to provide guidance on the following points, among others:

- Does some level of involvement by the referring physicians in the anesthesia company, or a focus on quality or efficiency, legitimize an otherwise suspect arrangement designed to allow referring physicians to profit from their referrals?

Inspector General Daniel R. Levinson
February 25, 2014
Page 10 of 19

- How is the commercial reasonableness standard to be applied to company model arrangements? Is it necessarily not commercially reasonable (*i.e.*, inherently suspect) for anesthesiologists (the supplier) to enter into arrangements with referring physicians which, however packaged, result in transferring some portion of the anesthesiologists' professional fees to the referring physicians (or the facilities they own) in exchange for the opportunity to provide anesthesia services?

- Is it commercially reasonable for an anesthesia group to change an existing model, in which it provides services on a fee-for-service basis, bills and collects for its services, and retains its professional fees, and enter into any of the company model variations, in which – whatever the structure – the result is that the referring physicians and/or the facilities they own profit from the referrals for anesthesia services by retaining some portion of the professional fees paid for anesthesia services?

- Is it inherently suspect for anesthesiologists to be forced into employment models, in which they are employed by ASCs owned (in whole or in part) by the referring physicians, in which the anesthesiologists in effect transfer a substantial portion – as much as fifty to seventy percent – of their revenues to the referring physicians as a condition of receiving referrals for anesthesia services?

- Does the same inherently suspect analysis apply when anesthesiologists are forced into employment models, in which they are employed directly by the referring physicians (or their professional practices), in which the anesthesiologists in effect transfer a substantial portion – as much as fifty to seventy percent – of their revenues to the referring physicians as a condition of receiving referrals for anesthesia services?

- Does the analysis differ if two or more groups of referring physicians seek to employ the same anesthesiologists through their professional practices?

- Does the safe harbor for employment protect arrangements in which the ASC directly employs anesthesiologists and in which the profit from anesthesia services is distributed to the referring physician owners of the ASC? (This point was addressed in Advisory Opinion 12-06, but legal commentary has questioned this portion of the Advisory Opinion.)

- Does the safe harbor for investment in a group practice protect distribution of profits derived from an arrangement in which the group practice, consisting of referring physicians in one or more other medical specialties, employs or contracts with anesthesiologists, in order to capture the anesthesia revenues from their referrals?

- Are joint ventures involving referring physicians and anesthesiologists that result in the anesthesiologists receiving less than their full professional fee and the referring physicians receiving a portion of the profits of the joint venture, which include a portion of the anesthesiologists' professional fees, inherently suspect under the Anti-Kickback Statute?

- Are arrangements in which the referring physicians, or the facilities they own, compensate the anesthesiologists on a per-diem or per-annum basis inherently suspect, as the profit that the referring physicians (or the facilities that they own) will retain will necessarily correspond to the value of the referrals from the referring physicians for anesthesia services?

- Does the availability of a safe harbor for payments to anesthesia personnel (*e.g.*, either under the safe harbor for employment or the safe harbor for personal services and management contracts) protect the profit that the referring physicians realize from a company model-type

transaction, or is it necessary for referring physicians to satisfy a safe harbor to cover the profit that they realize from the transaction if they want to be assured that no enforcement action will be taken?  (As noted above, some counsel take the position that the availability of a safe harbor for payments to anesthesia personnel results in protection of the entire transaction, including the profit that the referring physicians realize.)

ASA stands ready to provide you with examples of the different types of company model arrangements that ASA members have faced and to assist in identifying additional points that can be covered in such a Special Fraud Alert.

**2.     Modification of Existing Safe Harbors**

You recognized in Advisory Opinions 12-06 and 13-15 that the traditional company model arrangement and a variation on that arrangement posed the risk of violating the Anti-Kickback Statute in that it enabled referring physicians to do indirectly what they could not do directly – profit from their referrals.  You recognized the potential for corruption of Federal health care programs by these arrangements.  Due to the nature of the advisory opinion process, Advisory Opinions 12-06 and 13-15 are limited to the facts presented.  To apply the conclusion reached in both of those Advisory Opinions on a broader basis to limit the ability of referring physicians to access safe harbor protection for arrangements that are designed to enable them to profit from their referrals, modifications to existing safe harbors are needed.

To the extent that the OIG elects not to modify the existing safe harbors or, in the case of the safe harbor for employment, does not believe it has the authority to modify the safe harbor,[10] the need for guidance it the form of a Special Fraud Alert becomes even more pressing.

    **a.  *Safe harbor for investments in group practices*.**  ASA requests that you modify the existing safe harbor for investments in group practices (42 C.F.R. § 1001.952(p)) to limit its applicability to variations of company model arrangements in which the referring physicians, through their group practices, employ or contract with anesthesiologists or other anesthesia personnel and thus are able to capture the anesthesia revenue stream.

    This proposal can be accomplished in several ways.  The most straightforward way to modify the safe harbor is to provide that it does not apply to revenues derived from the provision of anesthesia services if any equity owner of the group practice practices in a medical specialty other than anesthesiology or pain medicine (many pain medicine physicians are trained as anesthesiologists).

    A second option, which may be susceptible to some abuse and is accordingly less preferable, is to limit application of the safe harbor to profits generated by the services provided by the equity owners of the group practice and from their employees who provide services in the same medical specialty as the equity owners of the group practice.  This approach would not protect against the "joint venture"-type arrangements in which a group practice were to make a single anesthesiologist a "token" owner to try to access the safe harbor.

---

[10] In 2013, ASA requested that the OIG modify the existing safe harbor for employment protection to make clear that it does not apply to employment arrangements in which referring physicians, directly or through a group or other entity they own, employ physicians in other medical specialties to whom they make referrals and pay the employed physicians less than the employed physicians would otherwise receive if they billed directly for their services.  The OIG indicated in its *Fall 2013 Semiannual Report to Congress* that it did not have authority to modify the statutory safe harbor for employment.  *Id.* at 108.

In addition, we request a modification to the safe harbor to provide that anesthesia services are not "in-office ancillary services" for purposes of the safe harbor for investments in group practices. The purpose of this revision is to clarify that referring physicians cannot try to justify the legality of company model arrangements by trying to characterize anesthesia services as in-office ancillary services.

   **b.   *Safe harbor for investments in ASCs*.** ASA requests that you modify the existing safe harbor for investments in ASCs (42 C.F.R. § 1001.952(r)) to reflect in the regulation the OIG position articulated in Advisory Opinion 12-06, which is that the safe harbor for investments in ASCs does not protect distribution of profits from the provision of anesthesia services. This revision is important, as having anesthesia personnel employed by or under contract with the ASC has been particularly attractive to ASCs with referring physician owners in multiple specialties.

   When referring physician ASC owners have separate group practices, they typically want to implement a model in which all of the ASC owners can share in the profits from their referrals for anesthesia services.

- Direct employment or contracting by one group practice does not provide all ASC owners with the opportunity to share in the anesthesia profits.

- A traditional anesthesia company model, in which all of the ASC owners create and own a separate anesthesia company, is risky in light of the reasoning articulated in Advisory Opinion 12-06.

- Having the ASC directly employ or contract with anesthesia personnel would provide a mechanism for all owners of the ASC to share in the anesthesia profits, and would be particularly attractive if that arrangement were eligible for safe harbor protection.

   Amending the safe harbor regulation will avoid abuse of the system by confirming the OIG's position. The OIG stated in its *Fall 2013 Semiannual Report to Congress* (at page 108) that it was not adopting this suggestion because the "existing safe harbor does not protect profits from anesthesia services." ASA renews its request, given the continuing questioning in the legal community of the OIG's position on this issue and the insistence by many attorneys that the safe harbor for investments in ASCs protects all profit that the ASC owners realize, including profits from anesthesia professional fees.

   Some legal commentary has questioned the OIG comments in Advisory Opinion 12-06 regarding the inapplicability of the safe harbor for ASC investments as a means to protect profits derived from anesthesia services. They point to the fact that ASCs can contract for anesthesia services and bill for them under a reassignment of benefits, and that the ASC is eligible for safe harbor protection.

   To be clear, ASA does not request changes in the safe harbor for ASC investments other than clarification that the safe harbor does not protect distribution of profits from the provision of anesthesia services. This change is necessary to avoid referring physicians from profiting on their referrals for anesthesia services.

   In summary, our two proposals are aimed at eliminating possible safe harbor protection for reconfigured company model arrangements that reward referring physicians for their referrals. Unless you move to narrow existing safe harbor protections so they do not protect arrangements that enable referring physicians to "capture the anesthesia revenue stream" from their referrals for anesthesia

Inspector General Daniel R. Levinson
February 25, 2014
Page 13 of 19

services, you will not protect Federal health care program beneficiaries from the corruption of medical judgment or preserve the integrity of Federal health care programs.  ASA stands ready to discuss these proposed modifications to existing safe harbors with the goal of narrowing existing safe harbors to protect only legitimate arrangements.

**D.     Additional Information Responsive to OIG Requests for Specific Information**

You already have recognized that company model arrangements implicate the Anti-Kickback Statute by allowing referring physicians to profit from their referrals.  As discussed in Section A, above, and this Section D, company model arrangements and variations on those arrangements adversely affect Federal health care programs and patients in many of the ways the OIG considers when assessing proposals for Special Fraud Alerts and modification of safe harbor protection, including the following:

- Decreasing access to health care services;
- Decreasing the quality of health care services;
- Limiting patient freedom of choice among health care providers;
- Decreasing competition among health care providers;
- Increasing the cost to Federal health care programs;
- Increasing the potential overutilization of the health care services, and
- Increasing the financial benefit to health care professionals or providers that may take into account their decisions whether to
    a) Order a health care item or service or
    b) Arrange for a referral of health care items or services to a particular practitioner or provider.

Our comments address each of these factors, along with supporting data on the volume and frequency of the conduct in question, to demonstrate the grave nature of the company model in its various forms.

**Decreasing Access to Health Care Services**

In company model arrangements, referring physicians make the choice of anesthesia provider based upon which anesthesia providers are willing to turn over a portion of their professional fees as a condition of providing anesthesia services.  Since the referring physicians retain any profit over expenses, they often seek the lowest cost anesthesia providers in order to maximize the anesthesia profit.  These choices can and do result in selection of anesthesia providers based upon profit, not quality, considerations.  If the referring physicians choose to provide only nonphysician anesthetists rather than anesthesiologists or a care team model that involves both anesthesiologists and nonphysician anesthetists, company model arrangements can result in decreased access to physician services.

Company model arrangements further disrupt the market and decrease access to anesthesia services, as company model employment agreements typically contain noncompetition agreements.  As a result, anesthesiologists who leave company model arrangements may be foreclosed from practicing in their communities for several years post-termination.

**Decreasing the Quality of Health Care Services**

As recognized leaders in patient safety, anesthesiologists pride themselves on providing the highest level of quality and safest patient care. ASA develops, modifies and updates evidence-based guidelines,

Inspector General Daniel R. Levinson
February 25, 2014
Page 14 of 19

statements and practice parameters to assist our members in keeping current with the latest science and best practices with respect to anesthesia care. As further evidence of our commitment to quality, ASA launched a separate organization, the Anesthesia Quality Institute (AQI), with the primary mission of establishing a national anesthesia outcomes registry. AQI began collecting data in January 2010 with the intent that researchers, ASA and other interested parties will use the data to further enhance the science and practice of anesthesia.

a. *Creating pressure on employed anesthesiologists to provide services against their clinical judgment.* Company model arrangements create incentives and pressures that represent the complete antithesis of these strides in quality care that ASA and anesthesiologists have achieved. Because the referring physician has a direct stake in the fees generated by anesthesia services, and because the referring physicians are not anesthesiologists and do not appreciate the risks of anesthesia, they can exert pressure on anesthesia providers to administer anesthesia services against their better clinical judgment. These issues may arise with patients whom the anesthesiologists consider too sick to be treated in an ASC, rather than in a hospital, or because of "production" pressure to rush through preanesthetic assessments without taking adequate time to assess patients. We have heard reports of referring physicians who, after implementing a company model arrangement, have scrimped on staff to increase their profits, creating a situation in which an anesthesiologist who is personally performing an anesthetic is expected to abandon his/her patient in order to attend to a second patient in another room, if a problem arises in that other room. Such a model violates basic patient care standards, but increases profits to the referring physicians. In traditional care delivery arrangements, adequate staff are retained so an anesthesiologist who is personally performing a case is not interrupted and can care for her or her patient without being requested to attend to patients in other rooms.

ASA has received anecdotal reports of these circumstances having occurred. Faced with such pressure, an anesthesia provider can be placed in a predicament – refuse to administer anesthesia and lose his/her job, or administer anesthesia. Although one would hope that all anesthesia providers would elect the former; the reality is that the referring physicians can exert pressure on some providers to compromise their clinical judgment in order to secure gainful employment.

As such scenarios play out and less qualified providers are hired or retained by referring physicians, quality of patient care will suffer dramatically. In an environment in which ASCs are only beginning to submit quality data to CMS, the quality of care could greatly diminish and no one would know until a catastrophic event occurred.

b. *Forcing employed anesthesia personnel to provide anesthesia services for the referring physician's gain, not for reasons of medical necessity.* Company model arrangements adversely affect the quality of health care services in yet another way, by creating a direct financial incentive for referring physicians to require that patients receive anesthesia services, even if they do not need them. This point is particularly applicable in the case of anesthesia for certain gastrointestinal procedures, such as endoscopies and colonoscopies. Company model arrangements can create unnecessary risks for patients by exposing them to anesthetic risk in circumstances in which is it not always necessary.

c. *Creating a second layer of profit that incentivizes performance of medically unnecessary procedures.* To the extent that company models give referring physicians a second profit stream, referring physicians have double the financial incentive to perform medically unnecessary procedures, as they capture two professional fees for their services – their own fee and that of the anesthesiologist.

Inspector General Daniel R. Levinson
February 25, 2014
Page 15 of 19

    d.  *The corruption of medical judgment threatens delivery of quality health care services*.  In all of these ways, company model arrangements result in a corruption of medical judgment, decreased quality of health care services, and increased risk to patients.

**Limiting Patient Freedom of Choice Among Health Care Providers**

To the extent that referring physicians select anesthesia providers in company model arrangements based upon financial rather than quality considerations, company model arrangements necessarily limit patient freedom of choice.  This point is further exacerbated by the role of consultants that operate the "anesthesia end" of a company model arrangement.  The result can be nonphysicians making the decision of which anesthesia provider to hire or engage, based solely on price considerations.  Anesthesia providers are not interchangeable; there are quality differences among them, just as there are with other professionals.  For reasons based entirely on profit – not quality or assurance of coverage –company model arrangements can and do limit the ability of patients to select their anesthesia provider.

**Decreasing Competition Among Health Care Providers**

Company model arrangements reduce competition among health care providers in at least two ways.  First, as referring physicians implement company model arrangements, anesthesiologists who are unwilling to share their professional fee are shut out from more and more opportunities.  ASA has heard anecdotal reports of anesthesiologists who had provided anesthesia services for referring physicians for more than twenty years, whose contracts were terminated when the referring physicians implemented a company model arrangement in which the referring physicians billed for and retained the anesthesia professional fee, sharing only a fraction with the new replacement anesthesiologists.

Second, as some anesthesia management companies develop that are willing to take risk and to enter into these arrangements in multiple locations nationwide, local competitors are foreclosed and competition decreases.  ASA has heard reports of at least one ASC management company creating its own anesthesia company to provide services at its ASCs, which could result in further market consolidation.

ASA's initial survey on company model arrangements conducted from December 2010-January 2011 demonstrated that 125 of 308 (41%) responding anesthesia practices from across the country had been requested by an ASC and/or referring physician practice to participate in a company model arrangement.  Those 125 practices, representing 21 states, also reported multiple requests from multiple ASCs (n=332).  Of the 332 requests reported in the survey, anesthesia practices lost a contract in at least 159 (48%) of those instances.

As mentioned in the introduction to this letter, ASA repeated the survey in 2013, receiving 828 responses from all fifty states, Washington DC and Puerto Rico. The results showed that 420 practices (just over 50%) had been approached about engaging in a company model, an increase from the 125 practices in the initial survey.[11]  Of those, 306 practices (73% of those who had been approached and 37% of all respondents) received a company model request at a facility where they already were providing services. 252 practices experienced this problem in more than one facility and 53 experienced it in more than two facilities.  Once again, of those practices that received a request to engage in a company model and rejected it, a significant number, 42.5%, lost their contract to practice at that location.

---

[11] "*A Growing Problem: Results of the Second ASA Survey on the Company Model*," American Society of Anesthesiologists Newsletter, December 2013, Vol. 77, N. 12, pp. 46-48.

Inspector General Daniel R. Levinson
February 25, 2014
Page 16 of 19

These numbers were surprising and troubling to the ASA, and further underscore the need for issuance of a Special Fraud Alert and modification of existing safe harbors.

As company model arrangements continue to increase in frequency, the eventual outcome is that those who reject contracts they believe to be illegal will be forced out of the competitive marketplace. Only those who concede to these illegal models will remain, and competition thus will be decreased.

Further, according to the U.S. Government Accountability Office (GAO),[12] Medicare pays anesthesiologists approximately 33% of their average commercial payment for the same anesthesia services. Other medical specialists receive from Medicare approximately 80-85% of their average commercial payments. There is no question that Medicare payment rates are not sustainable for anesthesia practices, particularly if the commercial payor mix declines over time. Given this economic reality, and with continuing implementation of company model arrangements, anesthesia practices cannot sustain themselves by also transferring 40% or more of anesthesia payments to referring physicians.

**Increasing the Cost to Federal Health Care Programs**

Since the purpose of company model arrangements is to enable referring physicians to profit from their referrals, such arrangements can be expected to, and do, result in increased cost to Federal health care programs. *First*, the referring physicians have every incentive to perform medically unnecessary services when they stand to capture two revenue streams – their own professional fee and the anesthesia fee.

*Second*, when the referring physicians employ the anesthesiologists, as is common in company model arrangements, referring physicians stifle the anesthesiologists' exercise of independent medical judgment with the insistence that cases be performed with anesthesia, without regard to medical necessity for the anesthesia.

To the extent that patients are receiving services they do not need, health care costs increase.

In 2013, the American Society of Anesthesiologists Department of Health Policy Research (DHPR) examined trends in the use of anesthesia services for gastrointestinal (GI) procedures on Medicare beneficiaries.  The DHPR reviewed data from the Medicare Limited Data Set for the years 2007-2011. The study sample included patients who received upper gastrointestinal endoscopies and colonoscopies based upon *Current Procedural Terminology*, edition 4 (CPT® codes).  For the five-year period from 2007-2011, there were 657,722 unique patients and almost 900,000 GI cases.

The data show that utilization of anesthesia services for GI procedures has increased significantly in almost every state from 2007-2011.  Specific details of the study include:

1. Though the number of overall cases has remained stable, the percentage of GI cases that utilized anesthesia services rose on average 17.3%, from 31.9% in 2007 to 49.2% in 2011

2. The percentage of GI cases that utilized anesthesia services rose in forty-nine out of fifty states (range 0.5% to 33.9%)

---

[12] GAO, *Medicare Physician Payments:  Medicare and Private Payment Differences for Anesthesia Services*, GAO-07-463 (July 2007), available at http://www.gao.gov/new.items/d07463.pdf.

Inspector General Daniel R. Levinson
February 25, 2014
Page 17 of 19

3.  In the ASA survey on the company model, the largest number of member responses reporting an invitation to participate in a company model came from Texas, Tennessee, and Florida.  In the DHPR analysis, these states had increases in utilization of anesthesia services of 28.6%, 22.3%, and 13.1% respectively from 2007-2011.

This analysis illustrates that utilization of anesthesia services for GI cases in Medicare beneficiaries has risen across the United States during the years 2007-2011.  When considered in conjunction with the results of the 2013 ASA Survey, in which anesthesiologists reported that company model arrangements appear to be occurring more frequently and across a wider geographic range, these data are consistent with our contention that company model arrangements contribute to increased utilization of anesthesia services.[8]

*Third*, and less obvious, is the overall upward pressure on the health care system when referring physicians syphon off the little profit available in the performance of anesthesiology services.  For most anesthesia practices, any profits realized on the performance of anesthesia services in the ASC setting (where company model arrangements most frequently occur) are used to offset the very significant costs of providing anesthesia for underinsured and uninsured patients in the hospital inpatient population.  Over the past ten or so years, industry surveys have shown that some two-thirds to three-quarters of anesthesiology practices nationwide receive compensation from the hospitals at which they provide services.  Such compensation usually pays for losses associated with coverage for service lines such as obstetrics, cardiovascular, trauma, and transplant services, which are not self-supporting in many hospitals.   As referring physicians in company model arrangements retain anesthesia revenue, anesthesiology practices have fewer opportunities to cross-subsidize their losses, which creates further pressure on hospitals, which provide care to all comers.

This syphoning off of anesthesia profits and the resulting increased pressure on the health care system to pay for anesthesia services will have long-term deleterious effects on the health care system and on health care costs.

Notably, MedPAC estimates that Medicare payments and beneficiary spending on ASCs in 2011 was $3.4 billion, which represents an increase of 2.2 percent per fee-for-service beneficiary from 2010.[13]  These payments do not include CMS professional fee payments to surgeons/proceduralists or anesthesia providers.   Data also show that 27% of procedures performed in ASCs are performed by gastroenterologists.[14]   The ASA 2013 survey demonstrated that gastroenterologists were the medical specialists who most frequently requested company model arrangements (49%), and there have been increasing reports of orthopedists, ophthalmologists, and others implementing company model arrangements.  Given the level of Federal health care payments and the volume of services provided to Medicare beneficiaries potentially under this economic model, there is significant opportunity to escalate the costs to Federal health care programs by the increased utilization of anesthesia services driven by referring physicians who profit from their ownership stake in the anesthesia revenue.   Additional information appears in the following section.

---

[8] American Society of Anesthesiologists, *Use of Anesthesia Services during Outpatient Gastrointestinal Cases Among Medicare Beneficiaries 2007-2011*, ASA Department of Health Policy Research, September 2013.
[13] MedPAC, *Report to the Congress:   Medicare Payment Policy*, at 105 (March 2013), available at http://www.medpac.gov/documents/Mar13_entirereport.pdf.
[14] *Id*. at 114.

Inspector General Daniel R. Levinson
February 25, 2014
Page 18 of 19

**Increasing the Potential Overutilization of Health Care Services**

Anesthesiologists play a critical role in the perioperative process by performing pre-anesthesia evaluations to assess whether the patient is appropriate for the procedure and whether the proposed location for the procedure is appropriate (*e.g.*, ASC, outpatient facility, inpatient admission, etc.).

Company model arrangements compromise this critical phase in the patient's perioperative care. The referring physician's direct financial interest in the anesthesia company creates the strong incentive to increase the utilization of anesthesia services and the depth of sedation to maximize anesthesia profits. Though there is no current registry or analysis being performed to determine with scientific precision whether ASCs that implement company model arrangements increase utilization of anesthesia services, ASA has heard from multiple sources that such ASCs have in fact increased from 45-60% utilization rates to nearly 100% once referring physicians are capturing the anesthesia revenue stream.

CMS data show huge disparities in different parts of the United States among the use of anesthesia for two of the procedures most frequently performed by gastroenterologists, endoscopies (CPT® code 00740) and colonoscopies (CPT® code 00810) (the GI procedures). We are discussing these data, as these two codes account for twenty-four percent (24%) of the total amount paid by Medicare for anesthesia services in 2012 (most recent data available), and because ASA data indicate that requests to participate in company model arrangements occur most frequently with gastroenterologists.

We are enclosing two maps that summarize the incidence of the use of anesthesia services for GI procedures in 2012. In some states, the use of anesthesia services for these GI procedures occurs as infrequently as 1.6 to 8 percent of the time. In contrast, in other locations, the incidence of these cases occurs an astounding 64-96.24 percent of the time. In states in which anecdotal evidence of company model arrangements is high, such as Florida, Tennessee, Georgia, Pennsylvania, New Jersey, New York and Connecticut, anesthesia utilization for GI procedures occurs from 64 to 95.24 percent of the time, a much higher rate than in states such as Utah and Montana, in which the incidence of anesthesia utilization for GI procedures is less than eight percent. Those two states are not ones in which company model arrangements are common.

While these data do not conclusively demonstrate that company model arrangements cause overutilization of anesthesia services, they do serve as a compelling reflection of the high incidence of anesthesia services in some states, which happen to coincide with states in which there are frequent reports of company model arrangements, and the far lower rate of anesthesia services in states in which company model arrangements have not been reported.

**Increasing the Financial Benefit to Health Care Professionals or Providers that may take into account their decisions whether to order a health care item or service**

For all of the reasons outlined in this letter, ASA believes that company model arrangements directly motivate referring physicians to consider financial incentives and how much money they will receive when they decide whether to order anesthesia services for a procedure. Again, anesthesia for GI procedures is a compelling example, as anesthesia is not always used for these procedures (see discussion in the preceding section). In the past, referring physicians received only the professional fees for their own professional services, and facility fees for any facilities, such as ASCs, in which they held an ownership interest. *With implementation of a company model arrangement, referring physicians are able to receive hundreds of thousands, if not millions, of dollars each year in anesthesia professional fees.*

Inspector General Daniel R. Levinson
February 25, 2014
Page 19 of 19

It simply is not possible to reach any conclusion other than that the direct linkage between ordering anesthesia services and pocketing enormous sums of money for those services absolutely affects referring physicians' decisions to order anesthesia services.

**E.        Summary**

We appreciate the enormous burden and workload of the OIG and applaud your ongoing efforts to identify fraudulent activity within our Federal health care programs. ASA believes that company model arrangements involve illegal kickback arrangements that threaten the quality of care that Federal health care program patients receive, corrupt medical decision making, and threaten the integrity of Federal health care programs by enabling referring physicians to realize enormous profits from their referrals. **We hope that you agree and take action to minimize the ability of referring physicians to profit from their referrals for anesthesia services.**

As always, we welcome a conversation to discuss this issue further if you would find it helpful. Please feel free to contact Sharon Merrick, M.S., CCS-P, Director of Payment and Practice Management, in our Washington office via e-mail (s.merrick@asahq.org) or phone (202-289-2222) with any questions or for additional information.

Respectfully yours,

Jane C.K. Fitch, M.D.
President
American Society of Anesthesiologists

Enclosures:

**2012 Medicare Anesthesiology Frequency with GI Endoscopy Procedures by ZIP Code**
**Anesthesia for Upper GI Endoscopy CPT 00740**
Case 2:19-cv-00873-TLN-AC   Document 31-3   Filed 03/14/22   Page 76 of 93





Anesthesia Frequency/GI Frequency

| | | |
|---|---|---|
| 3.226% – 8.000% | 8.000% – 16.00% | 16.00% – 24.00% | 24.00% – 32.00% | 32.00% – 40.00% |
| 40.00% – 48.00% | 48.00% – 56.00% | 56.00% – 64.00% | 64.00% – 82.34% | |

**2012 Medicare Anesthesiology Frequency with GI Endoscopy Procedures by ZIP Code**
**Anesthesia for Lower GI Endoscopy CPT 00810**
Case 2:19-cv-00873-TLN-AC   Document 31-3   Filed 03/14/22   Page 77 of 93





Anesthesia Frequency/GI Frequency

| | |
|---|---|
| 0.89% – 8.000% | 8.000% – 16.00% | 16.00% – 24.00% | 24.00% – 32.00% | 32.00% – 40.00% |
| 40.00% – 48.00% | 48.00% – 56.00% | 56.00% – 64.00% | 64.00% – 95.24% | |

# Exhibit 5

![ABA American Bar Association Health Law Section — Health eSource — Your Link to the ABA Health Law Section News & Information]

Home › Publications › ABA Health eSource › 2016-2017 › October 2016 › Something Ventured: The Continued Scrutiny o

## Something Ventured: The Continued Scrutiny of ASC-Anesthesia Joint Ventures

Vol. 13  No. 2

Scott R. Grubman and Samuel M. Shapiro, Chilivis, Cochran, Larkins & Bever LLP, Atlanta, GA

 

It has been over four years since the U.S. Department of Health and Human Services' (HHS) Office of Inspector General (OIG) issued its landmark advisory opinion pertaining to the Anti-Kickback Statute (AKS) implications of various joint ventures between anesthesia providers and physician-owned ambulatory surgical centers (ASCs). In that advisory opinion, the OIG called into question (and for all intents and purposes, prohibited) the "company model" of ASC-anesthesia revenue sharing, a model that had long been blessed by experienced healthcare attorneys nationwide. The advisory opinion not only initiated a shift in the advice provided by healthcare regulatory attorneys to their ASC and anesthesia clients, but also resulted in an increased level of scrutiny by both the OIG and the Department of Justice (DOJ), a trend that has continued through today with no obvious end in sight. As a result, many anesthesia companies and their ASC partners now find themselves in the government's crosshairs due to various types of revenue-sharing ventures.

This increased attention from the government stems, at least in part, from the fact that those in the anesthesiology business rely heavily on patient referrals – that is, unlike the services provided by other types of healthcare provide (e.g., hospitals, physician groups, or ASCs), the need for anesthesia services typically arises only in conjunction with services performed by another provider. Because anesthesia providers are so reliant on referrals, almost any monet arrangement between an anesthesia provider and the entity for which the anesthesia provider performs services cou implicate the AKS and elicit government scrutiny.

This article provides a brief overview of the regulatory framework surrounding these ASC-anesthesia joint ventures and revenue-sharing models. Moreover, the article serves to provide guidance as to what the government considers suspect agreement for anesthesia services.

### I. Background: ASCs and Anesthesia

As defined in the Medicare regulations, an ASC is "a distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission."[1] Prior to 1970, when the first ASC opened in Phoenix, Arizona, physicians performed nearly all surgeries in hospitals.[2] As noted by the Ambulatory Surgery Center Association, on the Phoenix center's first day, five physicians performed five procedures, four of which required general anesthesia.[3] By 1973, the American Medical Association had adopted a resolution endorsing the performance of certain surgical procedures under general anesthesia in the outpatient setting, and the American Society of Anesthesiologists had released "Guidelines for Ambulatory Surgical Facilities" to set some initial industry standards.[4] By 2011, the number ASCs had grown to 5,300 nationwide, and Medicare had granted approval for ASCs to perform over 3,500 procedure

ASCs participating in the Medicare program receive payment under Medicare Part B for services furnished to Medica beneficiaries at the ASC in connection with Medicare-covered surgical procedures.[6] Under the ASC payment system,

Medicare makes packaged facility payments to ASCs for the specific ASC-covered surgical procedures on the ASC list of covered surgical procedures, and separately pays ASCs "for certain ancillary services that are provided integral to a covered ASC surgical procedure."[7] Importantly, pursuant to Chapter 14 of the Centers for Medicare & Medicaid Services' (CMS) Medicare Claims Processing Manual, "ASCs must accept Medicare's payment as payment in full for services with respect to those services defined as ASC services."[8] However, both the physician and the anesthesiologist can bill for the professional component of their respective services.[9]

The regulations provide a specific (albeit non-exhaustive) list of ASC services intended to be included in and covered by Medicare's ASC facility fee payment, as well as a list of ancillary services for which separate payment may be allowed.[10] In addition to, *inter alia*, items and services such as laboratory testing, equipment, surgical dressings, nursing and technician services, and administrative, recordkeeping, and housekeeping services, the prospectively-determined bundled facility fee covers "[m]aterials, including supplies and equipment for the administration and monitoring of anesthesia."[11]

## II. Previous OIG Guidance Regarding Joint Ventures and the AKS

The AKS makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a federal healthcare program, and defines "remuneration" broadly to include the transfer of anything of value.[12] A violation of the AKS can also lead to liability under the False Claims Act (FCA)[13] and the Civil Monetary Penalties Law (CMPL),[14] as well as exclusion from federal healthcare programs.[15] Despite any past or ongoing scrutiny on the part of the government, however, joint venture arrangements between various healthcare providers are often permissible and do not automatically implicate (much less violate) the AKS.

The term "joint venture" does not have an express definition in statute or regulation; however, in a 1989 Special Fraud Alert (published in the Federal Register in 1994), the OIG noted that "[a] joint venture may take a variety of forms: it may be a contractual arrangement between two or more parties to cooperate in providing services, or it may involve the creation of a new legal entity by the parties, such as a limited partnership or closely held corporation, to provide such services."[16] Although the AKS does not expressly prohibit joint venture arrangements, the distinction between normal investment proceeds from the joint venture and prohibited remuneration often proves difficult. For that reason, the OIG established in the Special Fraud Alert certain factors that may assist in identifying a "suspect" arrangement:

1. Investors are chosen because they are in a position to make referrals;
2. Physicians who are expected to make a large number of referrals may be offered a greater investment opportunity in the joint venture than those anticipated to make fewer referrals;
3. Physician investors may be actively encouraged to make referrals to the joint venture, and may be encouraged to divest their ownership interest if they fail to sustain an "acceptable" level of referrals;
4. The joint venture tracks its sources of referrals, and distributes this information to the investors;
5. Investors may be required to divest their ownership interest if they cease to practice in the service area, for example, if they move, become disabled, or retire;
6. Investment interests may be non-transferable.[17]

Additionally, the OIG said it would also consider factors pertaining to the structure, financing, and profit distribution of the joint venture. Factors relevant to these aspects include:

1. Whether the joint venture business has its own separate location, distinct from the business location of any of the joint venture investors;
2. Whether the investment of capital is disproportionate, such that those investors who also make referrals to the venture have much less invested in the venture than other investors;
3. Whether the investors who can control patient referrals are allowed to "borrow" their investment capital from other investors or from the venture itself; and
4. Whether the investment returns are extraordinary.[18]

Thus, one of the key aspects of a well-structured healthcare joint venture is that payments to investors are directly proportional to their capital investments.

More recently, in 2003 the OIG issued a Special Advisory Bulletin relating to contractual joint ventures.[19] Citing to its previous Special Fraud Alert, the OIG recognized the continued proliferation of contractual joint venture arrangements between healthcare providers and the need for further guidance. The agency underscored certain "questionable contractual arrangements" in which "a health care provider in one line of business (hereafter referred to as the

'Owner') expands into a related health care business by contracting with an existing provider of related item or service (hereafter referred to as the 'Manager/Supplier') to provide the new item or service to the Owner's existing patient population," including Medicare and Medicaid patients.[20]

As it had done previously, the OIG again noted the "common elements" typical of such problematic arrangements:

1. Owner expands into a related line of business, which is dependent on referrals from, or other business generated by, the Owner's existing business.[21]

2. Owner neither operates the new business itself nor commits substantial financial, capital, or human resources to the venture, and instead contracts out substantially all of the operations of the new business to the Manager/Supplier; however, while the Manager/Supplier essentially operates the business, the billing of insurers and patients is done in the name of the Owner.

3. Manager/Supplier is an established provider of the same services as Owner's new line of business and would otherwise be a competitor of the new business, providing items and services in its own right, billing insurers and patients in its own name, and collecting reimbursement.

4. Owner and Manager/Supplier share in the economic benefit of the Owner's new business; Manager/Supplier takes its share in the form of payments under the various contracts with Owner, and Owner receives its share in the form of the residual profit from the new business.

5. Aggregate payments to the Manager/Supplier typically vary with the value or volume of business generated for the new business by the Owner. Although some arrangements involve certain fixed payments, other payments (such as payments for goods and services supplied by Manager/Supplier) will vary based on the number of goods and services provided; thus, the aggregate payment to the Manager/Supplier from the whole arrangement will vary with referrals from the Owner.[22]

As discussed below, these factors play a critical role in the OIG's evaluation of agreements between ASCs and anesthesiologists.

## III. OIG Advisory Opinion 12-06

In May 2012, the OIG issued Advisory Opinion 12-06, which specifically addressed certain concerns the requestors had with anesthesia arrangements in connection with ASCs.[23] The OIG concluded that each of the two anesthesia arrangements proposed by the requestors posed a heightened risk of fraud and abuse.[24]

The first proposed arrangement involved payment by the anesthesia group of a per-patient fee to the ASCs in return for "management services" from the ASCs.[25] The fee would cover the cost of certain ASC expenses (e.g., preoperative nursing assessments, space for the requestor's physicians and records); however, the OIG concluded that such expenses were already included in the facility fees paid to the ASCs by private payors and Medicare.[26] As such, the OIG opined that the "management services" fee constituted double billing and was in violation of the AKS.[27]

The OIG then analyzed a second proposed arrangement whereby the anesthesia group would provide anesthesia services to a subsidiary established by each of the ASCs, which in turn would bill third-party payors for those same anesthesia services.[28] Under this arrangement, commonly referred to as the "company model," the subsidiaries would either be owned directly by the ASCs or by the physician-owned LLCs or PCs that own the ASCs.[29] In turn, the subsidiary would engage the anesthesia group as an independent contractor to provide the anesthesia services to the ASCs or employ the anesthesiologists/CRNAs.[30] The anesthesia group would be paid a negotiated rate for its services out of the subsidiary's collections from Medicare/Medicaid and private payors for anesthesia-related services.[31] Importantly, the subsidiary would retain the profits from its anesthesia services business.[32]

In analyzing the company model, the OIG opined that the arrangement was designed to "do indirectly what [the parties] cannot do directly" – that is, permit the ASCs' physician owners "to receive compensation in the form of a portion of the [anesthesia group's] anesthesia services revenues, in return for their referrals to the [anesthesia group]."[33] Moreover, the OIG noted that no safe harbor would protect the remuneration the subsidiary would distribute to the ASCs' physician owners.[34]

The OIG also noted that the company model arrangement was substantially similar to the suspect "contractual joint ventures" described in its 2003 Special Advisory Bulletin (outlined above).[35] The OIG concluded that ASC physician owners would be in the same position as the Bulletin's hypothetical "Owner," and the anesthesia group would likewise be in the same position as the hypothetical "Manager/Supplier."[36] Like the Owner, the ASCs' physician owners would seek to branch out into a related line of business (anesthesia services) with a minimum of risk and investment.[37] Meanwhile, the anesthesia group, otherwise in a position to compete with the physician owners and able to provide and bill for anesthesia services in its own right, would effectively operate and manage the anesthesia business of the subsidiaries.[38] Thus, because the anesthesia group is essentially giving up profits that would otherwise inure solely to

its benefit, the OIG concluded that the only reason to give up such profits would be to exchange them for the ASCs' patient referrals, on which the anesthesia group is dependent for business.[39]

In sum, the OIG culled out the two major issues that should be avoided in all ASC-anesthesia relationships: (1) "pay-to-play," wherein an anesthesia group pays an ASC for the exclusive right to provide anesthesia services; and (2) "double dipping," wherein the ASC requires the anesthesia group to incur the cost of drugs and other supplies that are intended to be covered by the ASC facility fee and for which the ASC is reimbursed.

## IV. Continued Scrutiny of ASC-Anesthesia Arrangements after 12-06

### a. *Anesthesia's Response*

In the years leading up to the OIG's publication of Advisory Opinion 12-06, the anesthesia community had been working diligently to get the OIG's attention regarding the company model, a model the anesthesia community was solidly against. The American Society of Anesthesiologists (ASA) wrote multiple letters to the OIG, concerned that the then-current trend was of physician-owned facilities moving away from the traditional fee-for-service model and "turning to the company model and related arrangements to capture the revenue stream from their referrals for anesthesia services."[40] Believing these arrangements to be "fraudulent and abusive," the ASA's letters requested that the OIG issue a Special Fraud Alert on the issue and to state outright that such practices would be subject to scrutiny under the AKS.[41]

Even after the OIG issued 12-06, the ASA remained concerned. In February 2014, the organization again wrote to the OIG, this time requesting a Special Fraud Alert and modifications to existing safe harbors "to make clear that [the safe harbors] do not protect these elaborate schemes."[42] Alleging that "[t]hese 'fraudulent and abusive' practices continue unabated," the ASA cited data from its 2013 survey of some of its 52,000 anesthesiologist members.[43] Notably, the ASA informed the OIG that over half of the survey's respondents had received a "company model" request at a facility where the anesthesiologists were already providing services.[44] Moreover, said the ASA, of those that received such a request and rejected it, 42.5 percent lost their contract to practice at that location.[45]

### b. *U.S.* ex rel. *Florida Society of Anesthesiologists v. Choudhry*

In an October 2013 FCA *qui tam* complaint (unsealed in March 2016 after the federal government declined to intervene), the Florida Society of Anesthesiologists (FSA) accused more than 50 physicians, anesthesiology companies, and ASCs of engaging in illegal kickback schemes by sharing revenues under a company model.[46] Citing directly to Advisory Opinion 12-06, the FSA stated in its complaint that "[t]he sharing of profits led to overutilization of anesthesia, as well as potential harm to the patients who would not normally have received anesthesia services."[47]

In a motion to dismiss filed in June 2016, one of the defendants summarizes the FSA's (and its own) position:

> The [FSA's] real grievance appears to be its belief that all the defendants "have a captive patient base as a result of their practices, unlike anesthesiologists who depend for their practice solely on referrals" and that this reality "threatens the independence of anesthesiology." . . . But a gripe about the way health care providers deliver anesthesia services in surgery centers does not amount to a violation of the FCA [].[48]

Citing to Advisory Opinion 12-06, the Motion to Dismiss argues that the FSA's complaint "is improperly premised on an Advisory Opinion from the [OIG]. Consistent with being 'advisory,' the Advisory Opinion states on its face that it 'may not be relied on' by anyone other than the requester who sought it."[49]

Although the defendants' motions to dismiss are still pending before the District Court for the Middle District of Florida, and although the government declined to intervene, the outcome in *Choudhry* could prove to have a significant and lasting impact on the weight afforded to Advisory Opinion 12-06 and the government's decision whether or not to continue to target ASC-anesthesia company model arrangements moving forward.

### c. *Sweet Dreams Nurse Anesthesia Settlement*

More recently, on August 5, 2016, the DOJ issued a press release announcing a more than $1 million settlement with Sweet Dreams Nurse Anesthesia (Sweet Dreams) to resolve allegations that the anesthesia company had violated the AKS and, therefore, the FCA.[50] The press release described two kickback schemes alleged by the government. The first allegation concerned Sweet Dreams' "provision of free anesthesia drugs to [ASCs] in exchange for the ASCs

granting Sweet Dreams an exclusive contract to provide anesthesia services at those ASCs. In turn, the governme would likely view this arrangement as "double dipping," one of the OIG's main concerns outlined in Advisory Opinion 12-06. As discussed above, the Medicare regulations provide that drugs are included in the ASC facility fee payment Moreover, the Medicare Claims Processing Manual states that ASCs must accept the facility fee as payment in full.[53] Thus, if anesthesia drugs are needed, the government expects the ASC to use the facility fee money to purchase them; according to the government, if the anesthesia company pays for the drugs instead, this would constitute ille remuneration under the AKS.

The second alleged scheme discussed in the DOJ's Sweet Dreams press release pertained to "the agreement of an affiliate of Sweet Dreams to fund the construction of an ASC . . . in exchange for contracts for Sweet Dreams' select as the exclusive anesthesia provider at that facility and a number of other podiatry-based ASCs affiliated with [the A funded by Sweet Dreams]."[54] Such an arrangement, if entered into by any anesthesia company with any ASC, woul be viewed by the government as a "pay-to-play" scenario – the second of the OIG's main concerns in Advisory Opin 12-06.

Settled four years after the issuance of Advisory Opinion 12-06, the Sweet Dreams matter serves as a strong indication that the federal government will continue to seek to target ASCs and anesthesiologists engaged in compa model or similar revenue-sharing model arrangements.

## V. Avoiding Improper ASC-Anesthesia Arrangements

Despite the continued level of scrutiny over such arrangements, and despite the OIG's renouncement of the anesthe company model in Advisory Opinion 12-06, potential models still exist for ASCs seeking to enter into a mutually beneficial contractual arrangement with an anesthesia provider.

### a. *Traditional Model*

Under the traditional model, the ASC bills for the facility fee, the ASC surgeons bill for their professional fees, and th anesthesia group bills for its professional anesthesia services. Here, the ASC has no interest in profiting from anesthesia services and is contracting for such services solely to create efficiencies and increase patient satisfaction, which may ultimately help to attract more business. Although this model does not entail any actual compensation, t ASC physician owners should still remain wary of double dipping – that is, the ASC should ensure that it is incurring of the costs for any anesthesia-related drugs and equipment reimbursed under the ASC facility fee.

This is the simplest ASC-anesthesia model in that, because no remuneration is passed between the parties, the arrangement does not implicate the AKS (absent the double dipping issue described above) and therefore does not require a safe harbor analysis.

### b. *Employment/Independent Contractor Model*

Under this model, the ASC engages the anesthesiologists in either a direct employment or independent contractor arrangement. The anesthesia group reassigns to the ASC its right to bill and collect for professional anesthesia services, and the ASC enrolls in Medicare as a group practice and bills for anesthesia. This allows the ASC physician owners to have substantial flexibility in compensating the anesthesia provider, and allows the income from anesthes services to be distributed to all physician owners. Moreover, the AKS safe harbors for bona fide employment[55] or fo personal services and management contracts[56] would apply to any compensation paid to the anesthesiologists if properly structured.

## VI. Conclusion

Arrangements between ASCs and anesthesia providers have been heavily scrutinized in the last four years, no more than in the OIG's Advisory Opinion 12-06, and that trend shows no sign of ending any time soon. By challenging the validity of the ASC-anesthesia revenue-sharing models such as the company model, the OIG significantly changed th way that healthcare lawyers think about these arrangements. In the wake of 12-06, the DOJ, private *qui tam* litigan and anesthesia associations are working to enforce the OIG's opinion and do away with such practices. To avoid individual scrutiny, ASCs and anesthesiologists alike must remain wary of how they handle their relationships with o another moving forward.

***

Scott R. Grubman is a Partner with the law firm of Chilivis, Cochran, Larkins & Bever, LLP (CCLB) in Atlanta, Georgia. Mr. Grubman is a former Assistant U.S. Attorney and DOJ Trial Attorney, and focuses his practice on the representation of healthcare providers in connection with government investigations and litigation. He may be reached at sgrubman@cclblaw.com or (404) 262-6505.

Samuel M. Shapiro is an associate at CCLB, where he handles both litigation and regulatory matters on behalf of healthcare clients. He may be reached at sshapiro@cclblaw.com.

1    42 C.F.R. § 416.2; *see also* Centers for Medicare & Medicaid Services, Medicare Claims Processing Manual, Ch. 14, Sec. 10.1 (Rev. 3031, Sept. 23, 2014), *available at* https://www.cms.gov/Regulations-and-Guida

2    Ambulatory Surgery Center Association (ASCA), "History of ASCs," http://www.ascassociation.org/advanc 26, 2016).

3    *Id.*

4    *Id.*

5    *Id.*

6    42 C.F.R. § 416 *et seq.*; Claims Processing Manual, *supra* note 1.

7    *See* 42 C.F.R. §§ 416.163, 416.164.

8    Claims Processing Manual, *supra* note 1.

9    *Id.*

10    42 C.F.R. § 416.164.

11    *Id.*

12    42 U.S.C. § 1320a-7b(b).

13    *Id.* § 1320a-7b(g).

14    42 U.S.C. § 1320a-7a(a)(7).

15    42 U.S.C. § 1320a-7(b)(7).

16    59 Fed. Reg. 65372, 65373 (Dec. 19, 1994).

17    *Id.*

18    *Id.*

19    68 Fed. Reg. 23148 (April 30, 2003).

20    *Id.* at 23148.

21    *Id.* at 23149 ("The new business line may be organized as a part of the existing entity or as a separate su Owner's existing patient base.").

22    *Id.*

23    OIG Advisory Opinion No. 12-06 (May 25, 2012).

24    As with all Advisory Opinions, Advisory Opinion 12-06 did not conclude that the arrangements *did, in fact,* could.  *Id.*

25    *Id.*

26    *Id.*

27    *Id.*

28    *Id.*

29    *Id.*

30    *Id.*

31    *Id.*

32    *Id.*

33    *Id.*

34    For example, because the subsidiary would not provide surgical services, the profits paid to the ASC phys harbor. *Id.*

35    *Id.*

36    *Id.*

37    *Id.*

38    *Id.*

39    *Id.*

40    Letter from Jane C.K. Fitch, M.D., President, American Society of Anesthesiologists, to Daniel R. Levinson, 2014) (citing to previous letters in footnote), *available at*

https://www.asahq.org/~/media/sites/asahq/files/public/resources/practice%20management/201

41    *Id.*

42    *Id.*

43    *Id.*

44    *Id.*

45    *Id.*

46    Case No. 8:13-cv-2603-T-27AEP (M.D. Fl.).

47    *Id.*

48    Defendants Jax Anesthesia Providers, LLC, Southpoint Anesthesia, LLC, and Borland-Groover Clinic, P.A.'s Complaint, Case No. 8:13-cv-2603-T-27AEP (M.D. Fl. June 17, 2016).

49    *Id.*

50    Department of Justice, "Sweet Dreams Nurse Anesthesia Group Pays More Than $1 Million to Resolve Kick https://www.justice.gov/usao-mdga/pr/sweet-dreams-nurse-anesthesia-group-pays-more-1-million-resol

51     *Id.*

52     42 C.F.R. § 416.164.

53     Claims Processing Manual, *supra* note 1.

54     DOJ Press Release, *supra* note 50.

55     42 C.F.R. § 1001.952(i) ("'[R]emueration does not include any amount paid by an employer to an employ[ee] employer, for employment in the furnishing of any item or service for which payment may be made in wh[ole] health care programs.").

56     *Id.* at § 1001.952(d) (stating that "remuneration" does not include "any payment made by a principal to a[n] the parties; (2) the agreement covers all of the services to be provided by the agent for the term of the a[greement] for at least one year; (4) compensation to the agent is fair market value and does not take into account t[he] generated between the parties; (6) the services performed under the agreement do not involve counselin[g] the services contracted for are commercially reasonable).

# Exhibit 6



# NEWSROOM

December 3, 2018

# Compliance Risks in ASC Anesthesia Services

(https://www.nelsonhardiman.com/compliance-risks-in-asc-anesthesia-services/)

Ambulatory surgery centers (ASCs) operations and billing present unique compliance and reimbursement risks. ASC surgeries result in three bills: a facility fee for the ASC, a professional service claim by the surgeon, and a professional claim for the anesthesiology services. Some ASC physician-owners elect to bill for anesthesia services, either directly on behalf of the ASC (as a billing company for the anesthesiologist) or indirectly through another medical group. In other cases, ASCs and their physician owners collect management fees or other charges, such as space rental, from anesthesia providers. While such arrangements arguably streamline paperwork for patients (when structured carefully), we have recently noticed some more aggressive ASC-anesthesia services relationships that raise significant compliance concerns, especially with respect to the federal Anti-Kickback Statute (AKS) and California's anti-kickback laws.

## The Anti-Kickback Statute

The AKS prohibits any business relationship in which anyone knowingly and willfully receives or pays anything of value in return for a patient referral where a federal healthcare program is footing all or part of the bill. California's anti-kickback laws apply the same principle even more broadly to all payors.

It is important to remember that not every prohibited kickback arrangement involves the direct exchange of money for referrals. For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind. In the context of an ASC-anesthesia services arrangement, remuneration from the anesthesia provider to the ASC or its owners must be reviewed to determine whether it unduly influences the selection of the anesthesia provider's services, versus it being a fair market payment for billing services, for instance.

# Common Models

ASCs have three general models of providing anesthesia services to their patients: the Fee-For-Service Model, the Employment/Engagement Model, and the Company Model.

In the Fee-For-Service Model, the ASC allows Anesthesia to come in and perform the support service for the surgeons, with anesthesia doing its own professional billing and collection.  There is no financial connection between the ASC and Anesthesia, so the compliance risks are entirely minimal.

In the Employment/Engagement Model, where the ASC engages Anesthesia as an independent contractor, the ASC pays Anesthesia a fixed rate for services and then the ASC bills and collects for the anesthesia service.   The ASC takes the collection risk on denied claims, and may or may not make a margin on anesthesia services.  So long as the parties fulfill the seven requirements of the personal services safe harbor of the Federal Anti-Kickback Statute, 42 U.S.C. Section 1320a-7b  (b), there is likely manageable risk under the ordinary situation.  Although this arrangement is riskier than the Fee-For-Services Model, careful attention to drafting may address concerns with corporate practice of medicine laws and may satisfy the personal services and management safe harbor to the AKS set forth in 42 C.F.R. section 1001.952(d).

In the Company Model, the ASC (or the medical group owning the ASC in corporate practice ban states) forms a separate entity which hires/retains anesthesia and provides anesthesia to the ASC.  The anesthesia company then bills and collects the professional anesthesia fees, pays the anesthesiologists, and dividends the profits, if any, to the ASC.  While this model reduces the denials from commercial insurers who look askance, at times, at the ASC itself submitting both facility fee and anesthesia professional billings, it raises significant concerns under the AKS. The risks of this model are significantly higher than those of the Fee-For-Service Model and the Employment/Engagement Model, and entities may need to re-assess their risk and/or restructure their arrangement to comply.

# Problematic Arrangements

Whenever an entity other than the professional service provider bills for physician fees of any kind, including anesthesia, there can be AKS questions.

The OIG reviewed a proposed relationship in which an anesthesia provider billed and retained all collections from patients and third-party payors, including Medicare, but was also contractually obligated to pay the ASC a "management services" fee for the non-Medicare patients. It was not entirely clear exactly what management services were provided for the payment to the ASC, and whether such payments were fair market value for the services. In OIG Advisory Opinion No. 12-06 (2012), the OIG concluded that the ASC would be paid twice for the same activity: once by collecting the facility fee from the payor (designed to compensate it for the activities it undertook) and again by the management fee paid to the ASC by Anesthesia. Worse, at least optically was the fact that the "management fee" was calculated on a per patient basis (for items/services supposed to be covered by the facility fee only). In short, this arrangement had all of the hallmarks of a referral fee.

In another proposed arrangement reviewed in the same OIG Advisory Opinion, the OIG took on a version of the Company model, where, subsidiary companies owned by the ASC would contract with an anesthesia provider and bill for the provider's anesthesia services. The subsidiary companies would pay Anesthesia a negotiated rate. The OIG concluded that this relationship would pose more than a minimal risk of fraud and abuse, because the subsidiary companies would generate anesthesia revenue that would be paid to them even though they were not Medicare certified under Title 42 C.F.R. Part 416.

A third example challenged by the OIG was where a fee opportunity by the engaging medical group was created where none would otherwise exist. In OIG Advisory Opinion No. 13-15 (2013), the OIG reviewed a proposed relationship where a psychiatrist/anesthesiologist from the group would provide all anesthesia services, except when on vacation. During vacation coverage, a separate anesthesia group provided the anesthesia but was required to reassign its right to bill and collect for anesthesia services to the group in exchange for a *per diem* rate. The OIG concluded that the arrangement was designed to permit the psychiatry group to do indirectly what it could not do directly, that is, to receive compensation which it otherwise was not entitled to receive. Again, the federal government concluded that the arrangement presented a significant risk that the retention of anesthesia revenues in this circumstance raised the presumption that this was nothing more than a referral fee.

# Conclusion

What we can tell from these OIG opinions and other decisions, is that an ASC can provide billing and collection services for Anesthesia, but they must be at Fair Market Value, and otherwise meet the personal services safe harbor of the AKS. If there is excessive revenue being retained by the ASC, or where there is really no service being provided by the ASC to Anesthesia, the parties run a risk that the arrangements may be considered a mere referral fee and run afoul of the AKS. Given that anesthesia-related billing revenue continues to be a frequent focal point for many ASCs, ASCs and their owners are encouraged to carefully review their relationships with anesthesia providers to ensure that they are compliant and not running afoul of the anti-kickback laws.

For questions regarding this update, please contact us:

**Kate Bowles (https://www.nelsonhardiman.com/attorney/katherine-bowles/)**
310.203.2800
**kbowles@nelsonhardiman.com (mailto:kbowles@nelsonhardiman.com)**

John Mills (https://www.nelsonhardiman.com/attorney/john-a-mills/)

310.203.2800

j (mailto:jmills@nelsonhardiman.com)mills@nelsonhardiman.com
(http://jmills@nelsonhardiman.com/)

*This article is provided for educational purposes only and is not offered as, and should not be relied on as, legal advice.  Any individual or entity reading this information should consult an attorney for their particular situation.*



 (https://www.nelsonhardiman.com/compliance-risks-in-asc-anesthesia-services/?print=print)

## Share



f (/#facebook)    🐦 (/#twitter)    in (/#linkedin)

[Search...]    🔍

## Filter

Headlines (https://www.nelsonhardiman.com/category/headlines/)

Video (https://www.nelsonhardiman.com/category/video/)

Media Mentions (https://www.nelsonhardiman.com/category/media-mentions/)

Publications (https://www.nelsonhardiman.com/category/publications/)

Blogs (https://www.nelsonhardiman.com/category/blogs/)

 # Events

(https://www.nelsonhardiman.com/events)

## Healthcare Law News (https://www.nelsonhardiman.com/hc-law-news)



(https://www.nelsonhardiman.com/hc-law-news/covid19resources/)

# Coronavirus (COVID-19) Resources

(https://www.nelsonhardiman.com/hc-law-news/covid19resources/)

## NELSO    ARDIMAN

Nelson Hardiman is the premier healthcare specialty law firm in Los Angeles. Our attorneys represent health care providers, including hospitals, in California and throughout the U.S...Read more about Nelson Hardiman (https://www.nelsonhardiman.com/overview).

### FIRM | FOCUS

**TRANSACTIONS** (https://www.nelsonhardiman.com/transactions/)

**REGULATORY COMPLIANCE** (https://www.nelsonhardiman.com/regulatory-compliance/)

**LITIGATION** (https://www.nelsonhardiman.com/litigation/)

### CONTACT US

📍 1100 Glendon Ave, 14th Floor
Los Angeles, CA 90024

📞 877.246.6423 (tel:+18772466423)

✉ info@nelsonhardiman.com (mailto:info@nelsonhardiman.com)

Harry Nelson (author) (https://en.wikipedia.org/wiki/Harry_Nelson_(auth

GOVERNMENT INVESTIGATIONS
(https://www.nelsonhardiman.com/govern
ment-investigations/)

SUBSCRIBE TO OUR NEWSLETTER

Email Address

Subscribe

FOLLOW US

𝐟 (https://www.facebook.com/NelsonHardiman)    🐦 (https://twitter.com/nelsonhardiman)

in (https://www.linkedin.com/company/6615110/)    ▶️
(https://www.youtube.com/c/Nelsonhardiman11835)

© 2019 Nelson Hardiman, LLP. All rights reserved. Disclaimer. (https://www.nelsonhardiman.com/disclaimer)