UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JACK WATERS, | No. 2:19-cv-00873-TLN-AC |
| Plaintiffs, | |
| v. | **ORDER** |
| ENVISION HEALTHCARE CORPORATION, et al., | |
| Defendants. | |

This matter is before the Court on a Motion to Dismiss filed by Defendant Envision Healthcare Corporation and its subsidiaries (collectively, "Defendants"). (ECF No. 41.) Plaintiff-Relator Jack Waters ("Waters"), who brings this *qui tam* action on behalf of the United States, filed an opposition. (ECF No. 42.) The United States did not file an opposition. Defendants filed a reply. (ECF No. 45.) For the reasons set forth below, the Court GRANTS Defendants' motion.

///
///
///
///
///

1

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

Envision acquired AmSurg Corp. and its subsidiaries (collectively, "AmSurg") in December 2016. (ECF No. 36 at ¶ 10.) As part of the merger, Envision acquired AmSurg's Ambulatory Services Division, which manages and has ownership interests in approximately 260 ambulatory surgery centers ("ASCs") across the United States in partnership with physicians who perform surgeries at the facilities. (*Id.* at ¶¶ 1, 10.) Waters is a licensed certified registered nurse anesthetist ("CRNA"). (*Id.* at ¶ 9.) Starting on April 9, 2012, and ending on or about April 26, 2020, Waters was a CRNA independent contractor for AmSurg St. George Anesthesia, LLC, an AmSurg Anesthesia Company, and has provided anesthesia services for ASC patients at St. George Endoscopy Center LLC, an AmSurg ASC. (*Id.*)

Waters alleges that since at least 2012, Envision, through its network of AmSurg ASCs, has been knowingly submitting false and fraudulent claims to Medicare and TRICARE for anesthesia services that were the result of illegal renumeration (*i.e.*, kickbacks) to Envision and the physicians. (*Id.* at ¶ 2.) The scheme allegedly is perpetuated through a series of anesthesia management companies owned by the physicians and Envision to exclusively provide anesthesia services to AmSurg ASC patients. (*Id.* at ¶¶ 2, 185.) The anesthesia management companies contract with independent licensed anesthesia professionals to provide anesthesia services in exchange for signing over their right to reimbursement for those services. (*Id.* at ¶ 2.) As a condition of obtaining access to anesthesia referrals at AmSurg ASCs, the anesthesia professionals are required to accept a per diem rate for their services that is far below the anesthesia revenue generated and are also required to "kickback" the remaining anesthesia profit (the difference between the per diem rates and the higher insurance reimbursement) to Envision. (*Id.* at ¶¶ 2, 200.) At several of the AmSurg ASCs, Envision allegedly engages in a further "kickback" scheme by sharing a portion of this anesthesia profit with the physician owners in exchange for their referrals to the AmSurg ASCs. (*Id.* at ¶¶ 3, 203.)

Waters filed this lawsuit under seal on May 15, 2019. (ECF No. 1.) The Department of Justice investigated the allegations and declined to intervene on October 13, 2021. (ECF No. 17.) On April 11, 2022, Waters filed the operative First Amended Complaint ("FAC"). (ECF No. 36.)

1  Waters alleges four claims under the False Claims Act ("FCA"): (1) presentation of false claims
2  under 31 U.S.C. § 3729(a)(1); (2) making or using false records or statements in connection with
3  claims under 31 U.S.C. § 3729(a)(2); (3) reverse false claims under 31 U.S.C. § 3729(a)(1)(G);
4  and (4) conspiracy to submit false claims under 31 U.S.C. § 3729(a)(1)(C). (*Id.* at 64–67.)
5  Defendants filed the instant motion to dismiss pursuant to Federal Rule of Civil Procedure
6  ("Rule") 12(b)(6) on May 9, 2022. (ECF No. 41.)

7  **II.      STANDARD OF LAW**

8  A motion to dismiss for failure to state a claim upon which relief can be granted under
9  Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th
10 Cir. 2001). Rule 8(a) requires that a pleading contain "a short and plain statement of the claim
11 showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see also Ashcroft v. Iqbal*, 556
12 U.S. 662, 677–78 (2009). Under notice pleading in federal court, the complaint must "give the
13 defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic
14 v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted). "This simplified
15 notice pleading standard relies on liberal discovery rules and summary judgment motions to
16 define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema
17 N.A.*, 534 U.S. 506, 512 (2002).

18 On a motion to dismiss, the factual allegations of the complaint must be accepted as true.
19 *Cruz v. Beto*, 405 U.S. 319, 322 (1972). A court must give the plaintiff the benefit of every
20 reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *Retail
21 Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963). A plaintiff need not allege
22 "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to
23 relief." *Twombly*, 550 U.S. at 570 (internal citation omitted).

24 Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of
25 factual allegations." *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).
26 While Rule 8(a) does not require detailed factual allegations, "it demands more than an
27 unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A
28 pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Thus, "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss" for failure to state a claim. *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004) (citations omitted). Moreover, it is inappropriate to assume the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 680. While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, only where a plaintiff fails to "nudge [his or her] claims . . . across the line from conceivable to plausible[,]" is the complaint properly dismissed. *Id.* at 680 (internal quotations omitted).

If a complaint fails to state a plausible claim, "'[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

**III.   ANALYSIS**

Defendants move to dismiss for two reasons: (1) the FCA's public disclosure bar applies; and (2) Waters's claims fail to satisfy Rules 12(b)(6) and 9(b). (ECF No. 41-2.) As will be discussed, the Court agrees with Defendants that the public disclosure bar applies. Therefore, the Court need not and does not address Defendants' remaining arguments.

///

A. <u>Applicable Law</u>

"The FCA creates civil liability for 'any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States v. Allergan, Inc.*, 46 F.4th 991, 993 (9th Cir. 2022) (citing 31 U.S.C. § 3729(a)(1)). "A private person, known as a *qui tam* relator, may bring a civil action under the FCA in the name of the U.S. government." *Id.* at 994 (citing 31 U.S.C. § 3730(b)). "The government may proceed with the action or decline to take over the action; if the government declines, then the relator can still pursue the action." *Id.* (citing 31 U.S.C. § 3730(b)(4)). "The FCA incentivizes whistleblowers to come forward by offering successful relators up to thirty percent of the recovery." *Id.* (citing 31 U.S.C. § 3730(d)). However, "the FCA . . . provides limits on who can bring a *qui tam* action and the sources of information upon which they can base their suit." *Id.* "These 'bars' to suit are intended to prevent 'parasitic' or 'opportunistic' *qui tam* actions." *Id.* (citation omitted).

In the instant case, Defendants argue the public disclosure bar applies. "The public disclosure bar seeks to strike a balance between 'encourag[ing] suits by whistle-blowers with genuinely valuable information, while discouraging litigation by plaintiffs who have no significant information of their own to contribute.'" *Id.* (quoting *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 570 (9th Cir. 2016)). The public disclosure bar is set forth in 31 U.S.C. § 3730(e)(4)(A), which provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

5

The public disclosure bar is triggered when: "(1) the disclosure at issue occurred through one of the channels specified in the statute; (2) the disclosure was public; and (3) the relator's action is substantially the same as the allegation or transaction publicly disclosed." *Id.* at 996 (citing *United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 626 (9th Cir. 2018)) (internal quotations omitted). In the instant case, the parties only dispute the third element. In determining whether the third element is met, the Court first looks to "whether the publicly available information . . . contained an 'allegation or transaction' of fraud." *Mateski*, 816 F.3d at 570. "The substance of the disclosure . . . need not contain an explicit 'allegation' of fraud, so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain." *Id.* at 571 (citation omitted). The Court then decides whether the relator's claim and the prior disclosures are substantially similar. *Id.* at 573. Courts should not "read[ ] *qui tam* complaints at only the 'highest level of generality,'" thereby "wip[ing] out *qui tam* suits that rest on genuinely new and material information." *Id.* at 575–78 (citations omitted).

B.     Analysis

Defendants argue that Waters's allegations are based on information that was publicly disclosed prior to filing the lawsuit. (ECF No. 41-2 at 10.) More specifically, Defendants argue Waters alleges conduct that was previously disclosed by: (1) a nearly identical *qui tam* lawsuit; (2) Securities and Exchange Commission ("SEC") filings; and (3) various news media publications.[1] (*Id.*) Defendants contend those public documents individually and collectively disclosed the material elements of the same fraud alleged in the instant case. (*Id.* at 11.) Defendants also argue Waters does not qualify as an original source. (*Id.* at 16–18.) The Court will address Defendants' arguments in turn.

---

[1] Defendants request the Court take judicial notice of filings from the prior *qui tam* lawsuit and the SEC filings. (ECF No. 41-3.) Noting no opposition from Waters, the Court GRANTS Defendant's request as to those documents. *See Reyn's Pasta Bella, LLC v. Visa USA Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (courts "may take judicial notice of court filings and other matters of public record"). The Court does not rule on Defendants' request for judicial notice as to other documents not relied on herein. As will be discussed, because the Court finds *Vanasco* and the SEC filings are sufficient to trigger the public disclosure bar, the Court need not and does not address Defendants' arguments about news articles that detailed similar models used in the industry generally.

*i.     Prior Qui Tam Suit*

Defendants argue the material elements of the instant case were disclosed in a nearly identical *qui tam* lawsuit filed in 2016 — *U.S. ex rel. Vanasco v. Amsurg Corp. et al*, No. 8-16-cv-00288 (M.D. Fla. 2016). (ECF No. 41-2 at 12.) In opposition, Waters argues the allegations in *Vanasco* do not disclose fraud and are not detailed enough to be "substantially similar" to the allegations in the instant action. (ECF No. 42 at 19.) The Court will first discuss *Vanasco*, then relevant case law, and lastly whether the allegations of fraud in *Vanasco* and the instant case are "substantially similar."

*a.     Vanasco*

The complaint in *Vanasco* begins by stating "[t]his case involves fraudulent arrangements whereby physician owners of [ASCs] enter into 'joint ventures' in which the physicians [were] paid kickbacks from fees generated for anesthesia services for their referral of patients." (ECF No. 41-3 at 26.) The relator, Vanasco, was an anesthesiologist who worked for AHP of Orlando, LLC ("AHP"). (ECF No. 41-3 at 27.) Vanasco sued AHP and other defendants, including AmSurg, under the FCA. (*Id.* at 27–28.) Vanasco alleged the defendants perpetrated two fraudulent schemes that involved the payment of kickbacks in exchange for the referral of patients: the "Joint Venture Scheme" and the "In-House Scheme." (*Id.* at 41.)

Under the "Joint Venture Scheme," Vanasco alleged that in 2008, AHP formed a joint venture with a group of physicians who performed surgeries at ASCs they jointly owned with AmSurg. (*Id.*) AHP managed the joint venture and paid Vanasco and other anesthesia personnel a flat salary to provide anesthesia services to the ASCs. (*Id.* at 42.) AHP had its medical professionals assign their billing rights to AHP, and then AHP billed the government directly for anesthesia services. (*Id.*) AHP personnel would provide exclusive anesthesia services to the ASCs, and AHP would share the revenue generated from the billing of such services with the ASCs in exchange for the exclusive referral of patients. (*Id.*) Vanasco alleged this sharing of revenue constituted an illegal kickback meant to incentivize the ASCs to use AHP exclusively for anesthesia services. (*Id.*)

///

7

Under the "In-House Scheme," Vanasco alleged that in July 2013, AHP stopped performing anesthesia services at the ASCs and AmSurg entered a joint venture with the physicians like the previous relationship between AHP and the physicians. (*Id.* at 43.) AmSurg hired anesthesia services personnel directly onto their payroll (at a significantly lower rate than the rate in effect under the AHP arrangement) to provide exclusive services for the ASCs. (*Id.*) The difference between the low cost of the in-house anesthesia services and the revenue generated was significant and the owners of the ASCs retained the profits. (*Id.*) AmSurg collected the profits from the anesthesia service providers and gave a portion to the physicians. (*Id.*) Vanasco alleged this sharing of revenue constituted an illegal kickback paid in return for the ASCs' exclusive use of AmSurg personnel for anesthesia services. (*Id.*) Plaintiff further alleged AmSurg instituted the same or similar scheme with physicians at other surgery centers around the country. (*Id.*)

*b.    Relevant Case Law*

There are two Ninth Circuit decisions that bear on the issue of whether *Vanasco* precludes Waters's claims. The first, cited by Waters, is *Mateski*. In *Mateski*, Raytheon contracted with the government to design and build a sensor as part of an environmental satellite system project. 816 F.3d at 567. The project "incurred many delays and cost overruns," and various reports and news articles blamed Raytheon as the source of the problems. *Id.* at 567–68. The relator — an engineer who had worked on the sensor at Raytheon — brought a *qui tam* suit alleging Raytheon violated the FCA "by failing to comply with numerous contractual requirements in the development of the sensor, fraudulently covering up areas of noncompliance, and improperly billing the government for erroneous and incomplete work." *Id.* at 568. The complaint included "numerous specific allegations" about Raytheon's work, such as "creation of false waivers; improper (and forged) signoffs certifying work performed; failure to rectify issues relating to electrostatic discharge; cross contamination of flight and non-flight quality materials; and use of prohibited materials such as tin plating." *Id.*

The district court dismissed the action, concluding the public disclosure bar applied because earlier news reports made it "publicly known that there was rampant mismanagement,

1 deviations from protocol, and other problems with" the sensor. *Id.* The Ninth Circuit reversed,
2 explaining that "[a]lthough prior public reports had described general problems with Raytheon's
3 work" — such as "mismanagement, technical difficulties, and noncompliance with contract and
4 policy directives" — none of the public reports "provided specific examples or the level of detail
5 offered by [the relator]." *Id.* at 578–79. The court further explained "[e]ven if . . . the prior
6 public reports provided enough information to . . . pursue an investigation into *some* fraud, and
7 even though the Government did in fact undertake some investigation of [the sensor], the prior
8 reports could not have alerted the Government to the specific areas of fraud alleged by [the
9 relator]." *Id.* at 579. For these reasons, the court held the public disclosure bar did not apply
10 because the relator's allegations differed "in both degree and kind from the very general
11 previously disclosed information about problems" with the sensor. *Id.* at 580.

12 Waters also relies on two Seventh Circuit cases that were discussed in *Mateski*. The first
13 is *U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933 (7th Cir. 2012). In *Goldberg*,
14 relators brought a *qui tam* suit alleging "that Rush University Medical Center submitted fee-for-
15 service bills to the Medicare program on account of unsupervised work that residents had
16 performed in the hospitals operating theaters." *Id.* at 934. This conduct allegedly violated the
17 FCA because "Medicare pays teaching hospitals for work by residents (that is, recent graduates
18 still in training) on a fee-for-service basis only when a teaching physician supervises the
19 residents." *Id.* at 933–34. The district court determined the public disclosure bar applied because
20 prior Department of Health and Human Services ("HHS") audits and a General Accounting
21 Office ("GAO") report concluded that "many if not all of the 125 teaching hospitals affiliated
22 with medical schools were billing for unsupervised services that residents performed." *Id.* at 934.
23 On appeal, the relators argued the audits and GAO report "dealt with bills submitted for services
24 that residents had performed all by their lonesome" while their suit, by contrast, alleged that Rush
25 University improperly permitted teaching physicians to supervise multiple operations
26 simultaneously and then sought Medicare reimbursement for all the procedures by certifying that
27 they had all been supervised. *Id.* at 935. The Seventh Circuit agreed with the relators and held
28 the public disclosure bar did not apply because the kind of deceit alleged by the relators —

9

inadequate supervision due to double booking of the teaching physicians — was not "substantially similar" to the prior public disclosures about unsupervised work generally. *Id.*

The second Seventh Circuit case discussed in *Mateski* and cited by Waters is *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818 (7th Cir. 2013). In *Leveski*, a relator brought a *qui tam* suit alleging her former employer, ITT Educational Services, Inc. ("ITT"), illegally based her compensation on the number of students she brought into the for-profit college. *Id.* at 829. The district court dismissed the action under the public disclosure bar, finding that Leveski's allegations were "substantially similar" to a prior suit filed against ITT. *Id.* at 827. The Seventh Circuit reversed, concluding that the district court viewed Leveski's allegations too generally and overlooked four critical differences between Leveski's complaint and the prior action. *Id.* at 829. First, Leveski's decade-long tenure at ITT compared to the two years spent at ITT by the prior relators meant that Leveski likely possessed more evidence about ITT's compensation scheme than the prior relators. *Id.* Second, there was no temporal overlap between Leveski's allegations and the conduct alleged in the prior suit. *Id.* at 829–30. Third, Leveski worked in two different departments — the recruitment office and the financial aid office. *Id.* The prior lawsuit only involved relators who worked in the recruitment office, while Leveski's allegations about the compensation scheme in the financial aid office were entirely new. *Id.* at 830. Lastly, the prior suit alleged a straightforward quota system, while Leveski alleged a more sophisticated scheme where ITT's claimed compensation practices did not match its actual practices. *Id.* at 830–31.

The other Ninth Circuit case bearing on this issue, cited by Defendants, is *Solis*. In *Solis*, a relator brought a *qui tam* suit against his former employers, three pharmaceutical companies. 885 F.3d at 625. Solis promoted the sale of a cardiovascular drug, Integrilin, and an antibiotic drug, Avelox. *Id.* In his complaint, Solis alleged that the pharmaceutical companies promoted dangerous off-label uses of Integrilin and paid kickbacks to physicians to prescribe Integrilin and Avelox. *Id.* The district court dismissed the claims related to Integrilin under the prior disclosure bar because they were "substantially similar" to prior suits. *Id.* at 626.

The Ninth Circuit affirmed the district court on this issue. *Id.* at 626–27. The Ninth Circuit first compared the "combination use claims" in Solis's 2009 complaint to those brought in

10

a 2006 state court complaint by an unrelated plaintiff. *Id.* at 626. In his 2009 complaint, Solis alleged two of the pharmaceutical companies fraudulently promoted the use of Integrilin in combination with the drugs tenecteplase and heparin, which was extremely dangerous and increased bleeding risk. *Id.* By comparison, the 2006 complaint alleged the pharmaceutical companies were negligent in failing to warn physicians about Integrilin's danger of causing intracranial bleeds, failing to warn physicians about the dangers of using Integrilin in combination with tenecteplase and heparin, and marketing Integrilin for use in combination with tenecteplase and heparin. *Id.* The Ninth Circuit held that the allegations from the 2006 complaint were "substantially similar" to Solis's 2009 combination use claims because both sets of allegations pointed to the same actors, the same conduct, and the same risks. *Id.* The court also rejected Solis's argument that he provided 139 more pages of detail than was present in the 2006 complaint. *Id.* at 627. The court explained that much of Solis's complaint amounted to legal boilerplate and Solis failed to explain how the few unique details about the studies "would be material to a government investigation." *Id.* The Ninth Circuit also found that Solis's other "off-label use" and "kickback claims" closely mirrored those in 2007 federal court complaints, even though Solis's claims contained allegations about facts that transpired after the 2007 cases. *Id.* In sum, the court held the prior lawsuits were "close enough in kind and degree to have put the government on notice to investigate the alleged fraud before Solis filed his complaint." *Id.*

         c.  *Analysis*

This case is distinguishable from *Mateski*, *Goldberg*, and *Leveski*. In *Mateski*, the prior disclosures alleged "very general" problems with Raytheon's work in contrast to the relator's suit which alleged specific examples of fraud that were different in "both degree and kind" from the prior disclosures. 816 F.3d at 580. In *Goldberg*, the relators' allegations that residents were inadequately supervised because of double-booked teaching physicians were different in kind than prior public disclosures suggesting that residents were wholly unsupervised. 680 F.3d at 935–36. In *Leveski*, there were four critical differences between the relator's suit and a prior suit, including a lack of temporal overlap and new allegations from the relator about an entirely different compensation scheme used in another department of the college. 719 F.3d at 829–30.

11

1    In contrast to those cases where the prior disclosures were very general and/or
2 significantly different than the relator's allegations, *Vanasco* detailed a specific fraudulent
3 kickback scheme that is "substantially similar" to the scheme alleged by Waters. In *Vanasco*, the
4 relator alleged that starting in 2013, AmSurg: (1) created joint ventures with physicians (similar
5 to the previous arrangement between AHP and the physicians where AHP required anesthesia
6 personnel to assign their billing rights to AHP, paid anesthesia personnel a flat salary for their
7 services, billed the government directly for anesthesia services, and shared the profit with the
8 ASCs in exchange for the exclusive referral of patients); (2) hired anesthesia personnel to provide
9 exclusive services for the ASCs (at a significantly lower rate than the flat salary in effect under
10 the AHP arrangement); (3) collected "significant" profits from the anesthesia service providers;
11 (4) gave a portion of those profits to the physicians as an illegal kickback paid in return for the
12 exclusive use of AmSurg personnel for anesthesia services; and (5) instituted the same or similar
13 scheme with physicians at other surgery centers around the country. (ECF No. 41-3 at 43.) In the
14 instant case, Waters similarly alleges that since at least 2012, Envision, through its AmSurg ASCs
15 nationwide, contracts with anesthesia professionals who are required to sign over their rights to
16 reimbursement and accept a per diem rate far below the anesthesia revenue generated from the
17 insurance reimbursement. (ECF No. 36 at 3.) Waters alleges Envision then kicks back the profit
18 to itself and the co-owner physicians as an inducement for referrals. (*Id.*)

19    Waters argues *Vanasco* did not involve a "lopsided contractor relationship" and did not
20 include information about the extent of revenues retained by AmSurg or how much of that flowed
21 to physicians. (ECF No. 42 at 19.) Waters fails to sufficiently explain why these purported
22 distinctions matter. The major difference between the two cases seems to be that the "In-House
23 Scheme" in *Vanasco* involved AmSurg hiring anesthesia personnel directly onto its payroll, while
24 Waters alleges Envision used outside anesthesia companies (that are allegedly owned by Envision
25 and the physicians) to contract with independent anesthesia professionals. However, based on the
26 current filings, the Court cannot say that this difference is critical.[2] The Court believes that

---

[2] Moreover, as will be discussed, SEC filings disclosed that ASCs sometimes contracted — as opposed to employed — anesthesia professionals.

12

*Vanasco* and the instant action are similar enough to have alerted the Government that Envision/AmSurg uses anesthesia arrangements in which it obtains billing rights of anesthesia personnel in exchange for the exclusive right to provide anesthesia services at AmSurg ASCs, collects the insurance reimbursement for the anesthesia services while paying the anesthesia personnel a much lower flat rate/per diem rate, and then kicks back the profits from the anesthesia services to itself and the physician owners in exchange for referrals.  Although Waters argues *Vanasco* did not provide any information to credit the allegation that the arrangement it described applied to any other locations, he fails to persuade the Court that further information was necessary to put the Government on sufficient notice that Defendants may have implemented a similar scheme at other locations.

In short, the Court concludes that despite some differences, *Vanasco* involves substantially similar actors, conduct, and harm as the instant case and is therefore "close enough in kind and degree to have put the government on notice to investigate the alleged fraud before [Waters] filed his complaint."  *Solis*, 885 F.3d at 627; *see Mateski*, 816 F.3d at 573 ("[T]he publicly disclosed facts need not be identical with, but only substantially similar to, the relator's allegations.").  As such, based on the allegations and information presently before the Court, the Court finds the public disclosure bar applies.

         *ii.*  *SEC Filings*

AmSurg's SEC filings bolster the Court's conclusion that the public disclosure rule applies.  Defendants argue the SEC filings disclosed: (1) AmSurg's ASC revenues included revenues derived from charges for anesthesia services provided by medical professionals "employed or contracted" by the ASCs; (2) the ASCs made distributions to physician owners equal to their percentage ownership interests in the entity; (3) the arrangements did not fall within any statutory or regulatory safe harbor under the Anti-Kickback Statute ("AKS"); and (4) under certain circumstances, these arrangements presented a risk of violating the AKS.  (ECF No. 41-2 at 11–12 (citing ECF No. 41-3 at 4–19).)  Defendants argue Waters's allegations are "substantially similar" to the SEC filings, which the FAC quotes extensively.  (*Id.* at 13 (citing ECF No. 36 at ¶¶ 174–178, 187–188).)  Defendants argue not only are the SEC filings the

13

1  primary basis for Waters's allegation that Defendants employ a nationwide business model for
2  anesthesia arrangements, but Waters also relied on those SEC filings to plead that AmSurg
3  "knew" that the government had expressed concern about sharing anesthesia revenues with
4  referring physicians.  (*Id.* (citing ECF No. 36 at ¶¶ 190–199).)

5  In opposition, Waters argues the SEC filings do not disclose fraud.  (ECF No. 42 at 17.)
6  Waters argues the filings vaguely state CRNAs might be employed or contracted by AmSurg
7  ASCs, but they do not disclose the lopsided terms of the relevant contracts under which
8  Defendant assumed virtually no duties that may be typical of an employer.  (*Id.*)  Waters also
9  argues the filings state AmSurg ASCs enter "arrangements for anesthesia services," but fail to
10 disclose that the anesthesia companies were exclusive providers of anesthesia services for their
11 associated ASCs, or that CRNAs assigned their billing rights to those anesthesia companies.  (*Id.*
12 at 17–18.)  Further, Waters argues the filings vaguely state that AmSurg "derived" revenue from
13 anesthesia services, but do not disclose that AmSurg ASCs and their physician co-owners reaped
14 exorbitant profits (up to 70%) from anesthesia claims, which far exceeded the fair market value of
15 services AmSurg provided to CRNAs.  (*Id.* at 18.)  Lastly, Waters argues far from disclosing
16 fraud, the SEC filings expressly deny it.  (*Id.*)

17 As already discussed at length, *Vanasco* alone is sufficient to trigger the public disclosure
18 bar.  However, the SEC filings provide additional information.  For example, the SEC filings,
19 filed as early as 2012, discuss the operation of AmSurg's ASCs nationwide.  (ECF No. 41-3 at 6.)
20 The filings state that AmSurg's revenue from its ASCs included "charges for anesthesia services
21 provided by medical professionals employed or *contracted*" by the ASCs, which revenue is then
22 shared with the ASCs' owners, including the physician owners.  (*See, e.g.*, ECF No. 41-3 at 10–
23 12 (emphasis added).)  The SEC filings further disclose that — although AmSurg believed its
24 arrangements were legal — some arrangements between ASCs and anesthesia groups risked
25 violating the AKS.  (*Id.* at 13–14.)  These disclosures, read together with *Vanasco*, were sufficient
26 to put the Government on notice to investigate the alleged fraud before Waters filed his
27 complaint.  *See United States v. Cath. Healthcare W.*, 445 F.3d 1147, 1151 n.1 (9th Cir. 2006),
28 a*brogated on other grounds by Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401 (2011)

14

("[T]he elements of the fraud allegation need not have been made public in a single document."); *see also United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 944 (8th Cir. 2017) ("[W]e consider 'public disclosures contained in different sources' as a whole to determine whether they collectively 'provide information that leads to a conclusion of fraud.'") (citation omitted).

### iii. Whether Waters is an Original Source

Having found Waters's allegations are "substantially similar" to publicly disclosed allegations or transactions of fraud, the public disclosure bar applies unless Waters demonstrates he is an original source. *See United States ex rel. Solis v. Millennium Pharms., Inc.*, 445 F. Supp. 3d 786, 795 (E.D. Cal. 2020), *aff'd sub nom. Solis v. Millennium Pharms., Inc.*, 852 F. App'x 298 (9th Cir. 2021) ("Relator bears the burden of establishing that he qualifies as an original source."). An "original source" is defined as "an individual who either (i) prior to a public disclosure under subsection(e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (ii) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

The first prong is not at issue, and the parties only dispute the second prong. Defendants argue none of Waters's allegations materially add to the public disclosures and his allegations about AmSurg's "nationwide business model" are not based on any independent knowledge. (ECF No. 41-2 at 17.) Defendants argue Waters's allegations are based almost entirely on public information, such as AmSurg's website, court pleadings, and SEC filings. (*Id.*) Defendants argue details about Waters's personal compensation, duties, and responsibilities do not materially add to these public disclosures. (*Id.*)

In opposition, Waters argues he is a "whistleblowing insider" with firsthand knowledge from his years of contracting at an AmSurg ASC and is therefore the "paradigmatic original source." (ECF No. 42 at 23.) Waters further argues there is "no doubt" his allegations materially add to information in the public domain and cites various allegations from the FAC to support his position. (*Id.* at 24–25.)

The Court concludes Waters fails to demonstrate that he is an original source. Defendants correctly point out that many of the allegations in the FAC explicitly cite publicly available information, such as AmSurg's website (ECF No. 36 at ¶ 172), court pleadings (*id.* at ¶ 176), and SEC filings (*id.* at ¶ 175). To argue that his allegations materially add to public information, Waters cites the following allegations:

1. He had direct insider knowledge of the kickback schemes because he worked as a CRNA independent contractor at an AmSurg ASC from 2012 to 2020 (ECF No. 36 at ¶ 9);
2. He names the divisions and personnel responsible for implementing the scheme (*id.* at ¶¶ 151–152);
3. He discusses the details of his own contract and alleges that the scheme was implemented nationwide based on his conversations with Defendants' personnel (*id.* at ¶¶ 151–159, 162, 170–171);
4. He alleges facts about CRNAs' pay and Defendants' revenue and argues the arrangement could not possibly represent a fair market value exchange at any AmSurg ASCs (*id.* at ¶¶ 161–168); and
5. He alleges he witnessed the corrupting influence of the kickbacks — over his repeated objections, risky procedures that should have been performed at a hospital were instead performed at the AmSurg ASC (*id.* at ¶¶ 205–208).

Waters also argues that his allegations materially add to the allegations in *Vanasco* because Vanasco stopped working at an AmSurg ASC in early 2016, whereas Waters continued for four more years until 2020. (ECF No. 42 at 25.)

The Court agrees with Defendants that the allegations Waters cites provide nothing more than background information and immaterial details. *See United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*, 656 Fed. App'x 328, 331–32 (9th Cir. 2016) ("Allegations do not materially add to public disclosures when they provide only background information and details relating to the alleged fraud — they must add value to what the government already knew."). For his part, Waters does not engage in a meaningful analysis about how these allegations materially

16

add to the public information about the scheme.  Instead, Waters simply lists the allegations, makes conclusory arguments, and cites a string of district court decisions without any discussion about why the Court should rely on those decisions in the instant case.  (ECF No. 42 at 24–25.)

Waters also fails to persuade the Court that the fact that he worked for AmSurg longer than Vanasco necessarily means Waters qualifies as an original source.  The cases Waters cites do not convince the Court otherwise.  Waters cites *United States v. CVS Pharmacy, Inc.*, No. 2:15-CV-05518-ODW-FFM, 2018 WL 654289, at *5 (C.D. Cal. Jan. 31, 2018).  The district court in *CVS Pharmacy* found that the relator's specific examples of fraud that occurred after a "substantially similar" prior suit had settled was just one of several grounds for finding the relator to be an original source.  *Id.*  In this case, Waters has not shown there are any other grounds for finding him to be an original source.  Waters also cites *Leveski*.  719 F.3d at 830.  As previously discussed, there was "no temporal overlap" between Leveski's suit and the prior suit.  In contrast, there is temporal overlap between the allegations in *Vanasco* and the instant case.

Accordingly, Waters has not shown he is an original source.  Therefore, the Court GRANTS Defendants' motion based on the public disclosure bar.  Although it is unclear whether Waters can cure the deficiencies addressed herein, the Court will give Waters an opportunity to amend based on the liberal standard in favor of granting leave to amend.  *Lopez*, 203 F.3d at 1130.

### IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss with leave to amend.  (ECF No. 41.)  Waters may file an amended complaint not later than thirty (30) days from the electronic filing date of this Order.  Defendant's responsive pleading is due not later than twenty-one (21) days after Waters files an amended complaint.  If Waters opts not to file an amended complaint, the Court will dismiss this action and close the case.

IT IS SO ORDERED.

Date:  March 22, 2023

Troy L. Nunley
United States District Judge